**SUSAN MARTIN (AZ#014226)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone:   (602) 240-6900
smartin@martinbonnett.com
jkroll@martinbonnett.com
Attorneys for Plaintiffs and the proposed Class

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| DOUGLAS N. GAER, Individually and on Behalf of all others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>APOLLO GROUP, INC., JOHN SPERLING, GREGORY W. CAPPELLI, CHARLES B. EDELSTEIN, GREGORY J. IVERSON, JOSEPH L. D'AMICO, and BRIAN L. SWARTZ,<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

This is a federal class action on behalf of purchasers of the common stock of Apollo Group, Inc. ("Apollo" or the "Company") between **December 7, 2009, and August 3, 2010**, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements which defendants knew and/or deliberately disregarded were false and materially misleading at the time of such publication, and which omitted to reveal material information necessary to make

defendants' statements, in light of such material omissions, not materially false and misleading.

**OVERVIEW**

1.      Throughout the Class Period, Apollo purported to provide various "for-profit" educational programs and services at the undergraduate, graduate, and doctoral levels, offering associate's, bachelor's, master's, and doctoral degree programs in arts and sciences, business and management, criminal justice and security, education, human services, health care, psychology, technology, and nursing. The Company operated campus locations and learning centers in 39 states, the District of Columbia, and Puerto Rico, as well as through an online educational delivery system. The Company's flagship school was The University of Phoenix.

2.      Throughout the Class Period, defendants also issued a series of materially false and misleading statements regarding the growth and foreseeable profitability of Apollo. During this time, defendants announced purported strong financial performance and forecasted stable and predictable revenue growth.

3.      However, the positive statements regarding the Company's operational performance and future growth projections made by defendants and contained in the Company's press releases and SEC filings, made throughout the Class Period, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

*       At all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in Apollo's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained.

\*     At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects.

\*     During that time, it was also not true that Apollo contained adequate systems of internal operational or financial controls, such that Apollo's reported operational statements and foreseeable growth prospects were true, accurate or reliable.

\*     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Apollo was operating according to plan, or that Apollo could achieve guidance sponsored and/or endorsed by defendants.

**4.**     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding Apollo's business, operations, management and the intrinsic value of Apollo common stock; (ii) it enabled defendants to artificially inflate the price of Apollo shares; (iii) it enabled Apollo insiders to sell over $46 million dollars of their privately held Apollo shares while in possession of material adverse non-public information about the Company; and (iv) it caused plaintiff and other members of the Class to purchase Apollo common stock at artificially inflated prices.

5.     It was only beginning on August 3, 2010, however, that investors began to learn the truth about Apollo after investors realized that the Company could no longer foreseeably maintain its growth expectations or meet guidance sponsored and endorsed by defendants, and after the General Accounting Office of the United States of America ("GAO") issued a report that concluded that for-profit educational institutions like Apollo had engaged in an illegal and fraudulent course of action designed to recruit students and

over-charge the federal government for the cost of such education. Following these disclosures, shares decline precipitously over just a few trading days – falling almost 10% between August 3 and August 5, 2010, on unusually high trading volume, thereby eradicating over $684.53 million of the Company's market capitalization in only four trading days.

6.     The damages and losses suffered by plaintiff and other class members were a direct result of defendants' fraudulent scheme to artificially inflate the price of Apollo's stock, and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and fraudulent conduct was revealed. The artificial inflation of the Company's shares throughout the Class Period and the dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced below:



## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Apollo maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff **DOUGLAS N. GAER**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Apollo at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant **APOLLO GROUP, INC.,** is an Arizona corporation with its principal place of business at located at 4025 South Riverpoint Parkway, Phoenix, Arizona 85040. According to the Company's profile, throughout the Class Period, Apollo purported to provide various "for-profit" educational programs and services at the undergraduate, graduate, and doctoral levels, offering associate's, bachelor's, master's, and doctoral degree programs in arts and sciences, business and management, criminal justice and security, education, human services, health care, psychology, technology, and nursing. The Company operated campus locations and learning centers in 39 states, the

District of Columbia, and Puerto Rico, as well as through online educational delivery system.

13.     Defendant **JOHN SPERLING** ("Sperling") was, during the relevant period, the Founder and Executive Chairman of the Company. During the Class Period, Sperling assisted in the oversight or preparation of Apollo's SEC filings, including but not limited to Apollo's Form(s) 10-Q. Also during the Class Period, defendant Sperling liquidated over $4 million of his personally held Apollo shares while in possession of material adverse non-public information about the Company.

14.     Defendant **JOSEPH L. D'AMICO** ("D'Amico") was, during the Class Period, President and Chief Operating Officer of the Company. During the Class Period, defendant D'Amico assisted in the preparation and certified the Company's SEC filings, including but not limited to Apollo's Form(s) 10-Q. Also during the Class Period, defendant D'Amico liquidated over $400,000 of his personally held Apollo shares while in possession of material adverse non-public information about the Company.

15.     Defendant **GREGORY W. CAPPELLI** ("Cappelli") was, during the Class Period, Co-Chief Executive Officer and a Director of the Company and Chairman of Apollo Global Inc. During the Class Period, defendant Cappelli assisted in the preparation and certified the Company's SEC filings, including but not limited to Apollo's Form(s) 10-Q. Also during the Class Period, defendant Cappelli liquidated over $500,000 of his personally held Apollo shares while in possession of material adverse non-public information about the Company.

16.     Defendant **CHARLES B. EDELSTEIN** ("Edelstein") was, during the Class

Period, Co-Chief Executive Officer of the Company. During the Class Period, defendant Edelstein assisted in the preparation and certified the Company's SEC filings, including but not limited to Apollo's Form(s) 10-Q.

17.    Defendant **BRIAN L. SWARTZ** ("Swartz") was, during the Class Period, Chief Financial Officer and the Senior Vice President of Finance for the Company. During the Class Period, defendant Swartz assisted in the preparation and signed and certified the Company's SEC filings, including but not limited to Apollo's Form(s) 10-Q.

18.    Defendant **GREGORY J. IVERSON** ("Iverson") was, during the Class Period, Chief Accounting Officer, Vice President and Controller of the Company. During the Class Period, defendant Iverson assisted in the preparation and signed the Company's SEC filings, including but not limited to Apollo's Form(s) 10-Q.

19.    The defendants referenced above in ¶¶13-18 are referred to herein as the "Individual Defendants."

20.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and

shareholder and investor reports and other communications complained of herein and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

21.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market Exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**22.**    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Apollo common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Apollo's business, operations, management and the intrinsic value of Apollo common stock; (ii) enabled defendants to artificially inflate the price of Apollo shares; (iii) enabled Apollo insiders to sell over $46 million dollars of their privately held Apollo shares while in

possession of material adverse non-public information about the Company; and (iv) it caused plaintiff and other members of the Class to purchase Apollo common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Apollo between **December 7, 2009, and August 3, 2010**, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

24. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Apollo common shares were actively traded on the Nasdaq. As of June 17, 2010, the Company had over 147.05 million Class A and 475,000 Class B shares issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Apollo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25. Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A.   whether the federal securities laws were violated by defendants' acts as alleged herein;

B.   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Apollo; and

C.   to what extent the members of the Class have sustained damages and the proper measure of damages.

28.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

29.     On December 7, 2009, the inception of the Class Period, Apollo published a release that announced the purported results of the Company's internal analysis of its student success, in an acknowledgement of the "need to produce greater accountability and transparency."  This release stated, in part, the following

> University of Phoenix Releases Transparent Accounting of Student Outcomes and Previews Programs for Continuous Improvement
>
> Programs for Orientation, a Refined Approach to Introductory Courses and a Just-in-Time Plan for Remediation Designed to Increase Academic Attainment for Nontraditional Students
>
> PHOENIX, Dec 07, 2009 (BUSINESS WIRE) -- In acknowledgement of the need to produce greater accountability and transparency throughout higher education, Apollo Group, Inc. (NASDAQ:APOL) subsidiary University of Phoenix today announced key findings from its second Academic Annual Report, demonstrating the University's continued progress in addressing the challenges facing higher education today and calling for greater understanding of the country's next generation of students, who are increasingly different from generations past. Recognizing the Obama administration's ambitious goals to address the nation's educated workforce shortage and the economic crisis, the Report explores how best to serve the growing contingent of talented, hardworking people who want to better themselves, but find they are shut out of higher education because of their real-life responsibilities - a group that comprises 73 percent of college students today.
>
> *   *   *
>
> In a comparison of findings between its 2008 and 2009 reports, cautioning that two years cannot adequately point to significant trends, University of Phoenix reported slightly higher rates of student satisfaction this year over last. In the area of information literacy, results showed that scores for seniors continued to increase over those reported for freshman at approximately the same rate.
>
> University of Phoenix acknowledged a slight decrease in academic progress and progression, although the overall comparison between its students and their contemporaries was comparable because the variance in scores measured by the standard deviation was much greater than the decrease reported this year. Completion rates for the University showed a slight decline - 1 percentage point for associate, 2 percentage points for baccalaureate and 5 percentage points for graduate - in students graduating within 150 percent of the traditional time for degree completion.

* * *

The University is currently exploring possible reasons for the slight decline in completion rates. Specifically, it is examining the demographics of next-generation learners and how this unique student population learns. Important factors in this analysis will include age, previous academic experience, transfer credits and preference for learning modality.

Continuous Improvement

In response to data gathered to this point, University of Phoenix has determined specific areas to be addressed, with a focus on programs for orientation, a refined approach to introductory courses and a just-in-time plan for remediation. University Orientation, currently in trial with a small sub-set of the University's student population, upon introduction will be a three-week, non-credit bearing, free orientation course required for all students entering with fewer than 24 credits prior to their enrollment with the University. The new program is intended to address the skills necessary to be successful at University of Phoenix, and will introduce new students to the format, expectations and requirements of the environment in which they will be learning.

* * *

From there, it is anticipated that all students entering with fewer than 24 credits will be required to take a customized sequence of courses designed to increase retention and promote success for at-risk students. The First-Year Sequence has been designed in four blocks with the student at the center. Each block will build upon, reinforce and recycle the academic skills introduced in the previous blocks. Course content will be interrelated to reinforce content and skill-building mastered in each course, laddering material taught over multiple courses.

* * *

Lastly and also as part of the First-Year Sequence, University of Phoenix is changing its approach to remediation and instituting a program of integrative learning, which will provide just-in-time skills on a gradual basis. This innovative approach will make learning opportunities available to students throughout their course of study, not just at the beginning and not in an all-in-one, sink-or-swim course.

30.     The "Key Findings" of the Company's internal investigation purported to include, in part, the following:

Academic Proficiency and Progress: University of Phoenix uses the Measure of Academic Proficiency and Progress (MAPP) assessment developed by the Educational Testing Service (ETS) to help measure students' academic proficiency and progress. The MAPP assessment found that, as a group, the University's seniors score at comparable levels - with no significant difference - to students at other institutions in the areas of general education. Importantly, University of Phoenix students, who enter under an open-admissions policy at the undergraduate level, often start out with lower

test scores in the general education areas, but are able to make gains comparable to students at other institutions upon their graduation.

Information Literacy: Using the Standardized Assessment of Information Literacy Skills (SAILS) methodology, University of Phoenix freshmen score as well or better in all but two of the eight areas measured as incoming students at other master's institutions offering at least baccalaureate through graduate level programs. The same is true of the University's seniors, who compare favorably to students at similar institutions in all but two areas measured. Importantly, University of Phoenix seniors score better than its freshmen in each of the literacy competencies measured. The percentage of improvement for the University's freshmen and seniors is comparable to that of the improvement for like groups in the national survey.

Completion Rates: While University of Phoenix's degree completion rate is assessed by the federal government's Integrated Postsecondary Education Data System (IPEDS), as is every other accredited educational institution, the system does a poor job of capturing the nation's next-generation learners, who comprise the majority of the University's student body. IPEDS counts only those students who complete their entire degree program exclusively at one institution - without transferring any credit from another institution - and graduate within 150 percent of the normal completion time. Generally speaking, these conditions exclude most students who do not go directly from high school to college as well as those who work full-time. According to the American Federation of Teachers, "students still enrolled after 150 percent of expected graduation time represent a growing trend in higher education." As such, the number of students who qualify for inclusion in IPEDS decreases each year, particularly in the current economy, where more students cannot afford to continue their educations uninterrupted. University of Phoenix's completion rates for associate degrees is 26 percent for those students graduating in three years and 31 percent for students who take more than three years to complete. For bachelor's degrees, the University's completion rate is 36 percent for those students who graduate in six years and 39 percent for students who take more than six years to complete. At the graduate level, University of Phoenix's completion rate is 55 percent for students who graduate in three years and 63 percent for students who require more than 3 years to complete.

Average Salary Increases: Many University of Phoenix students are employed full-time while enrolled. As a result, the University's students do not forfeit wages during the time they are earning their degrees and, in fact, many experience wage increases that are above the national average salary increase for the same time period. Students enrolled in University of Phoenix's bachelor's degree programs in 2008 earned an average annual salary increase of 8.5 percent compared to the 2008 national average of 3.8 percent. At the master's level during the same time period, enrolled students earned an average annual salary increase of 9.7 percent compared to a 2008 national average of 3.8 percent. In addition, an analysis of public costs for higher education conducted by University of Phoenix demonstrated that the University actually pays back approximately $140 per student to the community as opposed to public and private not-for-profit institutions, which receive sizable public financing.

Diversity: University of Phoenix's student body is more diverse than those found at traditional universities. Thirty percent of the University's students are African American, compared to a national average of 13 percent.

Additionally, females make up 67 percent of undergraduate student enrollment at University of Phoenix, compared to 57 percent nationally.

Student Satisfaction: Student satisfaction, while not an academic measure, provides insight into how best holistically to meet the needs of this new majority population. University of Phoenix student satisfaction surveys over the last year showed that students rate all categories well above average, ranging from 91-96 percent satisfied. The University also uses an external measure of student satisfaction, the National Survey of Student Engagement (NSSE). In each of the ten relevant categories polled, students rate the support and instruction at University of Phoenix higher than the national average response rating, with the highest rating going for institutional contribution to their knowledge in the area of "thinking critically and analytically."
Comparisons

31.     The December 7, 2009 release also quoted William Pepicello, President of

the University of Phoenix, in part, as follows:

"These nontraditional students represent the next generation of learners," said Dr. William J. Pepicello, president of University of Phoenix. "They are not just our students, they are America's students. Understanding their needs and motivations and what systems will be necessary to serve them is critical if we, as a nation, are to produce the highest proportion of college graduates in the world by 2020."

"In areas where comparisons can be made and declines were found - no matter how slight - University of Phoenix has initiated thoughtful and critical analysis as to the possible reasons for the changes and developed programs for continuous improvement," said Pepicello.

*   *   *

"The orientation program will encourage prospective students to take personal responsibility for their learning and help them make informed decisions about whether this is the type of institution they wish to attend and if they are ready to do so," said Pepicello. "It will afford prospective students the opportunity to experience the rigors of the college classroom without financial burden, so that those who discover they are not ready will not incur debt."

*   *   *

"In this way, it is expected that students will learn and retain more information than if they were learning everything in one course, without a grounding context," explained Pepicello.

*   *   *

"We are changing remedial education to work for all students when they need it and without sacrificing their appropriate academic progression," said Pepicello.

32.    These were not the only statements that the Company made in early December 2009 that reflected on the purported improvement of Apollo's systems of internal controls and its school procedures. On December 14, 2009, when the Company announced a $67.5 million payment, plus attorney fees, to settle a False Claims Act case against Phoenix University, defendants published a release that stated, in part, the following:

> Apollo Group, Inc. Resolves University of Phoenix False Claims Act Case
> Agreement Provides for $67.5 Million Payment, Plus Attorneys Fees
>
> PHOENIX--(BUSINESS WIRE)--Dec. 14, 2009-- Apollo Group, Inc. (NASDAQ: APOL) (the "Company") today announced that it has entered into an agreement with the United States of America, acting through the U.S. Attorney's Office for the Eastern District of California and the U.S. Department of Justice on behalf of the U.S. Department of Education, and with two private plaintiffs to resolve the False Claims Act lawsuit filed in 2003 against subsidiary University of Phoenix, United States of America ex rel. Mary Hendow and Julie Albertson v. University of Phoenix. Although a party to the agreement, the U.S. Department of Justice at no time intervened in the lawsuit, which was pursued by the two private plaintiffs as a qui tam action on behalf of the government. Under the terms of the agreement, the Company will pay $67.5 million to the United States. A separate agreement provides for the payment by the Company of $11 million in attorneys fees to the plaintiffs, as required by the False Claims Act.
>
> * * *
>
> The agreement makes clear that the Company does not acknowledge, admit or concede any liability, wrongdoing, noncompliance or violation as a result of the settlement. Moreover, the Company is confident it will not face any further civil or administrative exposure relating to its compliance with the Higher Education Act provision relating to incentive compensation for the period of March 1997 through the present as a result of the various releases and related agreements it has obtained from the U.S. Department of Education, U.S. Department of Justice and the plaintiffs.
>
> * * *
>
> About the Litigation
>
> Under the False Claims Act, plaintiffs – or relators – sue as "partial assignees" of the government's claims for alleged injuries to the government. The False Claims Act lawsuit against University of Phoenix was filed by two private plaintiffs in March 2003 in United States District Court for the Eastern District of California, Sacramento Division. The suit alleged University of Phoenix violated a federal statute and regulation stating that while recruiters may be compensated based in part on the number of students they enroll, it cannot be the sole factor for determining

their compensation.

33.     The December 14, 2009 release also quoted defendant Edelstein, Cappelli and other officers of the Company, in part, as follows:

"This agreement not only brings closure to a long-running dispute and enables the Company to avoid the uncertainty and further expense associated with protracted litigation, it opens the door for a more constructive partnership with our lead regulator, the U.S. Department of Education," said Charles B. Edelstein, co-chief executive officer of Apollo Group.

"Apollo Group is committed to rigorous regulatory and compliance systems to serve and protect the academic innovations for which we are known," added Gregory Cappelli, co-chief executive officer of Apollo Group and chairman of Apollo Global, Inc. "Resolution enables us to focus on our core mission of providing access to quality higher education opportunities for students who have been historically underserved by the conventional system of higher education – and at a time when such access is more critical than ever."

*   *   *

"While we believe that the compensation practices and programs of University of Phoenix have always complied fully with applicable federal laws and regulations, the regulations at issue in this case were unclear and inconsistent and, even after they were clarified by Safe Harbor provisions, involved complex judgments and interpretations," said P. Robert Moya, executive vice president, general counsel and secretary of Apollo Group. "Settlement on these terms eliminates the risks inherent in taking any case to trial and, ultimately, is in the best interests of our students, employees and shareholders."

34.     The positive statements regarding the Company's operational performance and the remedial actions taken to strengthen Apollo's operational controls, and the statements regarding the sufficiency and effectiveness of those controls and procedures, contained the Company's December 7, 2009, and December 14, 2009, press releases, were each materially false and misleading when made and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

At all times during the Class Period, it was not true that the Company's

purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in Apollo's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained;

(ii)    At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects;

(iii)    During that time, it was also not true that Apollo contained adequate systems of internal operational or financial controls, such that Apollo's reported operational statements and foreseeable growth prospects were true, accurate or reliable; and

(iv)    As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Apollo was operating according to plan, or that Apollo could achieve guidance sponsored and/or endorsed by defendants.

35.    **Fiscal 1Q:10 Results**. On January 7, 2010, Apollo published a release announcing results for the fiscal first quarter ended November 30, 2009. This release also stated, in part, the following:

Apollo Group, Inc. Reports Fiscal 2010 First Quarter Results

PHOENIX, Jan 07, 2010 (BUSINESS WIRE) -- Apollo Group, Inc. (NASDAQ: APOL) ("Apollo Group," "Apollo" or the "Company") today reported financial results for the three months ended November 30, 2009.

* * *

Unaudited First Quarter of Fiscal 2010 Results of Operations

1
2
3
4
5
6

> Consolidated net revenue for the three months ended November 30, 2009, totaled $1,270.3 million, which represents a 30.8% increase over the first quarter of fiscal 2009. Contributing to the growth in the first quarter was an 18.4% year-over-year increase in University of Phoenix total Degreed Enrollment to 455,600 as well as $88.7 million in revenue from recently acquired BPP Holdings. The Company reported net income attributable to Apollo Group for the three months ended November 30, 2009, of $240.1 million, or $1.54 per share (156.0 million weighted average diluted shares outstanding), compared to net income attributable to Apollo Group of $180.4 million, or $1.12 per share (160.8 million weighted average diluted shares outstanding) for the three months ended November 30, 2008.

7
8
9

36.     In addition to the foregoing, the Company's January 7, 2010, release also quoted defendants Cappelli and Edelstein, in part, as follows:

10
11
12
13

> "We are pleased with our first quarter results and continued enrollment growth, particularly among our core bachelor's programs," said Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli. "We remain committed to providing access to high-quality education, while ensuring that only students who have a reasonable chance to succeed enroll in our institutions."

14
15
16

> Apollo Group Co-Chief Executive Officer Chas Edelstein, added, "We have recently received an important recertification of University of Phoenix's Program Participation Agreement and have successfully resolved some significant uncertainties. In addition, University of Phoenix published its second Academic Annual Report, demonstrating our commitment to championing accountability and transparency in academics."

17
18
19

37.     The January 7, 2010, release also stated that the Company had successfully completed the U.S. Department of Education Program Review, as follows:

20
21
22
23
24
25

> On December 31, 2009, University of Phoenix received the Department of Education's Program Review Report, which is a preliminary report of the Department's findings from its February 2009 program review of University of Phoenix's policies and procedures involving Title IV programs. The report contains six findings and one concern. The Company believes its liability resulting from the findings will be approximately $1.5 million. In addition, the Department's regulations require certain institutions to post a letter of credit where a preliminary program review report cites untimely return of unearned Title IV funds for more than 10% of the sampled students. Absent relief from this requirement, the University of Phoenix will be required to post by January 30, 2010, a letter of credit in the amount of approximately $125 million.

26
27
28

38.     **1Q:10 Form 10-Q.** The same day, January 7, 2010, defendants also filed with the SEC the Company's 1Q:10 Form 10-Q, for the quarter ended November 30,

---

2010, signed by defendants Iverson and Swartz and certified by defendants Edelstein, Cappelli and Swartz. The Company's 1Q:10 Form 10-Q stated, in part, the following:

**Basis of Presentation**

The unaudited interim condensed consolidated financial statements include the accounts of Apollo Group, Inc., its wholly-owned subsidiaries, and subsidiaries that we control. These unaudited interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the U.S. Securities and Exchange Commission and, in the opinion of management, contain all adjustments necessary to fairly present the financial condition, results of operations and cash flows for the periods presented.

Certain information and note disclosures normally included in these unaudited interim condensed consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted pursuant to Securities and Exchange Commission rules. We believe that the disclosures made are adequate to make the information presented not misleading….

39.     **Controls & Procedures**. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 1Q:10 Form 10-Q also provided statements concerning the Company's purported Controls and Disclosure Procedures, in part, as follows:

Item 4. Controls and Procedures

Disclosure Controls and Procedures

We intend to maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods and accumulated and communicated to our management, including our Co-Chief Executive Officers ("Principal Executive Officers") and our Senior Vice President, Chief Financial Officer and Treasurer ("Principal Financial Officer"), as appropriate, to allow timely decisions regarding required disclosure. We have established a Disclosure Committee, consisting of certain members of management, to assist in this evaluation. Our Disclosure Committee meets on a quarterly basis and more often if necessary.

Our management, under the supervision and with the participation of our Principal Executive Officers and Principal Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act), as of the end of the period covered by this report. Based on that evaluation, management concluded that, as of that date, our disclosure controls and

procedures were effective at the reasonable assurance level.

\* \* \*

Changes in Internal Control over Financial Reporting

Subject to BPP's internal control over financial reporting as discussed above, there have not been any changes in our internal control over financial reporting during the quarter ended November 30, 2009, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

40.  **Certifications.** The Company's 1Q:10 Form 10-Q also contained certifications by defendants Edelstein, Cappelli, and Swartz, that again attested to the purported accuracy and completeness of its disclosures, in part, as follows:

### CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

1.    I have reviewed this Form 10-Q of Apollo Group, Inc. (the "registrant");

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and

procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 7, 2010
/s/ Charles B. Edelstein
Charles B. Edelstein
Co-Chief Executive Officer and Director
(Principal Executive Officer)

*   *   *

Date: January 7, 2010
/s/ Gregory W. Cappelli
Gregory W. Cappelli
Co-Chief Executive Officer and Director
(Principal Executive Officer)

*   *   *

Date: January 7, 2010
/s/ Brian L. Swartz
Brian L. Swartz
Senior Vice President, Chief Financial Officer and Treasurer
(Principal Financial Officer)

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended November 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles B. Edelstein, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant

to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: January 7, 2010
/s/ Charles B. Edelstein
Charles B. Edelstein
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended November 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gregory W. Cappelli, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: January 7, 2010
/s/ Gregory W. Cappelli
Gregory W. Cappelli
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended November 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian L. Swartz, Senior Vice President, Chief Financial Officer and Treasurer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material

respects, the financial condition and results of operations of the Company.

Date: January 7, 2010
/s/ Brian L. Swartz
Brian L. Swartz
Senior Vice President, Chief Financial Officer and Treasurer
(Principal Financial Officer)

41.     The statements contained in Apollo's January 7, 2010, release and those statements contained in the Company's 1Q:10 Form 10-Q, referenced above were each materially false and misleading when made, and were known by defendants to be false at that time or were deliberately disregarded as such thereby, for the reasons stated herein in ¶34, *supra*.

42.     **2Q:10 Quarterly Pre-announcement.**   On February 19, 2010, Apollo published a release pre-announcing results for the fiscal second quarter. This release also stated, in part, the following:

> Apollo Group, Inc. Announces Timing of Fiscal 2010 Second Quarter Earnings Release and Provides Preliminary Commentary on Fiscal 2010 Second Quarter Results

> Board of Directors Increases Share Repurchase Authorization by $500 Million

> PHOENIX, Feb 19, 2010 (BUSINESS WIRE) -- Apollo Group, Inc. (NASDAQ: APOL) ("Apollo Group," "Apollo" or the "Company") today announced details for its fiscal 2010 second quarter earnings conference call. In addition, in anticipation of its participation at investor conferences on February 22 and 24, 2010, the Company provided preliminary comments on its second quarter of fiscal 2010 financial results.

> Preliminary Fiscal 2010 Second Quarter Results

> The Company currently expects consolidated net revenue from continuing operations for the second quarter of fiscal 2010 of approximately $1.07 billion and diluted earnings per share from continuing operations of between $0.77-$0.82. Excluded from these amounts are results from Insight Schools, which the Company expects will be reported as a discontinued operation beginning with the fiscal second quarter.

43.     In addition to the foregoing, the Company's February 19, 2010, release also quoted defendants Cappelli and Edelstein, in part, as follows:

"Current bad debt levels are higher than we would like; however, we are taking the necessary steps to reverse current trends," said Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli. "Importantly, as we outlined on our last earnings call, we continue to transition the business in an effort to shift our student mix towards bachelors and graduate programs, and believe over time this will have many positive effects on the business, including reducing bad debt expense. While we are still in the early phases of these efforts, we are pleased with the initial results, particularly the continued strong enrollment in our bachelor programs."

Apollo Group Co-Chief Executive Officer Chas Edelstein added, "Apollo Group remains dedicated to providing access to high-quality education and has recently taken additional steps to ensure that only students who are committed to the program and have a reasonable chance to succeed enroll in our institutions. Importantly, we want to help students make this determination prior to burdening themselves with debt. We believe we can accomplish these goals while achieving our long-term internal growth targets."

44.    **Investor Presentations.** As shares of the Company continued to trade at levels artificially inflated by defendants' materially false and misleading statements, in late-February 2010 defendants appeared at two investor conferences, where they reiterated many of the same or similar materially false and misleading statements as had been published in the Company's prior press releases and SEC filings. Accordingly, on February 22, 2010, defendant Edelstein and Cappelli appeared at the Credit Suisse 12th Annual Global Services Conference at the Arizona Biltmore Resort & Spa in Phoenix, AZ, and on February 24, 2010, they appeared at the Robert W. Baird Business Solutions Conference, held at the Four Seasons Hotel Boston in Boston, MA.

45.    **2Q:10 Results Announced.**   On March 29, 2010, Apollo published a release announcing results for the fiscal second quarter, the period ended February 28, 2010. This release also stated, in part, the following:

Apollo Group, Inc. Reports Fiscal 2010 Second Quarter Results

PHOENIX, Mar 29, 2010 (BUSINESS WIRE) --Apollo Group, Inc. (NASDAQ:APOL) ("Apollo Group," "Apollo" or the "Company") today reported financial results for the three and six months ended February 28,

2010.

* * *

Unaudited Second Quarter of Fiscal 2010 Results of Operations

Consolidated net revenue for the three months ended February 28, 2010, totaled $1,070.3 million, which represents a 23.1% increase over the second quarter of fiscal 2009. Contributing to the growth in the second quarter was a 15.3% year-over-year increase in University of Phoenix total Degreed Enrollment to 458,600 as well as $53.6 million in revenue from recently acquired BPP Holdings. The Company reported income from continuing operations attributable to Apollo Group for the three months ended February 28, 2010, of $103.2 million, or $0.67 per share (155.2 million weighted average diluted shares outstanding), compared to income from continuing operations attributable to Apollo Group of $128.8 million, or $0.79 per share (162.8 million weighted average diluted shares outstanding) for the three months ended February 28, 2009.

46.     In addition to the foregoing, the Company's March 29, 2010, release also quoted defendants Cappelli and Edelstein, in part, as follows:

"We are pleased with our second quarter results, particularly with respect to the continued mix shift in student enrollments towards bachelor degree level students," said Apollo Group Co-Chief Executive Officer Chas Edelstein. "We have set forth a strategy to transition the University of Phoenix to focus on better identifying and enrolling students who have a reasonable chance to succeed in our rigorous programs, and we are delivering on that plan."

Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli added, "Through our refined marketing efforts focused on identifying students who are better prepared for our programs, as well as the positive early results we are seeing from our University Orientation pilot, we are beginning to see the shift in student mix that we have been targeting, which we believe over time will result in more consistent, higher quality growth and profitability and will positively impact a number of our key metrics."

47.     The Company's March 29, 2010, release also provided purported forward guidance, in part, as follows:

Business Outlook

Given the transition it is undertaking in its business, the Company offers the following commentary regarding the outlook for the third quarter of fiscal 2010 based on current business trends, which could change:

Consolidated net revenue, including BPP, of approximately $1.3 billion;

Diluted earnings per share from continuing operations of approximately $1.55 excluding the impact of special items or additional share repurchases but including a contribution from BPP;

Effective tax rate of approximately 41.0%; and

Diluted shares outstanding of approximately 153 million.

Based on current business trends, for the fiscal year 2010, the Company should achieve its long-term target of mid-teens operating income growth, excluding the impact of special items and discontinued operations.

48.     **2Q:10 Form 10-Q.** On March 29, 2010, defendants also filed with the SEC the Company's 2Q:10 Form 10-Q, for the quarter ended February 28, 2010, signed by defendants Iverson and Swartz and certified by defendants Edelstein, Cappelli and Swartz. The Company's 2Q:10 Form 10-Q stated, in part, the following:

**Basis of Presentation**

The unaudited interim condensed consolidated financial statements include the accounts of Apollo Group, Inc., its wholly-owned subsidiaries, and subsidiaries that we control. These unaudited interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the U.S. Securities and Exchange Commission and, in the opinion of management, contain all adjustments necessary to fairly present the financial condition, results of operations and cash flows for the periods presented.

Certain information and note disclosures normally included in these unaudited interim condensed consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted pursuant to Securities and Exchange Commission rules. We believe that the disclosures made are adequate to make the information presented not misleading….

49.     **Controls & Procedures**. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 2Q:10 Form 10-Q also provided statements concerning the Company's purported Controls and Disclosure Procedures, in part, as follows:

Item 4. Controls and Procedures

Disclosure Controls and Procedures

We intend to maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time

periods and accumulated and communicated to our management, including our Co-Chief Executive Officers ("Principal Executive Officers") and our Senior Vice President and Chief Financial Officer ("Principal Financial Officer"), as appropriate, to allow timely decisions regarding required disclosure. We have established a Disclosure Committee, consisting of certain members of management, to assist in this evaluation. Our Disclosure Committee meets on a quarterly basis and more often if necessary.

Our management, under the supervision and with the participation of our Principal Executive Officers and Principal Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act), as of the end of the period covered by this report. Based on that evaluation, management concluded that, as of that date, our disclosure controls and procedures were effective at the reasonable assurance level.

Attached as exhibits to this Quarterly Report on Form 10-Q are certifications of our Principal Executive Officers and Principal Financial Officer, which are required in accordance with Rule 13a-14 of the Securities Exchange Act. This Disclosure Controls and Procedures section includes information concerning management's evaluation of disclosure controls and procedures referred to in those certifications and, as such, should be read in conjunction with the certifications of our Principal Executive Officers and Principal Financial Officer.

Changes in Internal Control over Financial Reporting

\* \* \*

Subject to BPP's internal control over financial reporting as discussed above, there have not been any changes in our internal control over financial reporting during the quarter ended February 28, 2010, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

50. **Certifications.** The Company's 2Q:10 Form 10-Q also contained certifications by defendants Edelstein, Cappelli and Swartz, that again attested to the purported accuracy and completeness of its disclosures, in part, as follows:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended February 28, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles B. Edelstein, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or

15(d) of the Securities Exchange Act of 1934; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 29, 2010
/s/ Charles B. Edelstein
Charles B. Edelstein
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended February 28, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gregory W. Cappelli, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 29, 2010
/s/ Gregory W. Cappelli
Gregory W. Cappelli
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended February 28, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian L. Swartz, Senior Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 29, 2010

/s/ Brian L. Swartz
Brian L. Swartz
Senior Vice President and Chief Financial Officer
(Principal Financial Officer)

51.     The statements contained in Apollo's February 19, 2010, and March 29, 2010, releases, as well as those statements made by defendants at the February 22, 2010, and February 24, 2010, analyst and investor conferences, and those statements contained in the Company's 2Q:10 Form 10-Q, referenced above were each materially false and misleading when made, and were known by defendants to be false at that time or were deliberately disregarded as such thereby, for the reasons stated herein in ¶34, *supra*.

52.     **Investor Presentations.** As shares of the Company continued to trade at levels artificially inflated by defendants' materially false and misleading statements, during May and June 2010 defendants appeared at two investor conferences, where they reiterated many of the same or similar materially false and misleading statements as had been published in the Company's prior press releases and SEC filings. Accordingly, on May 24 - 26, 2010, defendants Edelstein and Cappelli appeared and presented at the Bank of America Merrill Lynch Services Conference at the Millennium Broadway Hotel in New York, N.Y., and on June 15-17, 2010, they appeared and presented at the 30th Annual William Blair Growth Stock Conference at the Four Seasons Hotel in Chicago, Ill.

53.     On June 21, 2010, Apollo published a release that announced that the Company had received a final program review determination letter from the U.S. Department of Education. This release stated, in part, the following:

PHOENIX, Jun 21, 2010 (BUSINESS WIRE) --Apollo Group, Inc. (NASDAQ:APOL) today announced that subsidiary University of Phoenix has received the Final Program Review Determination Letter associated with its February 2009 program review by the U.S. Department of Education

(Department) and that the University has successfully completed the corrective actions and satisfied the obligations arising from the review.

"We are pleased to have successfully resolved the findings reported by the Department through a collaborative and productive process," said Joseph L. D'Amico, president and chief operating officer of Apollo Group, Inc. "In so doing, we have adopted a series of processes and procedures to further strengthen our already rigorous internal controls and administrative capability."

As required, Apollo has posted a Letter of Credit in the amount of approximately $125 million to comply with the Department's standards of financial responsibility. The Department's regulations require institutions to post a Letter of Credit where a program review report cites untimely return of unearned Title IV funds for more than 10 percent of the sampled students in a period covered by the review.

Of the six findings contained in the Final Program Review Determination Letter, three related to University of Phoenix's procedures for determining student withdrawal dates and associated timing of the return of unearned Title IV funds, which averaged no more than six days outside the required timeframe in the affected sample files. Importantly, there were no findings that indicated incorrect amounts of Title IV funds had been returned. In the second quarter of fiscal year 2010, Apollo made payments totaling $660,000 to reimburse the Department for the cost of Title IV funds associated with these findings.

The remaining findings involved isolated clerical errors verifying student-supplied information and, as self-reported by University of Phoenix in 2008, the calculation of student financial need where students were eligible for tuition and fee waivers and discounts, and the use of Title IV funds for non-program purposes such as transcripts, applications and late fees.

54.     **3Q:10 Results Announced.**   On June 30, 2010, Apollo published a release announcing results for the fiscal third quarter, the period ended May 31, 2010. This release also stated, in part, the following:

Apollo Group, Inc. Reports Fiscal 2010 Third Quarter Results

PHOENIX, Jun 30, 2010 (BUSINESS WIRE) --

Apollo Group, Inc. (NASDAQ: APOL) ("Apollo Group," "Apollo" or the "Company") today reported financial results for the three and nine months ended May 31, 2010.

\* \* \*

Unaudited Third Quarter of Fiscal 2010 Results of Operations

Consolidated net revenue for the three months ended May 31, 2010, totaled $1,337.4 million, which represents a 27.7% increase over the third quarter of fiscal 2009. Contributing to the growth in the third quarter was a 13.3% year-

over-year increase in University of Phoenix total Degreed Enrollment to 476,500, as well as $75.8 million in net revenue from BPP Holdings, which was acquired in the fourth quarter of fiscal 2009. The Company reported income from continuing operations attributable to Apollo Group for the three months ended May 31, 2010, of $177.2 million, or $1.16 per share (152.3 million weighted average diluted shares outstanding), compared to income from continuing operations attributable to Apollo Group of $206.4 million, or $1.30 per share (159.3 million weighted average diluted shares outstanding) for the three months ended May 31, 2009.

55.   In addition to the foregoing, the Company's June 30, 2010, release also quoted defendants Cappelli and Edelstein, in part, as follows:

"We are pleased to have made significant progress on our strategic initiatives designed to enhance the student experience, expand student protections and ensure we enroll students who we believe can succeed in our programs," said Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli. "This quarter's results reflect continued success with our efforts to shift the mix of our enrollments toward bachelor level students. Additionally, based on the favorable results we've seen from our University Orientation pilot, we have decided to roll out the program more broadly this fall. We are confident that this is the right thing to do for our students, and believe it will allow us to deliver sustainable, high quality results over the long term."

Apollo Group Co-Chief Executive Officer Chas Edelstein added, "We are committed to strengthening and capitalizing on Apollo Group's position as a leading provider of high quality, accessible education for individuals around the world, and for us that means putting the student first. We are focused on delivering quality academic programs that are relevant to today's working learners, and providing them with high levels of service and support from their first day in class through graduation--all of which should maximize the value of our students' return on their educational investment."

56.   The Company's June 30, 2010, release also provided purported forward guidance, in part, as follows:

Business Outlook

The Company offers the following commentary regarding the outlook for the fourth quarter of fiscal 2010 based on current business trends, which could change:

Consolidated net revenue, including BPP, of approximately $1.25 billion;

Diluted earnings per share from continuing operations of approximately $1.30, excluding the impact of special items or additional share repurchases beyond the repurchases noted above subsequent to quarter end, but including an adverse seasonal impact from BPP;

Effective tax rate of approximately 40.0%; and

Diluted shares outstanding of approximately 148 million.

In addition, the Company has been piloting its University Orientation program, which is a free three-week, non-credit bearing program for new students enrolling at University of Phoenix with fewer than 24 credit hours. The Company currently intends to require all incoming students with fewer than 24 credit hours to participate in the orientation program beginning during the latter half of the first quarter of fiscal 2011, which will adversely impact the Company's operating metrics and financial results. Based on current business trends, which could change, and the results of the initial pilot orientation program, the Company offers the following commentary regarding its preliminary outlook for the fiscal year 2011:

High-single digit consolidated net revenue growth; and

Operating income, excluding the impact of special items, approximately flat with fiscal year 2010.

57.    **3Q:10 Form 10-Q.** On June 30, 2010, defendants also filed with the SEC the Company's 3Q:10 Form 10-Q, for the quarter ended May 31, 2010, signed by defendants Iverson and Swartz and certified by defendants Edelstein, Cappelli and Swartz. The Company's 3Q:10 Form 10-Q stated, in part, the following:

**Basis of Presentation**

The unaudited interim condensed consolidated financial statements include the accounts of Apollo Group, Inc., its wholly-owned subsidiaries, and subsidiaries that we control. These unaudited interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the U.S. Securities and Exchange Commission and, in the opinion of management, contain all adjustments, consisting of normal, recurring adjustments, necessary to fairly present the financial condition, results of operations and cash flows for the periods presented.

Certain information and note disclosures normally included in these unaudited interim condensed consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted pursuant to Securities and Exchange Commission rules. We believe that the disclosures made are adequate to make the information presented not misleading….

58.    **Controls & Procedures**. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 3Q:10 Form 10-Q also provided statements concerning the Company's purported Controls and Disclosure Procedures, in part, as follows:

Item 4. Controls and Procedures

Disclosure Controls and Procedures

We intend to maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods and accumulated and communicated to our management, including our Co-Chief Executive Officers ("Principal Executive Officers") and our Senior Vice President and Chief Financial Officer ("Principal Financial Officer"), as appropriate, to allow timely decisions regarding required disclosure. We have established a Disclosure Committee, consisting of certain members of management, to assist in this evaluation. Our Disclosure Committee meets on a quarterly basis and more often if necessary.

Our management, under the supervision and with the participation of our Principal Executive Officers and Principal Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act), as of the end of the period covered by this report. Based on that evaluation, management concluded that, as of that date, our disclosure controls and procedures were effective at the reasonable assurance level.

\* \* \*

Changes in Internal Control over Financial Reporting

\* \* \*

Subject to BPP's internal control over financial reporting as discussed above, there have not been any changes in our internal control over financial reporting during the quarter ended May 31, 2010, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

59.    **Certifications.**  The Company's 3Q:10 Form 10-Q also contained certifications by defendants Edelstein, Cappelli and Swartz, that again attested to the purported accuracy and completeness of its disclosures, in part, as follows:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended May 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles B. Edelstein, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.
Date: June 30, 2010

/s/ Charles B. Edelstein
Charles B. Edelstein
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended May 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gregory W. Cappelli, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 30, 2010
/s/ Gregory W. Cappelli
Gregory W. Cappelli
Co-Chief Executive Officer and Director
(Principal Executive Officer)

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended May 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian L. Swartz, Senior Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 30, 2010
/s/ Brian L. Swartz
Brian L. Swartz
Senior Vice President and Chief Financial Officer
(Principal Financial Officer)

60.     The statements contained in Apollo's June 21, 2010, release, as well as those statements made by defendants at the May 24 - 26, 2010, and June 15-17, 2010, analyst and investor conferences, and those statements contained in the Company's 3Q:10 Form 10-Q, referenced above were each materially false and misleading when made, and were known by defendants to be false at that time or were deliberately disregarded as such thereby, for the reasons stated herein in ¶34, *supra*.

## **THE TRUE OPERATIONAL CONDITION**
## **OF APOLLO IS BELATEDLY REVEALED**

61.     Beginning on August 3, 2010, reports began to circulate that questioned the legitimacy of the means by which for-profit education providers, such as the Company, recruited students. While no names were initially provided, that day, the United States Government Accounting Office (the "GAO") published a report finding that: (i) certain for-profit schools used deceptive recruiting practices; (ii) certain for-profit schools substantially inflated their tuition costs; and (iii) certain for-profit schools engaged in other "troubling" practices. Accordingly, that day, Reuters reported, in part, the following:

> WASHINGTON, Aug 3 (Reuters) - U.S. government investigators found that for-profit colleges encouraged fraudulent practices and made deceptive statements to prospective students, according to a study released on Tuesday.
>
> Investigators from the Government Accountability Office posed as students and applied for admission at 15 for-profit colleges across the United States. School personnel encouraged GAO staff to falsify financial aid forms, misled them about costs and gave false information about accreditation.
>
> * * *
>
> GAO's investigators also found that tuition at the for-profit colleges was

"substantially more" than for comparable programs at nearby public colleges, but often misled prospective students about total costs.

The study found that a massage therapy program certificate cost $14,000 at a for-profit college but was just $520 at a local community college.

The Career College Association, an organization of mostly for-profit occupational colleges, said in a statement that the GAO report "is deeply troubling" and vowed to strengthen its members' compliance with regulations.

* * *

Investigators found that on average, tuition for an associate's degree was between 6 and 13 times as much at a for-profit school than at a nearby public college. The average of the for-profit schools investigated was $33,467, compared to just over $4,000 for public schools.

A bachelor's degree at a for-profit college averaged $55,000, almost twice as expensive as local public institutions.

* * *

The GAO findings add to pressure the industry, which has already faced a crackdown by the Obama administration.

The U.S. Department of Education proposed rules on July 22 that would force for-profit schools to show their former students are either paying off their loans or are capable of doing so.

62.     Later, on August 3, 2010, Barron's reported that the GAO report had been leaked to the press. That day, Barrons reported, in part, the following:

For-Profit Stocks Marked Down on Leaked GAO Report

For-profit college shares are being moved to the back of the class after a Government Accountability Office report accused some of deceptive marketing and encouraging fraud.

Education Management (EDMC) is off 6% at a 52-week low; Apollo Group (APOL) is off 4% and Corinthian Colleges (COCO) was off 2%.

The GAO report, which was leaked ahead of a hearing Wednesday before the Senate Committee on Health, Education, Labor and Pensions, said four undercover applicants were encouraged by college personnel to falsify their financial aid forms to qualify for federal aid, while other college representatives exaggerated potential salaries after graduation and failed to provide clear information about program duration, costs, or graduation rate despite federal regulations requiring them to do so, according to Dow Jones Newswires.

The for-profit stocks have been under pressure as a result of criticism, such as from hedge fund manager Steve Eisman, who said in May they are morally akin to the subprime mortgage market, DJ added.

63.     That same day, August 3, 2010, CNBC reported, in part, the following:

For Profit Education Gets 'F'

Shares of for-profit education companies tumbled Tuesday after a government report prepared ahead of a Senate hearing scheduled for Wednesday detailed deceptive -- and in some cases -- possibly illegal actions, by recruiters at 15 for-profit schools.

The Government Accountability Office's report, which was obtained by The Associated Press, said enrollment counselors allegedly encouraged investigators posing as potential students to falsify financial aid applications, and misled them about the cost of programs and potential salaries after graduation.

Tomorrow's Trades - Capital Ideas Into Year's End

No publicly traded companies were involved in the alleged fraudulent activity, but some may have used deceptive marketing and recruiting practices. The GAO said it plans to refer cases of deceptive marketing to federal investigators.

"As information emerges about which public companies were cited, we expect heads to roll," said Signal Hill education analyst Trace Urdan.

BMO Capital Markets analyst Jeffrey Silber and Baird analyst Amy Junker said it was likely that the unnamed schools whose counselors misled prospective students included two campuses owned by Apollo Group, two owned by Corinthian Colleges and one owned by Washington Post Co., a newspaper publisher that also owns the Kaplan school chain.

"We reviewed the testimony and it doesn't have enough information for us to determine whether any of the campuses are ours. We are investigating and if we find any reason to take action we will," said Corinthian spokesman Kent Jenkins.

Following the broadcast Apollo Group sent us this statement.

"The recent GAO study sampled recruiting practices at a number of for-profit colleges. While we have not been informed whether or not Apollo Group schools were involved in this study, we take very seriously the issues raised in the recent GAO study. We have clear policies in place to protect students. If we are made aware of violations of our code of conduct we will promptly and thoroughly investigate the matter and, if found true, will take disciplinary action up to, and including, termination of the employee involved."

64.     Similarly, on August 4, 2010, cable news network, CNBC, also published a report on its website that stated, in part, the following:

GAO Finds For-Profit Schools Encouraged Fraud

An investigation by the Government Accountability Office (GAO) contends that for-profit colleges encouraged fraud and engaged in deceptive and questionable marketing practices.

The investigation is part of a detailed report released this morning in conjunction with testimony before the Senate Committee on Health, Education, Labor and Pensions by Gregory Kutz, the GAO's managing director of forensic audits and special investigations.

* * *

Kutz made it clear he believed the company's findings suggested the practices were widespread throughout the industry, suggesting to some industry observers that legislators are likely to more tightly regulate the industry.

* * *

Meanwhile Harris Miller, president of the Career College Association, told me the findings are "disturbing." And while the report was expected, "It's hard to put lipstick on a pig. To have four schools have financial aid officers that are advising students to misrepresent their financial situation is totally unacceptable. The necessity to focus on compliance has to be elevated."

65.    Also on August 4, 2010, Senator Durbin, Assistant Majority Leader, posted in part the following on his official website at http://durbin.senate.gov/showRelease.cfm?releaseId=326961:

DURBIN, WEBB TAKE CONCERNS ABOUT FOR-PROFIT COLLEGES TO V.A. AND D.O.D.

Wednesday, August 4, 2010

[WASHINGTON, D.C.] – Concerned about reports of some for-profit colleges aggressively targeting military personnel and veterans, U.S. Senators Dick Durbin (D-IL) and Jim Webb (D-VA) today asked the Secretaries of the Department of Veterans Affairs, Eric Shinseki, and the Department of Defense, Robert Gates, for detailed information on how veteran and military tuition assistance program funding is being spent.

Specifically, Durbin and Webb asked for data on the tuition assistance used for education at for-profit colleges and the standards in place to ensure that veterans, service members and their families are given the best possible options for higher education and that taxpayer funding is being well-spent.

"Some for-profit colleges serve VA beneficiaries [and active duty students and their families] well by offering flexible course schedules, distance learning, and course credit for military training," the Senators wrote. "But we have heard reports that some for-profit institutions may be aggressively targeting service members and veterans, signing them up for educational programs that may bring little benefit to future employment opportunities, low graduation rates and high default rates. Finally, with the recent passage of the Post 9/11 GI Bill, which provides for tuition reimbursement, we have

heard concerns about excessive tuition being charged at some of these institutions."

In 2008, Congress passed the Post-9/11 GI Bill, hallmark legislation introduced by Senator Webb on his first day in office, to provide veterans with comprehensive educational benefits on par with the World War II-era GI Bill. More than 34,000 beneficiaries took advantage of the program in fall 2009 – the first year funding was available. Seven of the top ten recipients of Post-9/11 GI Bill funding were for-profit schools.

The United States began providing education benefits to veterans and members of the military in 1944, as part of the Servicemen's Readjustment Act, which was the origin of the GI Bill. Many of these educational opportunities are free or at reduced cost, and offer the flexibility necessary for service members subject to short-notice, worldwide deployments. In 2009, the Department of Defense spent $424 million on tuition assistance and the Department of Veterans Affairs spent $3.58 billion.

On June 21, Durbin joined with other lawmakers in asking the GAO to assess the quality of for-profit institutions, as well as how much of their revenue is comprised of Federal student aid and other Federal funding sources. Other Senators signing on to today's letter include: Senators Tom Carper (D-DE), Kay Hagan (D-NC), Claire McCaskill (D-MO), Russ Feingold (D-WI) and Tom Harkin (D-IA).

66.   As a result of the truth about the Company reaching the market, between August 3, 2010, and August 6, 2010, shares of the Company declined precipitously. During that time, shares of Apollo fell from a close of $47.14 per share on August 2, 2010, to a close of $44.81 per share the following day. As further news about the Company reached the market, shares of Apollo continued to trade lower, falling from a close of $44.76 per share on August 4, 2010, to a close of $42.83 per share the following day. On August 5, 2010, over 6.1 million shares traded and between August 2, 2010, and August 5, 2010, over 16 million Apollo shares traded – many times the Company's average share volume.  The chart below evidences the dramatic decline in the price of Company shares during that brief period :

1
2
3
4
5
6
7
8
9
10
11



## CAUSATION AND ECONOMIC LOSS

67.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Apollo's stock price and operated as a fraud or deceit on Class Period purchasers of Apollo's stock by misrepresenting the Company's operational results and foreseeable growth prospects. Over a period of approximately eight months, defendants improperly inflated the Company's results and issued false and misleading guidance. Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and were apparent to investors, shares of Apollo declined precipitously – evidence that the prior artificial inflation in the price of Apollo's shares was eradicated. As a result of their purchases of Apollo stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the securities laws.

68.    By improperly characterizing the Company's operational results and misrepresenting its prospects, the defendants presented a misleading image of Apollo's business and future growth prospects. During the Class Period, defendants repeatedly

emphasized the ability of the Company to maintain and sustain its objectives, and consistently reported growth within the range of investors expectations and its historical range. These claims caused and maintained the artificial inflation in Apollo's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

69.    Defendants' false and materially misleading statements had the intended effect of causing Apollo's shares to trade at artificially inflated levels throughout the Class Period – reaching a Class Period high of almost $66.00 per share on April 21, 2010.

70.    On August 3, 2010, however, as investors learned the truth about the Company, and realized or concluded that defendants had engaged in deceptive and manipulative recruiting that could not be sustained in the face of the federal government investigations, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of Apollo shares.

71.    These belated revelations also evidenced defendants' prior falsification of Apollo's business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Apollo's share price and plaintiff and the Class were damaged as a result of the related share price decline.

72.    As a direct result of investors learning the truth about the Company on August 3, 2010, Apollo's stock price collapsed almost 10% over several trading days, on abnormally high trading volume. This dramatic share price decline eradicated much of the

artificial inflation from Apollo's share price, causing real economic loss to investors who purchased this stock during the Class Period. This decline also eradicated over $684.53 million of Apollo's market capitalization over only four trading days.

73.     The decline in Apollo's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Apollo's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which Apollo's share price fell almost 10%, wiping out over $684.53 million of Apollo's market capitalization over only four trading days. as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

74.     The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Apollo's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed. The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



## ADDITIONAL SCIENTER ALLEGATIONS

75.   As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Apollo, their control over, and/or receipt and/or modification of Apollo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Apollo, participated in the fraudulent scheme alleged herein.

**76.**   Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme and illegal

course of conduct: (i) deceived the investing public regarding Apollo's business, operations, management and the intrinsic value of Apollo common stock; (ii) enabled defendants to artificially inflate the price of Apollo shares; (iii) enabled Apollo insiders to sell over $46 million dollars of their privately held Apollo shares while in possession of material adverse non-public information about the Company; and (iv) caused plaintiff and other members of the Class to purchase Apollo common stock at artificially inflated prices.

77.    The insider stock sales which occurred within the Class Period are set forth below:

| INSIDER TRANSACTIONS REPORTED DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| Date | Insider | Shares | Transaction | Value |
| Jul 29, 2010 | SPERLING PETER V Officer | 55,000 | Sale at $47.01 per share. | $2,585,550 |
| Jul 23, 2010 | REDMAN K. SUE Director | 2,015 | Sale at $50 per share. | $100,750 |
| Jul 23, 2010 | SPERLING PETER V Officer | 75,000 | Sale at $50.55 per share. | $3,791,250 |
| Jul 22, 2010 | SPERLING PETER V Officer | 20,000 | Sale at $46.56 per share. | $931,200 |
| Jul 20, 2010 | SPERLING PETER V Officer | 100,000 | Sale at $47.67 per share. | $4,767,000 |
| Jul 13, 2010 | SPERLING PETER V Officer | 100,000 | Sale at $43.84 per share. | $4,384,000 |
| Jul 10, 2010 | IVERSON G. JAMES Officer | 86 | Disposition (Non Open Market) at $44.44 per share. | $3,821 |
| Jul 10, 2010 | WRUBEL | 661 | Disposition (Non Open | $29,374 |

| | | | | |
|---|---|---|---|---|
| | ROBERT W<br>Officer | | Market) at $44.44 per share. | |
| Jul 8, 2010 | SPERLING PETER V<br>Officer | 150,000 | Sale at $43.77 per share. | $6,565,500 |
| Jun 15, 2010 | D'AMICO JOSEPH L.<br>Officer | 8,398 | Disposition (Non Open Market) at $48.30 per share. | $405,623 |
| Apr 30, 2010 | SPERLING PETER V<br>Officer | 113,821 | Sale at $57.44 - $58.2 per share. | $6,581,000 |
| Apr 29, 2010 | SPERLING PETER V<br>Officer | 106,279 | Sale at $57.80 per share. | $6,142,926 |
| Apr 28, 2010 | DE CONCINI DINO J<br>Director | 2,015 | Sale at $61.76 per share. | $124,446 |
| Apr 28, 2010 | SPERLING PETER V<br>Officer | 78,332 | Sale at $61.62 per share. | $4,826,817 |
| Apr 28, 2010 | SPERLING JOHN G<br>Officer | 79,001 | Sale at $61.65 per share. | $4,870,411 |
| Apr 2, 2010 | CAPPELLI GREGORY<br>Officer | 9,607 | Disposition (Non Open Market) at $61.50 per share. | $590,830 |

**Applicability Of Presumption Of Reliance:**

**Fraud-On-The-Market Doctrine**

78.     At all relevant times, the market for Apollo's common stock was an efficient market for the following reasons, among others:

        A.     Apollo's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

B.      As a regulated issuer, Apollo filed periodic public reports with the SEC and the Nasdaq;

C.      Apollo regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.      Apollo was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for Apollo securities promptly digested current information regarding Apollo from all publicly available sources and reflected such information in Apollo stock price. Under these circumstances, all purchasers of Apollo common stock during the Class Period suffered similar injury through their purchase of Apollo common stock at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

80.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Apollo who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

81.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Apollo, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

**Violation Of Section 10(b) Of**

**The Exchange Act And Rule 10b-5**

**Promulgated Thereunder Against All Defendants**

82.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**83.**    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the

investing public regarding Apollo's business, operations, management and the intrinsic value of Apollo common stock; (ii) enable defendants to artificially inflate the price of Apollo shares; (iii) enable Apollo insiders to sell over $46 million dollars of their privately held Apollo shares while in possession of material adverse non-public information about the Company; and (iv) cause plaintiff and other members of the Class to purchase Apollo common stock at artificially inflated prices.

84.     In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

85.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Apollo's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

86.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Apollo as specified herein.

87.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of Apollo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Apollo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Apollo common stock during the Class Period.

88.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading.

89.    The defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or with deliberately for the purpose and effect of concealing Apollo's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Apollo common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Apollo's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Apollo common stock during the Class Period at artificially high prices and were damaged thereby.

91.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had

plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Apollo was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Apollo common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

92. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

93. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### SECOND CLAIM

**Violation Of Section 20(a) Of**

**The Exchange Act Against Individual Defendants**

94. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95. The Individual Defendants acted as controlling persons of Apollo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content

and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     As set forth above, Apollo and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

1.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

2.     Awarding compensatory damages in favor of plaintiff and the other

Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    3.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

    4.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

    5.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 13, 2010

         _____

        **MARTIN & BONNETT, P.L.L.C.**

        s/Susan Martin
        SUSAN MARTIN
        JENNIFER KROLL
        1850 N. Central Avenue, Suite 2010
        Phoenix, AZ  85004
        Telephone: (602) 240-6900
        Facsimile: (602) 240-2345
        E-mail:  smartin@martinbonnett.com

        **Attorneys for Plaintiff**

**OF COUNSEL**
KIM MILLER (*pro hac vice app. forthcoming*)
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

1

Email: kim.miller@ksfcounsel.com

2

LEWIS KAHN (*pro hac vice app. forthcoming*)

**KAHN SWICK & FOTI, LLC**

3

206 Covington Street

Madisonville, Louisiana 70447

4

Telephone: (504) 455-1400

Facsimile: (504) 455-1498

5

Email: lewis.kahn@ksfcounsel.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF**

Douglas N. Graer _____ (name) ("plaintiff") declares, as to the claims asserted under the
federal securities law, that:

1.  Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the
    securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases
    that may be consolidated with it.

2.  Plaintiff did not purchase securities of ~~American Public Education, Inc.~~ *APOLLO Group* at the direction of counsel or in
    order to participate in a private action under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony
    at deposition and trial, if necessary.

4.  During the Class Period, plaintiff has executed transactions in the securities of American Public
    Education Inc. as follows. See Attached Schedule.

5.  In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in
    an action filed under the federal securities laws, except as indicated herein.

6.  Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any
    recovery, except such reasonable costs and expenses (including lost wages) directly relating to the
    representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and
correct.

Dated: 13 August _____ 2010

Douglas N. Graer
Plaintiff Signature

Name of Plaintiff: _Douglas N. Gaer_____

Schedule of Plaintiff's Transaction(s) in: ~~American Public Education Inc~~. APOLLO GROUP

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 07/11/08 | 100 | 54.7800 |

Sale(s):

| Date | Units | Price |
|------|-------|-------|
| 08/05/10 | 100 | 42.8354 |