Richard G. Himelrick (# 004738)
J. James Christian (# 023614)
TIFFANY & BOSCO P.A.
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, AZ  85016-9240
Tel:    602-255-6000
Fax:    602-255-0103
Email: rgh@tblaw.com
          jjc@tblaw.com
*Local Counsel for Lead Plaintiffs and the Class*

Stuart M. Grant (admitted *pro hac vice*)
Megan D. McIntyre (admitted *pro hac vice*)
John C. Kairis
Diane Zilka
Michele S. Carino
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
1201 N. Market St.
Wilmington, DE  19801
Tel:    302-622-7000
Fax:    302-622-7100
*Lead Counsel for Lead Plaintiffs and the
Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | Lead Case No. CV-10-1735-PHX-GMS |
| | Consolidated With: No. CV-10-2044-PHX-GMS No. CV-10-2121-PHX-GMS |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION........................................................................................1

II.   NATURE OF THE ACTION AND SUMMARY ALLEGATIONS ......................2

III.  JURISDICTION AND VENUE....................................................................8

IV.   PARTIES................................................................................................9

    A.    PLAINTIFFS..................................................................................9

    B.    DEFENDANTS ...............................................................................9

V.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .............17

    A.    APOLLO BUILDS AN EMPIRE BY PROFITING AT THE EXPENSE OF
        STUDENTS, INVESTORS AND U.S. TAXPAYERS ..............................17

    B.    TITLE IV AND THE FOR-PROFIT EDUCATION INDUSTRY ............17

        1.    The 90/10 Rule ................................................................18

        2.    The Cohort Default Rate ..................................................19

    C.    APOLLO EMPLOYED DECEPTIVE RECRUITMENT PRACTICES TO
        MAXIMIZE ITS ENROLLMENT OF STUDENTS ELIGIBLE FOR TITLE IV
        AID, IRRESPECTIVE OF THE STUDENTS' QUALIFICATIONS OR
        LIKELIHOOD OF SUCCESS ...........................................................20

    D.    APOLLO USED FRAUDULENT SCHEMES TO ARTIFICIALLY INFLATE
        REVENUES AND PRESERVE ITS ELIGIBILITY TO RECEIVE TITLE IV
        FUNDS, IN THE FACE OF INCREASING STUDENT WITHDRAWALS ...............35

    E.    APOLLO'S FINANCIAL STATEMENTS VIOLATED SEC RULES AND
        GAAP ......................................................................................46

    F.    APOLLO FAILED TO MAINTAIN ADEQUATE INTERNAL CONTROLS
        OVER FINANCIAL REPORTING .....................................................57

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......................60

    A.    DEFENDANTS CONCEALED FROM INVESTORS THAT APOLLO'S
        ENROLLMENT AND REVENUE GROWTH WERE DUE TO DECEPTIVE
        MARKETING PRACTICES, AND FALSELY ATTRIBUTED THEM TO THE
        PURPORTED QUALITY OF THE COMPANY'S SERVICES...............................60

    B.    DEFENDANTS MADE MATERIALLY FALSE STATEMENTS REGARDING
        APOLLO'S ORGANIZATIONAL VALUES AND MANAGEMENT
        INTEGRITY ................................................................................64

    C.    DEFENDANTS MADE MATERIALLY FALSE STATEMENTS REGARDING
        APOLLO'S BUSINESS FOCUS .......................................................65

i

| | | | |
|---|---|---|---|
| 1 | D. | DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT APOLLO'S COMPENSATION PRACTICES | 69 |
| 2 | E. | DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT APOLLO'S PRACTICES REGARDING THE RETURN OF FEDERAL LOAN FUNDS FOR STUDENTS WHO WITHDRAW | 70 |
| 5 | F. | DEFENDANTS' DISCLOSURE OF THE "RISKS" ASSOCIATED WITH APOLLO'S REGULATORY REQUIREMENTS WERE MATERIALLY MISLEADING BECAUSE DEFENDANTS KNEW, BUT FAILED TO DISCLOSE, THAT THESE "RISKS" WERE VIRTUAL CERTAINTIES | 72 |
| 7 | G. | APOLLO MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT ITS FINANCIAL CONDITION | 76 |
| 9 | H. | DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING DISCLOSURE CONTROLS AND PROCEDURES AND INTERNAL CONTROLS OVER FINANCIAL REPORTING | 93 |
| VII. | | AS INVESTORS BEGIN TO LEARN THE TRUTH ABOUT APOLLO, ITS STOCK PRICE DROPS, BUT THE COMPANY CONTINUES TO DECEIVE THE INVESTING PUBLIC WITH ADDITIONAL FALSE AND MISLEADING STATEMENTS | 98 |
| VIII. | | LOSS CAUSATION | 112 |
| IX. | | POST-CLASS PERIOD EVENTS | 114 |
| | A. | THE ATTORNEYS GENERAL OF FLORIDA AND KENTUCKY LAUNCH INVESTIGATIONS | 114 |
| | B. | THE SEC EXPANDS ITS INQUIRY INTO APOLLO | 115 |
| | C. | THE DOE COMMENCES THE SECOND PROGRAM REVIEW OF APOLLO'S FINANCIAL-AID PRACTICES IN JUST TWO YEARS | 115 |
| | D. | THE SENATE HELP COMMITTEE CONTINUES TO INVESTIGATE | 115 |
| | E. | UNDER INCREASING REGULATORY AND CONGRESSIONAL SCRUTINY, APOLLO MAKES FUNDAMENTAL CHANGES TO ITS BUSINESS PRACTICES | 116 |
| X. | | ADDITIONAL SCIENTER ALLEGATIONS | 117 |
| | A. | SENIOR OFFICERS AT APOLLO AND UOP KNEW OF THE COMPANY'S IMPROPER FINANCIAL AID AND FINANCIAL REPORTING PRACTICES, AND OF THE TRUE SOURCE OF APOLLO'S "GROWTH" | 118 |
| | B. | THE INDIVIDUAL DEFENDANTS' COMPENSATION WAS TIED TO APOLLO'S FINANCIAL RESULTS | 120 |
| | C. | INSIDER TRADING BY DEFENDANTS JOHN SPERLING, PETER SPERLING, D'AMICO AND PEPICELLO SUPPORTS A STRONG INFERENCE OF SCIENTER | 121 |

ii

1    1.   The Sales Were Unusual In Timing And Amount ........................ 123

2    2.   The Sales Are Suspicious Because They Coincided With
          Massive Stock Repurchases By Apollo ......................... 125

3
     3.   The Timing Of the 2009 and 2010 Sales Is Particularly
4         Suspicious Given Defendants' Knowledge Of Material,
          Adverse Information ...................................... 126

5
     D.   THE SPERLINGS HAD UTTER CONTROL OVER APOLLO, AND
6         PROFITED HANDSOMELY BY PREYING UPON THOSE LESS
          FORTUNATE ............................................. 128

7
XI.  CLASS ACTION ALLEGATIONS................................... 129

8
XII.  PRESUMPTION OF RELIANCE .................................. 131

9
XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .............. 132

10
XIV.  CLAIMS FOR RELIEF......................................... 132

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  INTRODUCTION

1.      Lead Plaintiffs Oregon Public Employees Retirement Fund, Amalgamated Bank (as Trustee for the LongView LargeCap 500 Index Fund, the LongView LargeCap 500 Index VEBA Fund, the LongView Quantitative LargeCap Fund, and the LongView Quantitative LargeCap VEBA Fund) and Mineworkers' Pension Scheme (collectively, "Plaintiffs") bring this federal securities class action under the Securities and Exchange Act of 1934 (the "Exchange Act"), on behalf of themselves and all other persons and entities who purchased Class A common stock of Apollo Group, Inc. ("Apollo" or the "Company") between May 21, 2007 and October 13, 2010, inclusive (the "Class Period").   This action alleges that Apollo and certain members of its senior management team – John Sperling, Peter V. Sperling, Joseph L. D'Amico, Gregory W. Cappelli, Charles B. Edelstein, Brian L. Swartz, Brian E. Mueller, Gregory J. Iverson  and William J. Pepicello – concealed material information and made false and misleading statements relating to Apollo's business and financial condition, and violated generally accepted accounting principles ("GAAP") in accounting for the Company's revenues, income, and accounts receivable, all of which had the effect of artificially inflating the price of Apollo's Class A common stock during the Class Period.

2.      The allegations in this Complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.   Plaintiffs base their belief upon information uncovered through an investigation conducted by and under the supervision of Plaintiffs' attorneys into the facts and circumstances alleged herein.   This investigation included, among other things: interviews with confidential witnesses; review of Apollo's filings with the Securities and Exchange Commission ("SEC"); review of Apollo's press releases and other public statements; and review of regulatory filings and reports, court filings, Congressional investigation materials, securities analysts' reports, and media reports about the Company.   Plaintiffs believe that substantial additional evidentiary support

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.        NATURE OF THE ACTION AND SUMMARY ALLEGATIONS

3.        Apollo's founder, John Sperling, is often credited with being the pioneer of the for-profit education industry.  Apollo and other companies in this industry tout themselves as providing valuable educational opportunities to those who may be unable to attend traditional colleges and universities – such as working adults, and those seeking to take on-line courses – and as filling the education gap left by non-profit private and public institutions of higher learning.  Particularly as many Americans have fallen on difficult economic times in recent years, business has been booming for these for-profit institutions as students have sought out new educational opportunities in hopes of improving their earnings potential and embarking on new career paths.  In 2008, nearly two million students were enrolled in for-profit institutions to pursue everything from technical certificates to graduate degrees.  Not only have these companies been able to attract substantial numbers of students, but they have attracted significant capital from investors by publicly portraying their business models as successful, growing, and sustainable.

4.        Apollo, one of the largest for-profit education companies, has taken the promise of increased access to higher education and turned it into a nightmare both for the underprivileged and underserved students it purports to serve and for the investors who believed that Apollo's success was attributable to a sound business model that delivered real results.  In actuality, Apollo built its multi-billion dollar global educational leviathan by capitalizing on a lax regulatory environment and weakened job market and by preying on the hopes of millions in dire economic circumstances. Through a combination of aggressive marketing and false and misleading assurances, Apollo has exploited the very population it purports to serve in order to gain access to billions of dollars of revenue awarded through federal student financial aid programs. In the process, Apollo engaged in slippery accounting and concealed from investors the

truth about its unsavory business practices and precarious regulatory status, which Apollo knew could not be sustained and would, eventually, precipitate drastic changes throughout its business and cause exorbitant losses for investors once exposed.

5.     The emergence of the internet, coupled with the 2006 revisions to Title IV of the Higher Education Act, 20 U.S.C. § 1070, *et seq.* ("Title IV") that allowed for-profit institutions offering online degree programs to participate in federal student financial aid programs for the first time, revolutionized the for-profit educational industry.  Apollo, anxious to tap into this vast reservoir of federal funds, immediately shifted its focus and began to target its marketing efforts toward low-income individuals, including single mothers, veterans and the homeless, who could qualify for Title IV financial aid payable directly to Apollo – without regard for whether those individuals truly understood the nature and costs of Apollo's programs or were likely to succeed in those programs.

6.     As hidden camera investigations by the Government Accountability Office ("GAO") and ABC News would eventually reveal, during the Class Period Apollo resorted to deceptive techniques to prey upon prospective students and convince them to enroll, thus providing Apollo access to Title IV funds.  These hard-sell tactics resulted in increased enrollment, which the Company's public statements to investors falsely attributed to its purportedly valuable service offerings and commitment to academic quality.

7.     Federal Title IV student loans, described in further detail below, became the backbone of Apollo's revenue stream.  Apollo derives a majority of its revenue (over 75%) from these loans, and is the single largest recipient of Title IV student loan funds in the United States.  Institutions receiving Title IV funding are required to meet a variety of regulations, including a cap on the ratio of government loan funds to cash revenue (the "90/10 Rule"), limits on the percentage of their student borrowers who default on these loans (the "Cohort Default Rate" or "CDR"), and other regulatory requirements on financial status and academic standards.  Institutions that violate these

requirements risk losing their Title IV accreditation.  Given Apollo's heavy dependence on Title IV revenues, such an outcome would be fatal.

8.     Because of Apollo's "increase enrollment at all costs" business model, large numbers of its students were destined to – and did – find themselves unsuited for Apollo's programs and withdrew from school.  Given the large number of these students who had Title IV loans, and the inability of these students to repay those loans after dropping out, Apollo's recruitment of ill-qualified students – and the students' inevitable withdrawal – jeopardized Apollo's compliance with the Cohort Default Rate. Unbeknownst to investors, Apollo resorted to manipulative practices to maintain regulatory compliance when students with Title IV loans withdrew from its programs. When a student withdrew prior to completing a program or obtaining a degree, Apollo was required to return to the lender the unearned portion of the proceeds of that student's Title IV loans.  In many cases, however, Apollo returned the ***full amount*** of the Title IV funds, including the portion that had been earned and that Apollo was legally entitled to keep, and which students had a legal right to have applied to their tuition bills.  Apollo then sought to collect from the students themselves the tuition payments for the time prior to the students' dropping out, and in many cases also sought to collect the tuition payments for the portions of the course the students did not attend (*i.e.*, after the students withdrew).  These withdrawing students are those who had applied for and qualified for financial aid and did not have the means to pay Apollo once their federal loans were returned.  Nevertheless, Apollo improperly returned the entirety of their Title IV loans in order to prevent these students from going into default and increasing Apollo's CDR, which would jeopardize its access to future Title IV funds.

9.     Apollo's improper practices did not stop with its manipulation of its CDR; they also involved fraudulent misstatements of the Company's financial results. Incredibly, despite knowing that the withdrawn students would be unable to pay their tuition bills, Apollo improperly recognized and artificially inflated revenue by, *inter*

*alia*:  recognizing and booking revenue for the partial time the students were enrolled and, in many cases, for the remainder of the student's course, even though that revenue was unearned and almost certainly uncollectible because Apollo had cancelled the students' loans and was seeking to collect tuition payments directly from students with no ability to pay; recording accounts receivable for the amount now due from the students, despite knowing that those amounts were uncollectible; and failing to maintain adequate bad debt reserves or take appropriate and timely write-offs of these uncollectible receivables.

10. By artificially inflating its revenues attributable to withdrawn students – which represented non-Title IV revenues in light of Apollo's return of the Title IV funds – Apollo also was able to improve its ratio of government loan-based revenue to cash revenue, thereby helping to ensure its compliance with the 90/10 Rule.

11. During the Class Period, students were dropping out of Apollo's schools in droves, which presented a further risk to Apollo's revenue stream.  To compensate for the loss of students, Apollo engaged in aggressive and deceptive recruitment strategies to get an ever-increasing number of students in the door.  As long as more students were enrolling than were withdrawing, Apollo was able to create the illusion of enrollment growth.  But this Ponzi-like scheme could not go on forever, and was destined to fail once the government – or the investing public – began to realize that Apollo's business model was a house of cards built on foundations of fraudulent marketing practices, sub-par educational services, improper accounting, and highly questionable financial aid practices.

12. During the Class Period, Defendants issued a series of materially false and misleading statements that perpetuated the illusion of Apollo's purportedly strong business model and financial performance, while concealing that its growth and profitability were inflated by improper recruitment and revenue recognition practices and at risk of an imminent collapse because of Apollo's improper financial aid policies, which threatened Apollo's access to Title IV federal funds.  In fact, at the

commencement of the Class Period, Apollo announced a restatement of its fiscal years 2004 and 2005 consolidated financial statements, claiming to have identified – but made substantial progress in remediating – material weaknesses in its internal controls over financial reporting, including weaknesses related to its allowance for doubtful accounts.  Unbeknownst to investors, these weaknesses had not been eradicated; rather, Apollo stuck with "business as usual" and continued to falsely represent its financial results in such a way as to mask the fact that its Title IV revenues and net income were materially lower, and its allowance for doubtful accounts should have been materially higher than as reported.

13.     The cracks in the armor began to show on March 31, 2009, when the Company released its financial results for the quarter ended February 28, 2009.  The Company reported year-over-year increases in second quarter net revenue and total enrollment of 26.3% and 20.4%, respectively, as well as earnings per share that were significantly higher than consensus estimates.  However, it also reported an increase in bad debt expense of 30 basis points (as a percentage of revenue) from the second quarter of 2008, and 50 basis points (as a percentage of revenue) from the first quarter of 2009, "primarily due to the increased risk of collecting aged receivables and lower collection rates on those receivables given the current economic downturn."  Additionally, Apollo revealed a 9% *decrease* in *new* degreed enrollments since the first quarter of 2009, and a deceleration in the rate of year-over-year increases in new degreed enrollment (23.1% in the second quarter, compared to 25.6% in the first quarter).  In response to these signs of trouble with the collectibility of Apollo's receivables and its ability to continue maintaining enrollment growth – both of which were materializations of the risks Defendants had been concealing – Apollo's Class A common stock price dropped $11.87 per share, or 15.15%, on unusually high volume between the close of trading on March 31 and the close of trading on April 1, 2009.

14.     On October 27, 2009, after the markets closed, Apollo surprised the market by disclosing in an earnings press release that it was the subject of an informal

inquiry by the SEC's Enforcement Division into its revenue recognition practices. Apollo's stock price dropped $12.91 per share, or 17.7%, the next day, wiping out nearly $2 billion in market capitalization.

15. Apollo's stock price suffered further declines as additional negative information was slowly released during the latter half of the Class Period. For example, the stock declined another $3.44, or approximately 5.4%, following the Company's January 7, 2010 disclosure that it had received a preliminary report from a recent U.S. Department of Education ("DOE") review, and that the report cited "six findings and one concern" regarding the Company's financial aid policies, including "untimely return of unearned Title IV funds." Then, in early August 2010, Apollo's stock was rocked by revelations that the GAO had conducted an undercover investigation of fifteen "for-profit" schools, including two of Apollo's University of Phoenix ("UOP") campuses, and found the widespread use of deception in the recruitment and admissions practices at all fifteen schools. Apollo's stock price declined precipitously over just a few trading days — falling almost 10% between August 3 and August 5, 2010, thereby eradicating another $684 million of the Company's market capitalization on unusually high trading volume. Finally, after the close of trading on October 13, 2010 – the last day of the Class Period – Apollo withdrew its financial forecast for fiscal 2011 and reported declining enrollment and slowing revenue growth, all of which were attributable to increased regulatory scrutiny and the implementation of new initiatives that had become necessary in light of the prior revelations. As a result of this announcement, Apollo's stock price dropped 23% to close at $38.00 per share on October 14, 2010. In all, investors saw the Company's stock price decline by more than 50% between March 31, 2009 and October 14, 2010, resulting in a market capitalization loss in excess of $6 billion at a time when the overall market was increasing.

16. During the Class Period, investors were misled into believing that Apollo was steadily increasing enrollment, was intently focused on providing quality

educational opportunities, and was earning legitimate and sustainable revenues that would enable it to remain in compliance with all Title IV and other federal regulations. Based on this perception, Plaintiffs and the other class members purchased Apollo Class A stock, only to suffer substantial losses when the Defendants' scheme began to unravel and the undisclosed risks facing Apollo's business started to materialize. Meanwhile, however, Apollo's senior executives were using their inside knowledge of negative non-public information about the Company to profit at the expense of public investors. During the Class Period, the Company's senior executives sold more than $400 million worth of Apollo Class A common stock into the public market at prices they knew were artificially inflated by their fraudulent scheme.

## III.   JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a) and 78t-1] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Apollo maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.    PARTIES

### A.    Plaintiffs

21.    Plaintiff Oregon Public Employees Retirement Fund ("OPERF") is a state pension fund for retired public employees of the State of Oregon, overseeing more than $51 billion in assets.  As set forth in the attached certification, incorporated by reference herein, OPERF purchased common stock of Apollo at artificially inflated prices during the Class Period.

22.    Plaintiff Amalgamated Bank ("Amalgamated") is a New York bank that manages approximately $12 billion for institutional investors, including Taft-Hartley plans and public employee pension funds.  Amalgamated has locations in New York, New Jersey, California, Nevada, and Washington D.C., with its main office located in Manhattan.  Amalgamated brings this action as Trustee for the LongView LargeCap 500 Index Fund, the LongView LargeCap 500 Index VEBA Fund, the LongView Quantitative LargeCap Fund, and the LongView Quantitative LargeCap VEBA Fund (collectively, the "LongView Funds").  As set forth in the attached certification, incorporated by reference herein, Amalgamated, as trustee for the LongView Funds, purchased common stock of Apollo at artificially inflated prices during the Class Period.

23.    Plaintiff Mineworkers' Pension Scheme ("MPS") is a pension fund located in Sheffield, United Kingdom with £11.159 billion in assets under management. As set forth in the attached certification, incorporated by reference herein, MPS purchased common stock of Apollo at artificially inflated prices during the Class Period.

### B.    Defendants

24.    Defendant Apollo Group, Inc. is an Arizona corporation with its principal place of business located at 4025 South Riverpoint Parkway, Phoenix, Arizona 85040. Throughout the Class Period, Apollo purported to provide various "for-profit" educational programs and services at the undergraduate, graduate, and doctoral levels,

9

offering associate's, bachelor's, master's, and doctoral degree programs in arts and sciences, business and management, criminal justice and security, education, human services, health care, psychology, technology, and nursing.  Apollo has been in the education business for more than 35 years and is one of the largest private "for-profit" education providers in the United States, operating campus locations and learning centers in 40 states, the District of Columbia, and Puerto Rico, as well as through an online educational delivery system.  The overwhelming majority of Apollo's revenues – more than 90% – come from its flagship school and wholly-owned subsidiary, the University of Phoenix ("UOP").  Apollo also provides educational services through Western International University ("WIU"), the Institute for Professional Development, the College for Financial Planning Institutes Corporation, and Meritus University, Inc. In addition to these subsidiaries, Apollo owns an 85.6% interest in a joint venture called Apollo Global, Inc. ("Apollo Global"), which was formed in October 2007 to pursue investments in the international education services industry.

25.    Defendant John Sperling – Apollo's founder – was the Chairman of its Board of Directors from its inception until June 2004.  He was also Apollo's President until February 1998 and its Chief Executive Officer until August 2001, and was Apollo's Acting Executive Chairman from January 2006 until September 2008, when he was officially appointed Executive Chairman of the Board.  During the Class Period, John Sperling knew about all material aspects of the Company's operations, finances, financial condition and present and future business prospects.  At all relevant times, John Sperling has owned approximately 51.2% of Apollo's Class B common stock, which is Apollo's sole class of voting securities, as well as a substantial number of Class A shares.  His Class B stock ownership results in his control of all actions requiring the vote or consent of the Company's shareholders, including the election of all members of the Company's Board of Directors.  During the Class Period, he sold over $220 million of his personally held Apollo Class A shares into the market while in possession of material adverse non-public information about the Company.  John

10

Sperling assisted in the preparation and/or approval of Apollo's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K, and he signed the Company's Forms 10-K for the fiscal year ending August 31, 2006, filed with SEC on May 22, 2007 (the "2006 10-K"), for the fiscal year ending August 31, 2007, filed with the SEC on October 29, 2007 (the "2007 10-K"), for the fiscal year ending August 31, 2008, filed with the SEC on October 28, 2008 (the "2008 10-K"), and for the fiscal year ending August 31, 2009, filed with the SEC on October 27, 2009 (the "2009 10-K").  He also signed the "Letter to Our Shareholders" in the Annual Reports for fiscal years 2006, 2007 and 2008.

26.    Defendant Peter V. Sperling ("Peter Sperling") is John Sperling's son and has been with Apollo since 1983.  From 1983 to 1987, he was Director of Management Information Services of Apollo; from 1987 to 1992, he was Director of Operations at Apollo Education Corporation; from 1992 to June 1998 he was Vice President of Administration; from June 1998 to January 2003 he was Secretary and Treasurer of Apollo; from June 1998 to December 2007 he was Senior Vice President of Apollo; from June 2006 to December 2007 he was Secretary of Apollo; and in December 2007 he was appointed Vice Chairman of the Board of Apollo.  At all relevant times, Peter Sperling has owned approximately 48.8% of Apollo's Class B common stock, along with substantial holdings of Class A common stock.  Together with his father, Peter Sperling exercised voting control over all actions requiring a shareholder vote, including election of the Board of Directors.  During the Class Period, Peter Sperling sold approximately $200 million of his personally held Apollo Class A common shares into the market while in possession of material adverse non-public information about the Company.  Peter Sperling assisted in the preparation and/or approval of Apollo's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K, and he signed the 2006 10-K, the 2007 10-K, the 2008 10-K, and the 2009 10-K.

27.    Defendant Joseph L. D'Amico ("D'Amico") joined Apollo in November 2006 when he was brought aboard to serve as interim Chief Financial Officer.  From

June 2007 to March 2009, D'Amico was Apollo's Executive Vice President and Chief Financial Officer, and he was also the Company's Treasurer from December 2007 to March 2009.  Additionally, D'Amico has been Apollo's President since June 2008 and its Chief Operating Officer since March 2009.  D'Amico has extensive expertise in accounting and financial reporting.  Prior to joining the Company, he was a senior managing director of FTI Palladium Partners, an interim management company and a division of FTI Consulting, Inc.  Prior to joining FTI, he was a partner with PricewaterhouseCoopers where he served in a number of leadership positions in the Financial Advisory Services line of business and was an audit partner earlier in his career responsible for audits of both public and privately held companies.  During the Class Period, D'Amico participated in numerous conference calls with securities analysts, oversaw the preparation of Apollo's financial statements, and assisted in the preparation of – and signed and certified – the Company's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K.  D'Amico signed the Company's 2006 10-K, 2007 10-K, and 2008 10-K.  In addition, he signed the Company's Forms 10-Q for the quarter ending February 28, 2007, filed with the SEC on May 22, 2007 (the "Second Quarter 2007 10-Q"), for the quarter ending May 31, 2007, filed with the SEC on June 28, 2007 (the "Third Quarter 2007 10-Q"), for the quarter ending November 30, 2007, filed with the SEC on January 8, 2008 (the "First Quarter 2008 10-Q"), for the quarter ending February 29, 2008, filed with the SEC on March 27, 2008 (the "Second Quarter 2008 10-Q"), for the quarter ending May 31, 2008, filed with the SEC on July 1, 2008 (the "Third Quarter 2008 10-Q"), and for the quarter ending November 30, 2008, filed with the SEC on January 8, 2009 (the "First Quarter 2009 10-Q"). Further, D'Amico signed Certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Certifications") in the Company's 2006 10-K, Second Quarter 2007 10-Q, Third Quarter 2007 10-Q, 2007 10-K, First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third Quarter 2008 10-Q, 2008 10-K, and First Quarter 2009 10-Q.  During the Class

Period, D'Amico sold over $14.5 million of his personally held Apollo Class A shares into the market while in possession of material adverse non-public information about the Company.

28. Defendant Gregory W. Cappelli ("Cappelli") has served as Co-Chief Executive Officer of Apollo since April 2009, as a member of the Board of Directors of Apollo since June 2007, and as Chairman of Apollo Global since its inception in October 2007. Previously, Cappelli served as Apollo's Executive Vice President of Global Strategy and Assistant to the Executive Chairman. Cappelli assisted in the preparation and/or approval of the Company's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K. Cappelli signed the Company's 2007 10-K, 2008 10-K, and 2009 10-K, and signed the "Letter to Our Shareholders" included in the fiscal 2009 Annual Report. Cappelli also signed Sarbanes-Oxley Certifications in the Company's 2009 10-K and in its Forms 10-Q for the quarter ending May 31, 2009, filed with the SEC on June 29, 2009 (the "Third Quarter 2009 10-Q"), for the quarter ending November 30, 2009, filed with the SEC on January 7, 2010 (the "First Quarter 2010 10-Q"), for the quarter ending February 28, 2010, filed with the SEC on March 29, 2010 (the "Second Quarter 2010 10-Q"), and for the quarter ending May 31, 2010, filed with the SEC on June 30, 2010 (the "Third Quarter 2010 10-Q").

29. Defendant Charles B. Edelstein ("Edelstein") currently serves as Co-Chief Executive Officer and a director of Apollo. Edelstein has served in the Office of the Chief Executive Officer and as a member of the Board of Directors since he joined the Company in August 2008. Edelstein assisted in the preparation and approval of the Company's SEC filings during his tenure, including but not limited to Apollo's Forms 10-Q and 10-K. Edelstein signed the 2008 10-K and the 2009 10-K, and the "Letter to Our Shareholders" included in the Annual Reports for fiscal 2008 and 2009. He also signed Sarbanes-Oxley Certifications in the Company's 2008 10-K, First Quarter 2009 10-Q, the Form 10-Q for the quarter ending February 28, 2009, filed with SEC on

1   March 31, 2009 (the "Second Quarter 2009 10-Q"), Third Quarter 2009 10-Q, 2009 10-

2   K, First Quarter 2010 10-Q, Second Quarter 2010 10-Q, and Third Quarter 2010 10-Q.

3       30.     Defendant Brian L. Swartz ("Swartz") has been Apollo's Senior Vice

4   President and Chief Financial Officer since March 2009.  Swartz held the additional

5   title of Treasurer from March 2009 to March 2010, was Chief Accounting Officer from

6   February 2007 to March 2009, has been Senior Vice President, Finance since June

7   2007, and was Vice President, Corporate Controller and Chief Accounting Officer from

8   February 2007 to June 2007.  During the Class Period, Swartz participated in numerous

9   conference calls with securities analysts, oversaw the preparation of Apollo's financial

10  statements, and assisted in the preparation of – and signed and certified – the

11  Company's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K.

12  Swartz signed the Company's 2006 10-K, Second Quarter 2007 10-Q, Third Quarter

13  2007 10-Q, 2007 10-K, First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third

14  Quarter 2008 10-Q, 2008 10-K, First Quarter 2009 10-Q, Second Quarter 2009 10-Q,

15  Third Quarter 2009 10-Q, 2009 10-K, First Quarter 2010 10-Q, Second Quarter 2010

16  10-Q, and Third Quarter 2010 10-Q.  Swartz also signed Sarbanes-Oxley certifications

17  in the Company's Second Quarter 2009 10-Q, Third Quarter 2009 10-Q, 2009 10-K,

18  First Quarter 2010 10-Q, Second Quarter 2010 10-Q, and Third Quarter 2010 10-Q.

19      31.     Defendant Brian E. Mueller ("Mueller") joined Apollo in 1987 and was

20  Apollo's Chief Operating Officer from December 2005 to January 2006, and President

21  and a director of the Company from January 2006 until his June 24, 2008 resignation.

22  From 1990 to 1993, he was Director of Enrollment of UOP, Phoenix Campus, and

23  before that, he was an Enrollment Advisor of UOP, Phoenix.  He was the Vice

24  President/Director of UOP, New Mexico, from 1993 to 1995 and the Vice

25  President/Director of UOP, San Diego, from 1995 to 1997.  From May 1997 to March

26  2002, Mueller was Chief Operating Officer and Senior Vice President of UOP Online.

27  From March 2002 to November 2005, he was Chief Executive Officer of UOP Online.

28  During the Class Period, Mueller assisted in the preparation and/or approval of the

14

Company's SEC filings, including but not limited to Apollo's Forms 10-Q and 10-K. Mueller signed the Company's 2006 10-K and 2007 10-K, as well as the "Letter to Our Shareholders" included in the fiscal 2006 and 2007 Annual Reports.   Mueller also signed Sarbanes-Oxley Certifications in the Company's 2006 10-K, Second Quarter 2007 10-Q, Third Quarter 2007 10-Q, 2007 10-K, First Quarter 2008 10-Q, and Second Quarter 2008 10-Q.

32.     Defendant Gregory J. Iverson ("Iverson") was appointed Vice President, Chief Accounting Officer and Controller of Apollo in March 2009.  Previously, Iverson served as Vice President and Corporate Controller of Apollo from April 2007 to March 2009.  He assisted in the preparation of the Company's financial statements throughout the Class Period, and signed the Company's Second Quarter 2009 10-Q, Third Quarter 2009 10-Q, 2009 10-K, First Quarter 2010 10-Q, Second Quarter 2010 10-Q, and Third Quarter 2010 10-Q.

33.     Defendant William J. Pepicello ("Pepicello") has been with Apollo since 1995.  From 1995 to 2000, he was the Dean of the College of General and Professional Studies and also held the position of Vice President of Academic Affairs of University of Phoenix.  Pepicello served as Vice Provost for Academic Affairs from 2003 to 2006 and Dean of the School of Advanced Studies from 2002 to 2003.  Pepicello became Provost of University of Phoenix in January 2006 and was appointed as President in October 2006.  Also during the Class Period, defendant Pepicello sold nearly $4 million of his personally held Apollo Class A shares into the market while in possession of material adverse non-public information about the Company.

34.     Defendants John Sperling, Peter Sperling, D'Amico, Cappelli, Edelstein, Swartz, Mueller, Iverson and Pepicello are collectively referred to herein as the "Individual Defendants."   The Individual Defendants and Apollo are collectively referred to herein as the "Defendants."

35.     During the Class Period, the Individual Defendants, by virtue of their senior executive positions at Apollo, were privy to confidential and proprietary

15

information concerning Apollo and its operations, financial condition and present and future business prospects.  They had access to such information via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them.  Among other information, the Individual Defendants had access to materially adverse non-public information concerning Apollo's marketing, compensation, financial aid, and revenue recognition practices.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

36.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts.  They were provided with copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be false and misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to prevent as well as commit the fraudulent acts alleged herein.

37.    Moreover, each of the Individual Defendants except Pepicello signed one or more SEC filings that are alleged herein to be false or misleading in material respects.  By signing these SEC filings, the Individual Defendants personally attested to the accuracy of their content, and assumed a duty to disclose adverse facts that undermined the statements contained therein.

38.    As senior executives of a publicly traded company whose common stock is registered with the SEC pursuant to the Exchange Act and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Apollo's financial results, growth, operations, and present and future business prospects, and to

correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Apollo's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## V.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Apollo Builds An Empire By Profiting At The Expense Of Students, Investors and U.S. Taxpayers

39.    The story of Apollo's rise to prominence as one of the world's largest for-profit education companies is fraught with greed and deception.  Recognizing the growing demand for higher-level knowledge and skills and the inability of traditional "brick and mortar" institutions to deliver those services, Defendant John Sperling devised a unique educational model that appealed to both employers and working adults, because it purported to facilitate advancement without interfering with the ordinary work day.  Sperling's educational model (providing instruction online) and strategy for expansion also appealed to investors, who were led to believe that Apollo's increasing revenues, profitability and growth prospects were the result of delivering quality degree programs that filled a real niche in the higher education market.  Apollo was highly motivated to maintain this image of the Company, because (as explained in Apollo's Form 10-K filed with the SEC on October 27, 1995), throughout the 1990s a majority of students financed their Apollo education through tuition reimbursements from employers, many of which were Fortune 500 companies.

### B.    Title IV And The For-Profit Education Industry

40.    Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et. seq.*, governs the federal student financial aid programs (also known as Federal Student Aid, or "FSA") administered by the U.S. Department of Education.  A "Title IV" loan is a term used to describe several types of student loans, including Unsubsidized Federal Stafford Loans, Federal Perkins Loans, and Federal PLUS Loans.  Students who are undergraduates or graduate students enrolled in postsecondary education may qualify to

1   receive these types of loans to pay for their education.  Each loan has slightly different

2   qualifications and criteria to meet.

3       41.    After vigorous debate in Congress and intensive lobbying by for-profit

4   education institutions, Title IV was amended in February 2006 to allow online degree-

5   granting institutions that meet certain statutory requirements to participate in federal

6   funding programs for payment of educational expenses, such as Pell Grants and low-

7   interest Stafford loans.  *See* H.R. 4283, The College Access and Opportunity Act: Does

8   Accreditation Provide Students and Parents Accountability and Quality?, Hearing

9   before the Subcommittee on 21st Century Competitiveness of the Committee on

10  Education and the Workforce, U.S. House of Representatives, June 22, 2004, Serial No.

11  108-64.

12      42.    Institutions receiving Title IV funding are required to comply with a

13  variety of regulations in order to maintain their eligibility for Title IV funds, including a

14  cap on the ratio of government loan funds to cash revenue (the 90/10 Rule), limits on

15  the percentage of their student borrowers who default on these loans (the Cohort

16  Default Rate), and other regulatory requirements relating to financial status and

17  academic standards.

18              **1.      The 90/10 Rule**

19      43.    Under the Higher Education Act, as reauthorized by the Higher Education

20  Opportunity Act, proprietary institutions of higher education – including Apollo

21  subsidiaries UOP and WIU – must comply with the 90/10 Rule.  Specifically, a

22  proprietary institution will be ineligible to participate in Title IV programs if, for any

23  two consecutive fiscal years, it derives more than 90% of its cash basis revenue, as

24  defined in the Rule, from Title IV programs.  An institution that derives more than 90%

25  of its revenue from Title IV programs for any single fiscal year will be placed on

26  provisional certification for two fiscal years and will be subject to possible additional

27  sanctions by the DOE in the exercise of its broad discretion.  UOP and WIU are

28  required to calculate this percentage at the end of each fiscal year, and in the event they

are not in compliance, they must return any Title IV program funds that were received while they were ineligible.

## 2.   The Cohort Default Rate

44.   The Cohort Default Rate (or CDR) is the percentage of a school's borrowers who enter repayment on certain federal student loans during a particular federal fiscal year (October 1 to September 30), and who default prior to the end of the next fiscal year.  The "cohort" is the group of students who first enter into student loan repayment during a federal fiscal year, and the CDR for each cohort is the percentage of the cohort members who default on their student loans prior to the end of the following federal fiscal year.

45.   The Cohort Default Rate was initiated in the late 1980s to address the growing concern that fly-by-night trade schools were preying upon minorities and low-income populations to build their enrollments (and profits) by enticing academically under-qualified students to apply for Pell Grants and guaranteed student loans that the students were unlikely to repay, especially if they received a substandard education that did not lead to a good job.  As explained in a November 30, 2007 article titled *A More Meaningful Default Rate* in <u>Inside Higher Ed</u>, the idea was that abnormally high student loan default rates signified a low-quality institution that was failing to prepare students for work and life, and that institutions needed to be held accountable for the rates at which their students defaulted.

46.   To remain eligible to participate in Title IV programs, educational institutions must maintain an appropriate CDR.  Under current law, if an institution's CDR exceeds 10 percent for any one of the three preceding years, it must delay for 30 days the release of the first disbursement of U.S. federal student loan proceeds to first-time borrowers enrolled in the first year of an undergraduate program.  Institutions with three consecutive CDRs of 25 percent or greater or with a CDR greater than 40 percent in any one federal fiscal year could lose eligibility to participate in certain Title IV programs.

47.     The DOE reviews an educational institution's CDR annually as a measure of administrative capability, and then publishes the CDRs approximately 12 months after the end of the measuring period.  Thus, in September 2009, the DOE published the CDRs for the 2007 cohort, which measured the percentage of students who first entered into repayment between October 1, 2006 and September 30, 2007 and defaulted prior to September 30, 2008.

**C.     Apollo Employed Deceptive Recruitment Practices To Maximize Its Enrollment Of Students Eligible For Title IV Aid, Irrespective Of The Students' Qualifications Or Likelihood Of Success**

48.     From Apollo's perspective, Title IV was essentially a slush fund financed by the U.S. taxpayer, providing access to billions of dollars in revenue based on the enrollment of students demonstrating financial need.  Once Title IV was amended in 2006 to permit students to use federal financial aid to attend non-traditional, for-profit institutions, Apollo immediately ramped up marketing efforts to pull in anyone and everyone who qualified for Title IV programs.

49.     Enrollment became the cornerstone of Apollo's business strategy.  Well-honed, aggressive marketing tactics were employed to pressure individuals into signing up for classes irrespective of their academic credentials or career objectives.  Apollo partnered with companies that identified leads, maintained "boiler room"-like operations involving a huge sales force that heavily recruited the leads, and pressured prospective students to enroll and attend the minimum number of classes necessary for Apollo to have "earned" the tuition and federal Title IV funding.  Apollo carried out these practices in many instances by affirmatively misleading prospective students about the cost of obtaining an education and their financial obligation to repay loans borrowed through Title IV programs.  Students also were often encouraged to borrow the maximum amount they could qualify to receive, as opposed to the amount actually necessary to finance their Apollo education.

1            **(a)      Apollo Focused On Enrolling Students At Any Cost**

2            50.      Over the past ten years, Apollo has embarked on a path of becoming more

3   of a marketing company than an educational institution.  Since the year 2000, Apollo

4   has seen its enrollment increase in size by 200%, its faculty increase by 100%, and the

5   number of its "enrollment counselors" increase by a staggering 1000%.  Apollo's entire

6   business model during the Class Period was to get as many students as possible to

7   enroll in its institutions, regardless of whether these students were suited for college,

8   had an ability to pay for an education, or indeed had any probability of obtaining a

9   degree.  Recognizing the true nature of its enrollment process, Apollo's then-President

10  Mueller aptly referred to the Company's enrollment counselors as "sales people" during

11  an April 5, 2006 Apollo Group Analyst Meeting.

12          51.      The Company's sole focus was on getting "asses in classes" (as the DOE

13  characterized the practice in a February 5, 2004 report concerning UOP), which led

14  Apollo to engage in a number of improper practices in connection with marketing,

15  admissions, and enrollment that threatened the Company's continued access to the Title

16  IV funds needed to continue its business operations and, in turn, its very survival.

17          **(b)      Apollo Improperly Compensated Its Enrollment Personnel
                       Based On The Number Of Students They Were Able To Enroll**

18

19          52.      The Higher Education Act prohibits an institution that receives Title IV

20  funds from providing "any commission, bonus or other incentive payment based

21  directly or indirectly on success in securing enrollments or financial aid to any person

22  or entit[y] engaged in any student recruiting or admission activities or in making

23  decisions regarding the award of student financial assistance …" 20 U.S.C.

24  §1094(a)(20).

25          53.      During the Class Period, Apollo was well aware of these restrictions,

26  having been the subject of a lawsuit and a DOE report in the recent past arising from

27  the Company's violations of these very rules.  On March 7, 2003, a *qui tam* action was

28  filed against the Company in the U.S. District Court for the Eastern District of

21

California by two then-current employees on behalf of themselves and the federal government, alleging that UOP provided incentive compensation to employees for the recruitment of students, in violation of federal requirements.   Apollo stated in a September 4, 2003 press release that "we do not believe the allegations have any basis in fact or law," and UOP dismissively characterized the lawsuit in February 2007 as a "case … about two disgruntled former employees of [UOP] attempting to extract a large financial settlement."  *See* "University of Phoenix response to New York Times Article by Sam Dillon, Fact versus Fiction," available at https://www.phoenix.edu/about_us/media_relations/for-the-record/Fact-Check-of-New-York-Times-Article.html.   However, Apollo ultimately paid $78.5 million to settle the suit in December 2009 – one of the largest settlements ever of a False Claims Act fraud case prosecuted by private plaintiffs.  As Defendant Pepicello would later acknowledge in an August 19, 2010 interview on the television show Good Morning America, this settlement is "proof that we weren't doing as well as we could."

54.     In response to the filing of the *qui tam* suit, the DOE undertook an audit and investigation pursuant to a "Program Review" at several UOP campuses.   The investigation began in the late summer of 2003 and led to the issuance of a "Program Review Report" to Apollo on February 5, 2004.   In a cover letter to Apollo's then-president and CEO, the DOE noted:

> This report contains a ***serious finding regarding the school's substantial breach of fiduciary duty***; specifically that the University of Phoenix (UOP) ***systematically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation systems*** for those involved in recruiting activities.

(emphasis added).   The DOE report found, among other things, that UOP "provides substantial incentives to its staff to recruit unqualified students and students who cannot benefit from the training offered" and "systematically and intentionally operates in a duplicitous manner so as to violate the Department's prohibition against incentive compensation while evading detection."

55.     Apollo failed to publicly disclose the February 2004 DOE Program Review Report until September 2004, when it revealed that it had agreed to pay a $9.8 million fine to settle the allegations in the report.  (Apollo's delay in disclosing the report to investors became the subject of a federal securities class action in the United States District Court for the District of Arizona, *In re Apollo Group, Inc. Sec. Litig.*, 04-cv-2147, which ended in a $277 million jury verdict against Apollo.)

56.     Despite Apollo's knowledge of these clear restrictions on tying compensation to enrollment, and despite having been caught and severely penalized for violating those restrictions, Apollo continued during the Class Period – unbeknownst to investors – to evaluate and compensate its "Enrollment Managers" based chiefly on the number of students they were able to enroll.  CW1, an Enrollment Manager employed by UOP from March 2008 through November 2010, informed counsel for Lead Plaintiff that Enrollment Managers were evaluated on a "performance matrix," ***seventy percent*** of which related to enrollments and retention.  Notably, a student was considered "retained" for purposes of this performance matrix if the student stayed on through only the second set of classes.

57.     According to CW1, prior to September 2010, Enrollment Managers were given specific enrollment and retention numbers that they were required to hit.  According to CW2, an Admissions Manager with UOP from March 2003 through June 2010, Enrollment Counselors were expected to enroll 4.5 students per month, Senior Enrollment Counselors were expected to enroll 6.5 students per month, and executives were expected to enroll 8.5 students per month.  Failure to "make the numbers" had dire consequences:  according to CW1, employees were threatened (until 2009) with pay decreases for failing to enroll their target number of students.  As an incentive for his recruiters to "hit the numbers," Mike Bibbe, Vice President for the Military Division, was known to tape a fake $500 bill in enrollment counselors' offices each time they enrolled a student because, according to CW2, "every registered student was worth $500 on your review."

58.     Further, CW7 – a Senior Director of Product Marketing for UOP from November 2008 through February 2010 – informed counsel for Lead Plaintiff that UOP's six Regional Vice Presidents had their respective bonuses structured based on how many people they enrolled, and how many of those students attended at least three online classes (known internally at UOP as "3Y").  CW7 believes the sole enrollment goal was to get a student to stay for three classes.

59.     The compensation system for enrollment advisors at Apollo's WIU subsidiary likewise was based upon employees' success in signing up students.  CW10, who left Apollo in July 2010 after serving as a senior-level executive at WIU since before the beginning of the Class Period, was a member of a compensation committee comprised of senior executives of Apollo, Apollo Global, WIU, UOP and IPD.  According to CW10, WIU's compensation scheme was virtually the same as UOP's and consisted of a performance matrix that rewarded Enrollment Advisors based primarily on the number of students that were enrolled and the retention rate of students.  The compensation packages outlined in the matrix were issued and approved at the Apollo corporate level, and CW10 indicated that defendant D'Amico "lent direction to the compensation committee and approved all performance based compensation packages throughout all of [Apollo's] structure from the time he came on as President."  According to the CW10, the compensation program and performance matrix were not changed following Apollo's 2004 settlement with the DOE, and Apollo continued to compensate its Enrollment Advisors primarily based on the number of students enrolled and the retention rate.  It was not until 2010, when the government was considering new rules to govern for-profit schools, that Apollo began to change its compensation system, although no new program was implemented before CW10 left WIU in July 2010.

**(c)    Apollo Routinely Recruited Students Without Regard For Their Suitability For College Or Their Ability To Finance An Education**

60.    This pressure to "hit the numbers" led enrollment counselors to enroll students at all costs, regardless of their suitability for college or their ability to pay for an education.  According to CW3, a Fraud Analyst/Examiner for UOP between 2003 and June 2010, Apollo had a practice and policy of enrolling students "whatever the cost."  This policy was communicated from senior executive management down through the ranks of Enrollment and Finance Counselors.  Debunking any illusion that UOP had a commitment to providing education to qualified students, CW4, a Senior Enrollment Advisor, has stated:

> 66% of your performance-based compensation was based upon how many students you enroll, whether they are good or bad, can read or write, or whatever.  It's all about the hard number of how many students you enroll.  The culture is all about getting students.  It's not about getting good, quality students as much as it is the number of students.  You can enroll anybody.  ***If they have a heartbeat and a social security number you can pretty much enroll them***.

61.    CW4 estimated that "conservatively speaking at least 60% of UOP students aren't capable for or ready for school for a variety of reasons including not being able to type.  They don't have computers.  They don't have transportation to and from school, and other reasons."  However, when CW4 raised concerns about a prospect's chances of successfully completing the required coursework, CW4 was essentially told to mind his/her own business.  According to CW4, his/her supervisors would say, "Who are you to judge and say that they are not going to make it?  You let that person start.  It's not your call.  If they fill out that application and they're approved for financial aid and they make that decision that's on them.  You're not responsible for that."

62.    CW7 – a Senior Director of Product Marketing for UOP from November 2008 through February 2010 – similarly noted the rampant practice of admitting unqualified students to hit the numbers.  CW7 had multiple conversations with people

on the "academic side" of the school – including high-ranking educators in the UOP Business School – who expressed their concern that the practice of enrolling unqualified students was hurting the school's reputation. These individuals told CW7 that they were pressured to give students better grades and to pass students who were not academically meeting the criteria so that they would not fail out and so UOP could continue to collect money. Bill Barry, Associate Dean of the Business School, told CW7 about a study he had done which showed that UOP MBA graduates had inferior skills in comparison to state school MBA graduates in all tested areas and had failed miserably compared to their peers. Mr. Barry told CW7 that either Defendant Pepicello or UOP Provost Adam Honea (CW7 could not recall which) told him to "bury" the study.

63.    Further, according to CW7, when UOP's "Right Student Initiative" – a plan designed to recruit more suitable students – led to a decline in enrollment, Rob Rubell, Chief Marketing Officer and Head of Products, was told in a private meeting with Defendant D'Amico "to turn the dial back up" – in other words, to return to the old marketing models that enrolled more, but less qualified, students. According to CW7, UOP had "created the perfect storm of achieving high enrollment rate with poor quality students who tended to drop out. They just need to keep feeding the lead machine."

64.    CW5, a Senior Enrollment Counselor employed by Apollo from January 2007 through April 2010, informed counsel for Lead Plaintiffs that he/she was "encouraged not to discourage" students who indicated an inability to pay from enrolling. In certain instances, CW5 heard enrollment counselors touting the benefits of "excess funds" – *i.e.*, the amount of federal financial aid a student could receive over and above the cost of tuition. CW5 heard other counselors encouraging students to enroll in UOP because they would receive this money. CW5 heard counselors say things like, "You don't have to worry about it financially because aid will take care of the entire cost and you will have some extra money that will be sent to you," and "You

can use the money for a new computer or whatever you need to use it on, that's fine, always good to have extra money."  Further, CW5 believes that many enrollment counselors misled prospective students about their liability to repay excess money, noting that "a lot" of students would call back and say, "I was told it was a grant not a loan," when informed that they were required to repay this excess money.  CW5 believed that approximately 35-40% of students took excess money and then dropped out of school.

65.    Similarly, CW2 noted that many enrollment counselors would not talk to students about when they would be required to pay back financial aid loans, or would tell them the loans only had to be repaid when a student graduated.  Consequently, many students took several years off from school erroneously thinking that the loans would not become due until they completed their degrees.  CW2 heard enrollment counselors giving inaccurate information on financial aid to prospective students "on a daily basis."

66.    CW6, a Campus Accounting Supervisor working for Apollo subsidiary the Institute for Professional Development ("IPD") between 2005 and 2009, similarly indicated that students were not given full and complete information about financial aid.  According to CW6, "A lot of times students expressed to me that they felt that the Enrollment Counselors had hustled them into the program.  They were brought in so quickly and they didn't have a clear understanding of the financial commitment and investment that was going to be needed on their part."  Further, CW6 noted that students repeatedly told CW6 that many of the details concerning their financial aid, from financial aid obligations to how the money was to be utilized, were not explained to the students clearly or fully.  This, CW6 observed, was evidenced by IPD's common practice of allowing students to enroll and start classes before important financial aid paperwork was filled out or completed.

67.    During a hidden camera investigation by ABC News, which was featured in segments on both Good Morning America and Nightline on August 19, 2010, a UOP

recruiter strongly encouraged the undercover applicant to borrow the maximum possible amount of money under Title IV, stating that no one would follow up to see what they used the money for.  The recruiter also gave the applicant false information about the value of a UOP degree, falsely stating that such a degree would enable the applicant to sit for teaching exams and be eligible for a teaching certificate.  This was the same false assurance that had been given to a former student who was interviewed for the show, who had enrolled and incurred $8,000 in federal financial aid debt, only to find that a UOP degree would get her no closer to her dream of becoming a teacher.  Pepicello acknowledged on the program that such conduct is "indefensible" and "wrong" although he denied – falsely – that it is condoned at UOP.

68.     On March 28, 2008, representatives of the DOE met with senior executives of UOP and Apollo – including Defendant D'Amico, UOP President Dr. William J. Pepicello, UOP Director of Dispute Resolution Lee Finkel, Apollo Chief Human Resources Officer Diane Thompson, Apollo Chief Communications Officer and Executive Vice President Terri Bishop, and Apollo Vice President, Student Financial Aid Robert Collins – to discuss a number of complaints the DOE had received from students concerning Apollo's financial aid practices.  As was later revealed in a DOE report that was released to the public in June 2010, UOP was told that in one instance:

> [A] student complained that after he told the enrollment counselor that he had no money and did not want to start school until his financial aid was finalized, the enrollment counselor told him to go ahead and start, that he "would need no money."   When the student's financial aid was not approved, UOP began immediate collection efforts against the student.  The student complained that he had been misled by UOP.

Another student alleged that he "was advised by UOP that it is UOP's policy to *leave a student enrolled until 29 days after the student's last date of attendance*," allowing the student's debt to continue to accumulate during this time.

69.     The August 4, 2010 GAO Report details other examples of UOP's deceptive recruitment practices.  In one instance, an admissions representative at a UOP

28

campus in Arizona told an undercover applicant that a bachelor's degree would take a maximum of four years to complete, but then provided a one year cost estimate equal to only 1/5 of the required credit hours, thereby understating the total cost by 20%.  This admissions counselor then told the applicant that he was qualified for $9,500 in student loans and that he should take out that full amount, even though the applicant had $250,000 in savings.  In addition to being given false information about the costs of a UOP education, the applicant was further lied to about his prospects of graduating:  the admissions representative told him that UOP had a 20% graduation rate when, in fact, its actual rate was only 15% – a full 25% lower than the stated 20% rate.

70.    The GAO Report reveals that another admissions representative at the UOP Arizona campus compared UOP to the University of Arizona and Arizona State University, refused to disclose the graduation rate after being directly asked, claimed that he did not know the job placement rate "because a lot of students moved out of the area," and encouraged the undercover applicant to continue with a master's degree after finishing his bachelor's, stating that "some countries pay teachers more than they do doctors and lawyers."

71.    Undercover applicants to a UOP campus in Pennsylvania were similarly misled by admissions representatives when inquiring about financial aid.  According to the GAO Report, one undercover applicant was told that she could take out the maximum amount of federal loans, even if she did not need all the money, and was encouraged to "put the extra money in a high interest savings account."  This applicant was not told that, to the extent the "extra money" she borrowed to put in a savings account came from an unsubsidized loan, this loan would accrue interest while the student was still in school.  In another instance at the same UOP campus, an undercover applicant was met with a refusal to disclose the graduation rate after directly asking this question, and was also told that the financial aid department might be able to use "professional judgment" to determine that the applicant would not be required to report over $250,000 in savings on her federal financial aid application.

72.     Many other students have similarly reported that UOP representatives lied to them about financial aid.  During a November 3, 2009 Marketplace broadcast on National Public Radio, former UOP student Michele Rambo of Grand Prairie, Texas said that at the time she signed up at UOP in Dallas, "I did tell them that I was pregnant and they were like, oh, well, that just solves everything, you know, you qualify for a grant, you're covered.  And I'm like, so I don't have to pay anything?  And they told me no."  As she neared completion of her associate degree, Rambo talked with a school counselor about moving on to a bachelor degree.  According to Rambo, "[O]ne of the questions that she asked me completely stopped the whole conversation.  She had asked me, so what kind of loan do you have?"  Rambo thought she did not have a loan, but recalled "signing what she thought was a form inquiring about federal aid."  It turns out that Rambo had unknowingly applied for – and received – $18,000 in loans that she would be responsible to repay.

### (d)     Apollo Used Inappropriate Sales Tactics In Seeking To Enroll Students

73.     UOP's "admit students at all costs" philosophy led its enrollment counselors to employ despicable tactics in signing up new students.  Numerous complaints have been lodged against Apollo with the DOE and the Federal Trade Commission and other agencies, seeking relief from the financial and emotional burdens imposed by Apollo's deceptive marketing efforts.

74.     As CW4 noted, enrollment counselors were trained not to take "no" for an answer if a prospective student indicated that he or she was not interested in attending UOP.  Rather, enrollment counselors were trained – pursuant to the "Overcoming Objections" program – to "make the person feel bad for not going to school.  They wanted you to make them cry."  CW4's immediate supervisor, a Director of Enrollment, told CW4, "If you don't make that person cry by the time you get off the phone you haven't done your job."

75.    Similarly, CW4 stated that UOP trained its sales force on the "Drive Theory," pursuant to which enrollment counselors were trained "about helping the prospect get to their motivation by making them feel bad about what they didn't have and getting them to dream about what they do want."  If a prospect indicated to an enrollment counselor that he or she was not ready to enroll, the enrollment counselor would say, "Well then you don't really want it that bad if you're not ready to sign up to go to school right now."

76.    On March 5, 2009, the financial information website *SeekingAlpha.com* published a report detailing a UOP tactic of leaving "trick messages" designed to dupe prospective students into returning calls from UOP.  The website cited the following December 21, 2006 email from Enrollment Managers Barbara Keramati and Marvie Wright to their sales team about sending "trick messages" for prospective students:

> I am sending out a few of my trick messages . . . that will get people to call you back.  Try one this week and see what happens.
>
> "Can you please call me John . . .  you have an unresolved issue that I need to discuss with you as soon as possible."
>
> "This message is for Mary . . .  I have a[n] open file for you I would love to be able to close before the year ends.  I just need to ask you a few simple questions."
>
> "This message is for Sharon  .  .  .  I was given your information and I would love to talk to you.  I have something awesome to tell you."
>
> "I need to speak to Kenya, as soon as possible, regarding an unresolved issue."
>
> "I have an open file for Karen, that can be resolved with a few simple questions."
>
> "Please give me a call, this is Marvie and I am calling you from Phoenix."
>
> "This message is for Steve . . .  I have something for you that will change your life."
>
> "Ang[el] if you just call me back . . .  I have information that could turn your life around."

77.   As reported by NPR Marketplace in a story titled "Examining University of Phoenix recruitment" on November 4, 2009, UOP Enrollment Counselor Brandon Burke, who left the Company in December 2008, recalled a different ploy to "create a sense of urgency."   He explained that "One thing we would be told to do is call up a student who was on the fence and say, all right, I've only got one seat left.  I need to know right now if you need me to save this for you.  Well, that wasn't true."  If that student later showed up and saw only a small number of students in the class, Burke's manager told him to lie to the student by "tell[ing] them that the class got so full that we had to split it."

78.   A December 15, 2010 internet posting by an individual identifying himself as a former UOP enrollment counselor provides further evidence of UOP's unethical recruitment practices:

> First of all the employees are ALL BRAINWASHED from DAY #1. They are told that they are "changing lives", and that is not a lie, however, they are not changing lives for the good, instead they are RUINING LIVES by saddling students with WORTHLESS DEGREES and DEBT that they will never be able to repay!  While I was there I was told by a "regional vice president" that were [sic] TARGETED BLACKS & HISPANICS, ESPECIALLY SINGLE MOTHERS BECAUSE THAT WAS ARE [sic] TARGET AUDIENCE!!!  I couldn't believe what I was hearing, but it was true, since I soon realized that these individuals made up 70% of the student population in Florida.
>
> They also preyed on INTERNATIONAL STUDENTS and new PERMANENT RESIDENTS who were new to this country and didn't know any better, and FORMER CONVICTS WHO WERE RECRUITED STRAIGHT OUT OF PRISON!!!   They taught us to "PROBE FOR A STUDENTS MOTIVATION" and make the[m] "FEEL THE PAIN of NOT HAVING A DEGREE" (basically guilt them into going to school or make them feel like a loser).  They also taught us to build "RAPPORT" with potential students so that they would "TRUST" us. Each employee was required to meet their "QUOTA" of students or face a decrease in salary or termination - EVEN THOUGH THIS WAS AN ILLEGAL PRACTICE, they got around the rules by saying that this was not the sole basis of compensation…. They also required us to bring in at least 8 referrals a month, and retain 80% of our students past the second course.  Anyone who didn't meat [sic] these standards were met with swift and severe punishment and humiliation. Managers and directors were

1        always quick to say that it was all about the #'s and brag
2        about all the money that we were making….

*See*  http://universityofphoenixsucks.blogspot.com/2009/02/does-university-really-care-about.html.

3    79.    Eliminating any doubt as to whether UOP's "enrollment counselors" were any more than sales people, during the Class Period these enrollment counselors were made to participate in exercises known as "blitzes" during which they were expected to stay at their desks, making as many calls to prospective students as possible without getting up even to go to the bathroom.  For example, on June 20, 2007, Alison Herring sent an email to the enrollment counselors who reported to her with the threatening subject line:  "IF YOU DON'T BLITZ AT 11:30 [ENROLLMENT MANAGER] MECHELLE [BONILLA] SAYS YOU'RE FIRED!"  The opening line of the email removed any doubt as to whether this subject line was a joke:  "SERIOUSLY…SHE'S NOT MESSING AROUND."  Reinforcing the seriousness of the blitz, Ms. Herring emailed her staff a mere four minutes after the scheduled 11:30 blitz was to end, demanding that her reports "send [her their] blitz results."

80.    And in perhaps the worst example of UOP's underhanded tactics, *Bloomberg* reported on April 30, 2010 that UOP had targeted one of the most vulnerable markets imaginable – the nation's homeless.  According to a *Bloomberg* article titled "Homeless High School Dropouts Lured By For-Profit Colleges," in October 2009 two UOP recruiters "got themselves invited to a Cleveland shelter" and "pitched the advantages of going to the country's largest for-profit college to 70 destitute men."  One of these men – Benson Rollins, a recovering alcoholic who had been homeless for ten months – was "barraged" with phone calls and emails after the recruiters' persuasive pitch led him to fill out an online form.  While Rollins did not fall for UOP's hard sell, he did note that the UOP recruiters failed to mention a critical point:  that he would have to take out a government loan at 5% to 7% interest to pay the $10,000-plus annual tuition.  Fortunately for Rollins, he realized what many other

victims of these coercive recruitment tactics do not:  "I'm in a homeless shelter and money is hard to come by.  It's not worth going to school to end up in debt."

81.    Byron Thompson, who joined UOP as a recruiter in 2009, recruited the homeless at no less than three Cleveland shelters – Y Haven, Salvation Army Harbor Light, and Transitional Housing – and was compensated well for his success in this arena, noting, "The month I signed up two or three women from Transitional Housing was a good month."  Thompson's recruitment efforts typify UOP's detestable practices: one of his recruits, Marisol Lugo, ran away from her Chicago home at age 12, became a heroin addict, and lived on the streets for 22 years, eating out of restaurant trash bins and sleeping in parks and abandoned cars.  Following Thompson's "wonderful words of encouragement," Lugo took out federal grants and loans covering the $10,000 annual tuition for a two-year online business degree at UOP.  Lugo "soon ran into academic difficulties, failing a course in critical thinking."  "Sometimes, having used so much drugs, I have trouble retaining information," said Lugo.  Lugo dropped out of UOP and now has a maintenance job at the shelter, along with substantial debt to the federal government and nothing to show for it.

82.    Similarly, CW9, an Enrollment Counselor in UOP's Center City, Philadelphia office from August 2007 through July 2009, reported that her supervisor pressured her to "harass and constantly call" prospective students, leading the UOP to enroll "people who couldn't read and/or were homeless."

83.    UOP's efforts to recruit at homeless shelters received widespread notoriety, inspiring competitors to adopt the practice.  As noted in the *Bloomberg* article, "Chancellor University in Cleveland, which counts Jack Welch as an investor and features a weekly video for students by the former General Electric Co. chief executive, explicitly focused recruiting efforts on local shelters after it realized that Phoenix, owned by Apollo Group, Inc., was doing so."

84.    Sara Cohen, a case manager at Shelter Now in Meridien, Conn., pulled no punches in criticizing this practice, noting that companies recruiting at homeless

shelters "are preying upon people who are already vulnerable and can't make it through a university. ***It's evil***."

85.     By failing to disclose the deceptive recruiting practices described above, Defendants created the false, public impression that the Company's increased enrollment revenue resulted primarily from Apollo's ability to attract new business (students) through enhanced and expanded educational services and improvements in academic quality.  In truth, the increased revenue resulted from Apollo's deceptive and unsustainable "increase-enrollment-at-all-costs" business model.

**D.     Apollo Uses Fraudulent Schemes To Artificially Inflate Revenues And Preserve Its Eligibility To Receive Title IV Funds, In The Face Of Increasing Student Withdrawals**

86.     The inevitable result of Apollo's marketing and recruitment tactics was the enrollment of substantial numbers of students who not only lacked significant financial resources, but who did not fully understand the costs and nature of the programs they signed up for and were ill-equipped to succeed in those programs. Consequently, UOP and Apollo's other schools had a shockingly high withdrawal rate. UOP consistently recruited and enrolled more students each year than it had enrolled at the beginning of the year (or at any given time), yet experienced such high turnover that its year-over-year increases in net enrollment were only in the 20% range.

87.     According to UOP's 2010/2011 Consumer Information Guide, only 42.23% of the first-time, full-time Bachelor's degree-seeking students who enrolled at UOP between August 1, 2008 and October 31, 2008 were still enrolled at the same time in 2009.  Other data, released by the Chairman of the U.S. Senate's Health, Education, Labor and Pensions Committee, indicates that of the 177,368 Associate's degree-seeking students who enrolled at Apollo's schools between August 2008 and July 2009, 66.4% had withdrawn (without obtaining a degree) by August 2010.  The median number of months that these students attended before withdrawing was only 4.2.

**1.      Apollo's Manipulation Of Its CDR and 90/10 Rule Ratio**

88.      Apollo's strong-arm recruiting practices, the sudden influx of billions of dollars of Title IV revenue into Apollo, and the high turnover rate that Apollo experienced as a result of its marketing practices, had several consequences.  First, they placed UOP dangerously close to violating the 90/10 Rule and the CDR.  For the year ended August 31, 2007, Apollo reported a 90/10 Rule percentage of 69% for UOP.  Just two years later, Apollo reported that UOP's percentage had increased to 86%, and it increased to 88% by the year ended August 31, 2010.

89.      Given that Apollo derived more than 90% (and in some years more than 95%) of its total revenues from Title IV programs, and given that more than 80% of Apollo's students relied on Title IV aid, the consequences of violating the 90/10 Rule or the CDR and losing eligibility to receive Title IV funds would be catastrophic to Apollo's business.

90.      In order to preserve its eligibility status and maintain access to billions of dollars in Title IV revenues, Apollo undertook a course of conduct designed to deceive both the DOE and investors about Apollo's compliance with Title IV.  Since the 90/10 Rule and CDR were the primary metrics utilized to assess compliance, Apollo devised several methods to manipulate these calculations.

91.      For example, Apollo adopted a practice of returning all of a student's federal loan proceeds to lenders – in effect, cancelling student loans without the student's consent – when a student withdrew prior to completing coursework, even though Title IV regulations permitted Apollo to retain the "earned" portion of Title IV funds (for the period prior to the student's withdrawal).  Students were entitled to have the "earned" amounts applied toward their tuition bills, but for many students Apollo returned the *full* amount of their Title IV loans, including the earned portion, and then billed the students directly for the charges.  Thus, instead of owing money to the federal government pursuant to a Title IV loan with favorable repayment terms, students found themselves unexpectedly owing money directly to Apollo, and being subjected to

harassing collection efforts.  No matter what Apollo's proclaimed policy of providing refunds to students who withdrew early, Apollo employed its "behind the scenes" practice of returning to the lenders all of those students' Title IV funds.

92.    For example, during part of the Class Period (until March 1, 2008), Apollo's refund policy permitted it to collect – and keep – a full semester's tuition once the student attended two classes.    If the semester consisted of ten classes, the government would only consider 20% of the student's Title IV loan to be "earned," but vis-à-vis the student Apollo considered itself to have earned 100% of the tuition.  If a student dropped out after attending two of ten classes, the school was entitled to keep the "earned" portion of the Title IV loan (equal 20% of the tuition), but would return those funds to the lender and then bill the student directly for the full semester's tuition, even though the student dropped out early in the semester.

93.    Even after Apollo revised it refund policies (superficially to more closely align them with Title IV policies), Apollo employed refund practices that sharply diverged from Title IV in order to further Defendants' scheme to maintain compliance with the 90/10 Rule and the CDR.  Effective March 1, 2008, UOP implemented a new refund policy whereby students who attended less than 60% of a course were eligible for a refund for the portion of the course they did not attend.  Likewise, under Title IV, a student needed to attend at least 60% of a course's classes in order for 100% of the Title IV loan to be deemed earned; attendance at less than 60% required the school to return the *pro rata* unearned portion of the Title IV loan monies to the lender. However, for  students who attended less than 60% of a course, Apollo returned ***all*** of their Title IV funds to the lender, even though the Company was entitled to keep the *pro rata* portion for the time the student attended.

94.    Not surprisingly, no matter which of Apollo's refund policies applied, the overwhelming majority of students who qualified to receive Title IV funds could not afford to pay the full cost of attendance, especially since without completing the program, it was unlikely that their time at Apollo enabled them to land better-paying

jobs that supposedly would justify their investment in an Apollo education in the first place.

95.    Significantly, Apollo failed to notify students that the full amount of their Title IV loan money could be returned, or explain the circumstances in which that would occur.  These were students that, as the Company knew, were highly unlikely to have the financial means to pay their tuition bills themselves.  Apollo's failure to notify the students that they may have to pay tuition directly to Apollo upon withdrawal, rather than paying back federal Title IV loans with less onerous repayment terms, only compounded the problem, making it even more unlikely that Apollo's tuition bills would ever be paid.

96.    In the process of ruining these students' credit histories and eliminating any chance that they might be able to improve their lives by attending another institution, Apollo continued to record the students' debt as current accounts receivable, without timely recording bad debt expense, thereby creating the impression that revenues were unaffected by Apollo's unilateral decision to return all of the students' Title IV funds.

97.    On its face, it seems counterintuitive that Apollo would return Title IV money to lenders when the focal point of its business strategy was to enroll students and access that revenue stream.  However, in an effort to maintain continued access, certain "sacrifices" became necessary.  First, by returning Title IV loans to the lenders for students at high risk of default, Apollo prevented those students from being counted as part of the calculation of Apollo's CDR, because the students never entered repayment under a Title IV program.  Instead, the students' obligations to the lenders had been replaced with debts owed directly to Apollo.  Thus, Apollo eliminated the very high risk that these students would default at the expiration of the grace period, increase Apollo's CDR, and bring Apollo closer to losing its eligibility to participate in Title IV programs.

98.     Apollo's return of student loan money to lenders also helped it maintain compliance with the 90/10 Rule.  Because these students were no longer recipients of Title IV funds, the revenue booked as a result of their attendance – even though it likely would never be collected – now shifted into the non-Title IV category, meaning that it counted towards calculation of the minimum 10% of revenues that Apollo was required to derive from non-Title IV sources.  Through the use of these manipulative practices with respect to the return of Title IV loans, Apollo was able to report that it was in compliance with 90/10 Rule – though barely so – with reported percentages of 86% for the year ended August 31, 2009, and 88% for the year ended August 31, 2010.

99.     Apollo therefore was willing to bite the bullet by returning Title IV funds it was otherwise allowed to retain, even though it would eventually result in increased write-offs for bad debt when Apollo belatedly acknowledged that the receivables from the students were uncollectible, because this ultimately served Apollo's paramount goal of preserving its Title IV status.  In other words, it was far more lucrative for Apollo to do whatever was necessary to keep billions of dollars in Title IV funds flowing into the Company than to worry about charging off increased bad debts in twelve to eighteen months.  Moreover, so long as Apollo continued to attract a new crop of enrollees with promises of free government money to cover the cost of attendance, the eventual losses incurred as a result of departures and return of Title IV funds were more than offset by the intake of new students.

100.     Numerous former students have confirmed that the practice of returning all of a student's Title IV funds was pervasive.  In a class action lawsuit filed by former UOP students against Apollo captioned *Russ v. Apollo Group, Inc., et al.*, United States District Court, Central District of California, Case No. CV09-0904, former UOP students allege that, when they withdrew from UOP, the University canceled the full amount of their federal loans – even though it knew the students had incurred some tuition obligation against which the loan proceeds could be debited – and thereafter turned to the students to collect the full amount outstanding on the student loans.  The

1  terms of these new obligations to UOP were more onerous than the terms of the federal

2  loans these students had applied for and secured.   Through this chicanery, UOP was

3  able to maintain compliance with the 90/10 Rule and artificially deflate its CDR,

4  ensuring its continued entitlement to Title IV funds.

5       101.   Other students have posted complaints on various websites regarding

6  UOP's unauthorized return of their Title IV loan proceeds to the lenders upon their

7  withdrawal from the school.  For example, the following posting was made on March 3,

8  2010:

9       I am a United States Marine on the Temporarily Disabled
        Retired List residing in Charlotte, NC.   I qualified and
10      received a federal student loan to pay for my University of
        Phoenix education.   Coexisting with enrollment, I was
11      contracted with Bank of America for the approximate loan
        amount of $9,000.00 - $10,000.00; a loan authorized under
12      the Title IV federal student loan program.   My financial
        agreement and obligations were designated and contracted to
13      federal financial aid only.  I am unable to finance education
        without federal assistance; if I was unable to pursue [a]
14      federal loan I would have not nor [sic] considered an
        education through University of Phoenix if put into the
15      stipulation of a cash payment basis.  According to Federal
        guidelines, University of Phoenix is entitled to a pro-rata
16      share of tuition consequent to the amount of time I attended
        their online campus.   This pro-rata sum was to be deducted
17      from my federal loan that had been received by the University
        of Phoenix.   Instead of accepting the payment from my
18      federal loan, without consent, University of Phoenix
        improperly returned my federal loan monies, informing me
19      that I was now responsible and obligated to pay any
        outstanding balance that the return of my federal loan had left
20      on my University of Phoenix account.

21                     *       *       *

22      University of Phoenix now represented themselves that if I were not
        [to] pay off the debt in full immediately; my account would be
23      turned over to collections damaging my credit.

24  http://www.complaintsboard.com/complaints/university-of-phoenix-axia-college-

25  apollo-group-c317668.html.

26       102.   UOP's practice of returning withdrawn students' Title IV loans to the

27  lenders is also confirmed by the following internet postings dated December 15, 2010,

28  by a former UOP enrollment counselor:

My short time as a UOP enrollment counselor was among the lowest points in my life.  I hated the job from day one, but my wife wasn't working at the time, and I was trying to start my business, so I stayed there for a year until she started working.  To anyone who I actually enrolled in that scam, I am truly SORRY, and I want to tell you the truth now, so that others can be spared from wasting a tremendous amount of time and money.

*     *     *

UOP also engaged in unethical and ILLEGAL practices when it came to the handling of students FINANCIAL AID!  The Stafford Loan program is the LIFEBLOOD of UOP and without it they would be out of business quickly because none of their students could afford their ridiculous tuition costs.  The government has a rule called the COHORT DEFAULT RULE that states that a schools students "DEFAULT RATE" cannot go above a certain level (%) or that school would not be eligible to receive FEDERAL AID ANYMORE.   THIS WOULD PUT UOP OUT OF BUSINESS INSTANTLY!  Since UOP has NO ADMISSION STANDARDS (doesn't even verify high school diplomas in most cases) and their DEGREES ARE WORTHLESS the VAST MAJORITY OF THEIR STUDENTS DON'T GRADUATE, and CAN'T PAY BACK THEIR HUGE LOANS, so THEY DEFAULT... UOP knows this and so they have to engage in the deceptive and hopefully soon to be illegal practice of - RETURNING THE STUDENTS FUNDS TO THE LENDER.

THIS IS IMPORTANT - if a student takes out financial aid to pay for school they are entering into a contract between themselves (student) and the FEDERAL GOVERNMENT (through Stafford Loans).  The contract says that the student does not have to start paying back their loans until 6 months from their last date of attendance.   HOWEVER, UOP INTERFERES WITH THIS CONTRACT and SENDS STUDENT FUNDS BACK TO THE LENDER, AND THEN TRY TO COLLECT DIRECTLY FROM THE STUDENT in 30 DAYS.

FOR EXAMPLE - a student starts a UOP class like GEN/200, student realizes that the school is shit or fails the class and wants to withdraw after this course.  They currently owe UOP $1500 for the class, WHICH IS COVERED BY FINANCIAL AID.  Once they withdraw they should have 6 months to start making payments, and only have to pay $50 a month, per the federal guidelines.  HOWEVER, UOP knows that there is a GREAT CHANCE that this student will DEFAULT ON THIS LOAN, because they have no means to pay it back, so UOP WILL INTERFERE WITH THE RELATIONSHIP BETWEEN THE STUDENT AND THE GOVERNMENT AND SEND THE FUNDS BACK TO THE GOVERNMENT ON THE STUDENTS BEHALF!!!!!  Stop and think about that for a moment, UOP is interfering as a 3rd party in a

relationship between the student & government. SINCE THE GOVERNMENT NOW HAS THEIR MONEY BACK THIS STUDENT DOES NOT COUNT AGAINST UOP's DEFAULT RATE!!!  UOP then harassess [sic] the student relentlessly and sends their bill collectors after them, they threaten the student by telling them that they have ONLY 30 DAYS TO PAY IN FULL!!!!  Verses [sic] the 6 month grace period and $50/month agreement they have with the government.  IF THE STUDENT DOES NOT PAY IN 30 DAYS THEY ARE TURNED INTO THE COLLECTION AGENCY WHO ALSO HARASSES THE STUDENT AND RUINS THE STUDENTS CREDIT!  UOP knows that they will collect very little of this money EVER, but they are willing to accept this small loss because THEY MAKE SO MUCH MORE MONEY BY KEEPING THEIR FINANCIAL AID (TITLE IV) STATUS!

*See*  http://universityofphoenixsucks.blogspot.com/2009/02/does-university-really-care-about.html.

103.    Thus, at all times during the Class Period, both the 90/10 Rule calculation and the CDR reported by Apollo to the DOE and included in the Company's public disclosures were deliberately false and misleading, because they did not accurately reflect that the Company was either in danger of or already violating Title IV regulations and in jeopardy of, at a minimum, being subject to greater restrictions to its access to Title IV funds, and at worst, losing its eligibility to receive Title IV funds altogether.  Apollo also failed to disclose that its practices, especially returning all of students' Title IV funds, threatened its financial stability by reducing the actual cash in its coffers and replacing it with receivables from students that Apollo knew it had virtually no chance of recouping.

### 2.    Apollo's Artificial Inflation Of Revenue

104.    As a second consequence of the Company's push to enroll students at all costs in order to get access to Title IV funds, a substantial number of these students were unsuited for the school's programs and dropped out soon after enrolling.  At institutions where a majority of students are expected to and actually do complete coursework, the potential for this midstream reduction in expected revenues is relatively straightforward and likely will have only minimal impact on overall profitability.  However, because Apollo emphasized enrollment without regard to the

quality of either the applicants or the curriculum, it had a high drop-out rate that presented severe risks to its revenue stream.  Not only did student withdrawals affect the Company's ability to realize revenue for the portions of the programs the students did not attend, but to the extent Apollo returned the withdrawn students' Title IV money to the lenders, they also limited the Company's ability to recognize revenue for the courses the students did attend.  To conceal the financial impacts and risks associated with its business model from investors, Apollo inflated its revenues and assets by failing to properly account for student withdrawals.

105.   First, Apollo's revenue was inflated by the amount of tuition the Company earned prior to a student's withdrawal, but for which the Company returned the applicable Title IV funds.  Even though this tuition revenue was earned, it was neither realized nor realizable because the Title IV funds had been returned and Defendants knew the revenue was not collectible directly from the students.  Nonetheless, Defendants booked this revenue and kept it on the Company's income statement even after the students withdrew and their Title IV funds were returned.  As described in greater detail below, this was a violation of GAAP.

106.   Additionally, Apollo artificially increased the amount of tuition it could treat as "earned," thereby inflating its revenue and net income, by improperly delaying the effective dates of students' withdrawals from school.  Under Title IV regulations, a student who provides notification of his/her withdrawal must be deemed to have withdrawn on the later of (a) the actual withdrawal date (*i.e.*, the last date of attendance for schools that are required to take attendance, or the date the student begins the withdrawal process at a school where attendance is not required to be taken) or (b) the date the student notifies the school of his/her withdrawal.  For students who do not notify the school of their withdrawal, the school must treat them as having withdrawn as of the date the school becomes aware that they stopped attending.  *See* 34 C.F.R. §§ 668.22(1) and (3), 668.22(b) and (c).

107.   In March 2008, the DOE informed UOP that it had received a number of student complaints in 2008 indicating that, among other things, UOP had refused to acknowledge the students' withdrawal notifications and had kept the students enrolled for up to an additional month.  The DOE's resolution of these complaints indicated that UOP had indeed failed to treat the students' notice of withdrawal as the withdrawal date, choosing a date much later in time.  During a July 7, 2009 exit conference with the DOE, UOP officials stated that UOP had taken action to address these issues, including revision of UOP's withdrawal process in June 2008 and August 2008.  However, the DOE conducted a program review of UOP in February 2009, and its review of student files in the program review process revealed that throughout 2008, UOP continued to fail to timely withdraw students who expressed a desire to withdraw, resulting in UOP's untimely return of Title IV funds.  In violation of Title IV regulations, UOP was still systemically disregarding students' notifications of their intent to withdraw, and was not treating those students as withdrawn until they had at least 30 days of consecutive absences.  Aside from enabling UOP to improperly delay the return of unearned funds, this practice of failing to timely withdraw students also inflated Apollo's revenues because the Company was able to claim that it "earned" tuition revenues for an extra month.

108.   In addition to inflating its revenues, Apollo overstated the value of its assets by failing to appropriately account for the uncollectibility of its receivables.  At the time of a student's enrollment in a course, Apollo recorded the full amount of the tuition on its balance sheet in an accounts receivable asset account and a deferred revenue liability account.  When the school received the student's Title IV loan money, Apollo replaced the account receivable with cash on the asset side of its balance sheet.  When a student withdrew from a course, Apollo returned some or all of the Title IV funds to the lender, reduced its cash asset account by the amount returned, and reinstated on its balance sheet the account receivable from the student for the tuition owed (less any Title IV money retained by the school).  In doing so, Apollo treated the

cash and accounts receivable entries as though they represented equivalent levels of risk.   However, based on its experience, Apollo knew that for the overwhelming majority of these students – who had required financial aid in order to afford to attend school in the first place – the likelihood of ever collecting these receivables was extremely low.   Apollo should have immediately written off substantial amounts of these receivables and taken charges to bad debt expense, or at least recorded large reserves.   Instead, it carried these uncollectible receivables on its books as assets without disclosing their uncollectibility to investors.

109.   Meanwhile, on the liability side of its balance sheet, Apollo failed to properly reduce its deferred revenue account when a student withdrew before completing a course.   As noted above, at the time of a student's enrollment in a course, Apollo recorded deferred revenue equal to the full amount of the tuition due for that course.   As that tuition was "earned" through the student's attendance, the Company was able to recognize revenue by moving deferred revenue into the revenue account over time.   Conversely, when a student withdrew before the full amount of tuition was earned, Apollo should have reduced its deferred revenue account by the unearned amount, because the Company no longer had any legitimate expectation of earning or collecting this revenue.   By manipulating the way in which it deemed tuition to be "earned," Apollo not only avoided this reduction of deferred revenue, but it enabled itself to convert that deferred revenue to revenue even though it was not properly realizable under GAAP.

110.   As explained above, prior to March 1, 2008, Apollo considered 100% of a student's tuition to be earned once the student attended two classes.   Until March 1, 2008, for students who withdrew after attending two classes (but before completing the course), Apollo improperly recorded 100% of the tuition for the course as revenue, even though all of the student's Title IV funds attributed to the first two classes were returned (and that revenue was not collectible from the student), and even though the tuition attributed to the unattended classes was neither realized nor realizable.

111.    After March 1, 2008, under Apollo's new refund policy (whereby students who attended less than 60% of a course were eligible for a refund for the portion not attended), Apollo continued to inflate revenue.  For students who withdrew prior to completing 60% of a course, even though Apollo returned the students' Title IV funds and was extremely unlikely to ever collect this revenue from the students, Apollo recognized revenue for the time the students attended.  For students who withdrew after attending 60% of a course (but prior to completing the course), Apollo booked 100% of the revenue (moving all the deferred revenue for the course to revenue).  Apollo's recording of the revenue for the portion of the course not attended was improper, as that revenue was not realized or realizable, nor likely to be collected.  To the extent Apollo returned the Title IV funds to lenders for these students for the portion of the course that had been completed, its recording of revenue for that portion of the course was also improper, as Apollo knew it was extremely unlikely to collect the tuition from the students.

112.    Thus, at all times during the Class Period, Apollo's financial reporting was false and misleading because Apollo improperly recognized revenues, failed to take adequate reserves for bad debts, and failed to write-off uncollectible receivables in a timely manner.  These practices resulted in artificially inflated revenues and net income on the condensed consolidated income statements and artificially inflated accounts receivable (sometimes referred to as tuition accounts receivable) and deferred revenue on the condensed consolidated balance sheets.  Apollo's "churn and burn" Ponzi scheme enabled it to report continued increases in revenues and profitability and line the pockets of the Defendants by stealing opportunity from students and investors alike.

### E.    Apollo's Financial Statements Violated SEC Rules And GAAP

113.    All of the financial statements issued by Apollo during the Class Period, including those set forth in the Forms 10-Q and 10-K issued by the Company, as well as the financial results that were derived from those financial statements and discussed in

46

the Company's press releases and SEC filings, and in conference calls and at conferences, were materially false and misleading because they failed to comply with SEC rules and GAAP as set forth herein.

114. Federal regulations strictly govern what must be included in documents filed with the SEC. The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984). In addition to filing the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970). The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19, 1981).

115. In Securities Act Release No. 6349 (September 8, 1981), the SEC stated that "it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company," and in Accounting Series Release 173, the SEC reiterated the duty of  management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

116. SEC Regulation S-K provides, in part, that annual and period reports must contain a section entitled "Management's discussion and analysis of financial condition and results of operations" (the "Management Discussion"). *See* 17 C.F.R. § 229.10, *et*

*seq*.  The contents of the Management Discussion are regulated by Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), which requires, in part, that the Management Discussion:

> Discuss registrant's financial condition, changes in financial condition and results of operations.  The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations.

117.  Paragraph (a)(3) of Item 303 requires, in part, that the Management Discussion discuss a company's "results of operations" as follows:

> (i)  Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii)  Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

118.  Congress provided instructions in the Notes to Item 303 to clarify what is required of publicly-filing companies like Apollo.  Instructions 1 - 3 provide:

> 1.  The registrant's discussion and analysis shall be of the financial statements and of other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations.  Generally, the discussion shall cover the three year period covered by the financial statements and shall use year-to-year comparisons or any other formats that in the registrant's judgment enhance a reader's understanding.  However, where trend information is relevant, reference to the five year selected financial

data appearing pursuant to Item 301 of Regulation S-K (§ 229.301) may be necessary.

2.    The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3.    The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

119.    Defendants had knowledge of material adverse information concerning their improper accounting, marketing and billing practices and the effects that those practices could have and did have on Apollo and its financial statements during the Class Period. Defendants had an obligation to disclose such improper practices and their financial impact on and concomitant risks to Apollo pursuant to Item 303 of Regulation S-K. For example, Defendants were required to, but did not, disclose:

- That the Company was refunding to lenders 100% of the Title IV funds for many students who withdrew from Apollo schools, yet continued to book those funds as revenue despite the high degree of uncollectibility;

- The amount of refunds or discounts that should have been classified as a reduction of revenue as opposed to bad debt expense;

- The overstatement of revenue and deferred revenue attributable to refunds of Title IV funds or untimely refund payments;

- A quantification of the impact that changes in the refund policy had on tuition revenues; and

- That the Company's accounts receivables from students were overstated due to grossly inadequate reserves and write-offs.

49

120.   Federal regulations also required Apollo to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that Apollo's annual and interim (*e.g.*, quarterly) financial statements as filed with the SEC must be prepared in accordance with GAAP.   If the filings do not comply with GAAP, they are "presumed to be misleading or inaccurate," despite footnote or other disclosure.   17 C.F.R. §210.4-01(a)(1).

121.   In the hierarchy of authoritative GAAP literature, the highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), FASB Interpretations ("FIN"), APB Opinions ("APB"), and AICPA Accounting Research Bulletins ("ARB").   GAAP provides other authoritative pronouncements, including, among others, AICPA Statements of Position ("SOP") and Consensus Positions of the FASB Emerging Issues Task Force ("EITF"). Each provision in these pronouncements now has a citation under the recently adopted Accounting Standards Codification ("ASC").   If a particular issue is not addressed in the authoritative literature, additional sources may establish GAAP, including FASB Statements of Financial Accounting Concepts ("CON").

122.   Throughout the Class Period, Defendants caused Apollo to represent that the Company's financial statements complied with SEC regulations and were prepared in conformity with GAAP in all material respects.   However, that was not the case. Among other things, the Company's revenue recognition policies were not in compliance with GAAP in that revenue and related receivables were improperly and prematurely recognized.

123.   Apollo's practice of recognizing revenue from students who withdrew before they completed their courses and had their Title IV funds returned, violated GAAP.  Specifically, CON No. 5, ¶¶ 83 and 84 state, in pertinent part:

Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration.

a.  *Realized or realizable*. **Revenues and gains generally are not recognized until realized or realizable.**  Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash.  Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  Readily convertible assets have (i) interchangeable (fungible) units and (ii) quoted prices available in an active market that can rapidly absorb the quantity held by the entity without significantly affecting the price.  [Footnote reference omitted].

b. *Earned*.  **Revenues are not recognized until earned.**  An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and ***revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues***….

In recognizing revenues and gains:

(a)   The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery).

\*       \*       \*

(c)   If product is contracted for before production, revenues may be recognized by a percentage-of-completion method as earned — as production takes place — provided reasonable estimates of results at completion and reliable measures of progress are available.

(d)   If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes.

\*       \*       \*

51

1

2

*(g)   **If collectability of assets received for product, services, or other assets is doubtful, revenues and gains may be recognized on the basis of cash received.***

3

(emphasis added).

4

5

6

7

8

124.   The SEC staff has issued Staff Accounting Bulletin ("SAB") No. 104, which sets forth the Staff's interpretation of GAAP governing accounting for revenue recognition in financial statements of SEC registrants.  SAB No. 104 states that revenue generally is realized or realizable and earned only when all of the following criteria are met:

9

10

11

12

- Persuasive evidence of an arrangement exists;
- Delivery has occurred or services have been rendered;
- The seller's price to the buyer is fixed or determinable; and
- Collectability is reasonably assured.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

125.   Apollo's recognition of revenue from students who withdrew from school violated GAAP.  First, many of the students who withdrew were nonetheless billed for the full tuition for those courses.  To the extent Apollo was billing students for tuition and other charges that post-dated their withdrawal, Apollo did not earn those revenues because it had neither rendered any services in exchange for those revenues, nor substantially accomplished what it needed to do to be entitled to those revenues.  Persuasive evidence of an arrangement did not exist since Apollo's revenue did not represent faithfully the services provided to the students, as no services were provided after the time the students withdrew.  Second, as explained above, as a result of its improper marketing and billing practices, Apollo knew that the overwhelming majority of withdrawn students would not be able to pay their tuition bills for the post-withdrawal period, and when Apollo returned those students' Title IV loan funds for the pre-withdrawal period, it likewise knew that it was highly unlikely to recoup that money from the students directly.  Thus, the collectability of revenue from these withdrawn students was highly "doubtful" and not "reasonably assured," and under GAAP it should not have been booked until (if ever) cash was received.  Accordingly,

when these students withdrew, Apollo should have immediately reduced its revenue and deferred revenue – which had been recorded when the Title IV loans were received – by the amount owed by these students.

126.   Not only did Apollo improperly recognize revenue that was not realized, realizable or earned, but it also violated GAAP in its booking of accounts receivable, its failure to take sufficient allowances for bad debts, and its failure to take sufficient and timely write-offs for its uncollectible receivables.  When Apollo returned students' Title IV loans to the lenders and then billed the students directly for their tuition and other charges, it replaced the cash on its balance sheet with receivables from those students. While Apollo eventually recorded allowances for doubtful accounts with respect to these receivables, it recorded materially insufficient allowances that failed to take into account what Apollo knew from experience to be true – *i.e.*, that many, indeed most, of its students would not be able to pay their bills, especially those students whose entire Title IV package Apollo returned to the lenders.  Upon recording of these receivables, Apollo should have immediately recorded allowances for doubtful accounts that accurately took into account its knowledge and experience regarding the high degree of uncollectibility of those receivables (thus reducing its accounts receivable asset balance), and should have simultaneously recorded bad debt expense in the same amount on its income statement.

127.   ASC No. 450 (formerly SFAS No. 5, Accounting for Contingencies), ¶¶ 22 and 23, provides:

> Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 [it is probable that an asset has been impaired and the amount of loss can be reasonably estimated] are met.  Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables.  If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.
>
> …  Whether the amount of loss can be reasonably estimated …  will normally depend on, among other things, the experience of the enterprise, information about the ability of

individual debtors to pay, and appraisal of the receivables in light of the current economic environment.

128.    Under ASC No. 450, the estimated portion of uncollectible accounts receivable must be accrued – *i.e.*, an allowance for bad debts must be recorded on the balance sheet and a bad debt expense must be recorded on the income statement – in the period it becomes evident that a receivable or some reasonably estimable portion of it will probably not be collected.

129.    Defendants violated ASC No. 450 by Apollo's failure to take immediate and adequate allowances for the receivables from students who withdrew from school, including those whose Title IV funds were returned by Apollo, as Defendants knew from the outset that it was probable that those amounts would not be collected, and the amount of loss could be reasonably estimated based on, *inter alia*, Apollo's historic collections experience.  Instead, the Company recorded revenue in one period (which it never should have recorded in the first place under CON No. 5) and then waited until a subsequent period to record bad debt allowances and bad debt expense for the corresponding account receivable.  This inappropriate accounting allowed Apollo to overstate revenue dollars and growth rates.

130.    The following table (all figures in thousands) shows some of Apollo's key financial metrics for the fiscal years ended August 31, 2006 through 2010.  Net revenue grew by 99 percent between fiscal 2006 and 2010, whereas deferred revenue grew at nearly twice that rate (by 193 percent) during the same time period.  The growth in revenue and deferred revenue reflects the aggressive recruitment practices of students dependent on Title IV funding, and the failure to write off amounts after students withdrew from courses, a fact that was never disclosed.  Similar rates of growth in revenue and deferred revenue on a quarter over quarter basis were reported for the respective quarterly periods from fiscal 2007 to fiscal 2010.

|  | 2006 Form 10-K | 2007 Form 10-K | 2008 Form 10-K | 2009 Form 10-K | 2010 Form 10-K |
|---|---|---|---|---|---|
| Net revenue | $2,477,533 | $2,723,793 | $3,140,931 | $3,974,202 | $4,925,819 |
| Deferred revenue | $136,295 | $167,298 | $231,283 | $388,677 | $398,599 |
| Accounts receivable, net | $160,583 | $190,912 | $221,919 | $298,270 | $264,377 |
| Beginning allowance | $45,785 | $65,184 | $99,818 | $78,362 | $110,420 |
| Bad debt expense | $101,038 | $120,614 | $104,201 | $152,490 | $282,628 |
| Write-offs | ($81,639) | ($85,980) | ($125,657) | ($120,432) | ($199,332) |
| Included in assets held for sale |  |  |  |  | ($859) |
| Ending allowance | $65,184 | $99,818 | $78,362 | $110,420 | $192,857 |

131.    The allowance for doubtful accounts – *i.e.*, the amount of the accounts receivable that the Company admitted were probably uncollectible – grew by 196 percent from fiscal year 2006 to the end of fiscal year 2010, with a 75 percent growth in the allowance account in 2010 alone.  A similar rate of growth in the allowance for doubtful accounts on a quarter over quarter basis is reported for the Form 10-Q filings covering periods from the second quarter of fiscal year 2007 through the third quarter of fiscal 2010.  In spite of Apollo's disclosures that it considered recent collection experiences and recent trends when recording these allowances, Apollo's contemporaneous financial reporting explicitly led investors to believe that the Company's collection experience was better than it was.  The financial reporting did not reflect a high degree of risk associated with collecting receivables from students who withdrew from classes.  Apollo knew that student withdrawals were increasing and that it would be unable to collect the corresponding accounts receivable from those students, yet it did not incorporate this information into its reporting of the allowance for doubtful accounts.  Apollo's financial reporting instead reflects that the Company

put off recognizing the bad debt expense associated with the uncollectible accounts receivable until after the end of the Class Period.

132.    The following table shows four key ratios that reflect the relationships between the financial statement items listed in the table above.

| | Fiscal year ended August 31, 2006 | Fiscal year ended August 31, 2007 | Fiscal year ended August 31, 2008 | Fiscal year ended August 31, 2009 | Fiscal year ended August 31, 2010 |
|---|---|---|---|---|---|
| Bad debt expense as % of net revenue | 4.08% | 4.43% | 3.32% | 3.84% | 5.74% |
| Write-offs as % of bad debt expense | 80.80% | 71.29% | 120.59% | 78.98% | 70.53% |
| Allowance as % of accounts receivable, gross | 28.87% | 34.33% | 26.10% | 27.02% | 42.18% |
| Accounts receivable turnover | 15.4 | 14.3 | 14.2 | 13.3 | 18.6 |

133.    Bad debt expense as a percentage of revenue should have been increasing significantly during the Class Period, given the decline in the quality of the accounts receivable was declining.  However, that percentage remained relatively constant on both an annual and quarterly basis from fiscal 2008 until fiscal 2010.  In violation of GAAP and contrary to its own disclosures, Apollo understated the bad debt expense it knew it would experience as it tried to collect on receivables from students that withdrew from courses.  As further evidence of the decline in the quality of the receivables, the accounts receivable turnover, which is a measure of collectibility risk, was declining on a quarterly and annual basis until 2010.  However, Apollo's financial reporting falsely suggested that it was having success in collecting these receivables in spite of the increased risk, because it understated its allowance for doubtful accounts balance from the second quarter of fiscal 2007 through the third quarter of fiscal 2010. In reporting the allowance for doubtful accounts, Apollo did not adequately consider its recent collections experience.

134.   Over time, the cumulative write-offs of accounts receivable should approximate the estimated amounts that are uncollectible, *e.g.*, bad debt expense.  From the second quarter of 2007 through the third quarter of 2010, Apollo wrote off significantly lower amounts of receivables than it recorded as bad debt expense.  This consistent understatement in write-offs distorted Apollo's historical collections experience and trends, which it claimed to have utilized to estimate bad debt expense. This resulted in an overstatement of accounts receivable.

135.   These data demonstrate that while the Company inflated its net revenue, it also failed to adequately reserve for uncollectible tuition receivables and understated its bad debt expense.  These failures to comply with GAAP not only led to the publication of false and misleading financial statements, but also to inadequate disclosure in violation of SEC Regulation S-K.  The overstatement of net revenue, deferred revenue, accounts receivable and income because of violations of GAAP enabled Apollo to project a trend in operating results that was not being attained and was not sustainable. In addition, the false and misleading financial reporting portrayed improved liquidity and a potential for future cash flows that were not supported by the facts.

### F.   Apollo Failed To Maintain Adequate Internal Controls Over Financial Reporting

136.   Under the securities laws, Apollo is required to develop and implement the internal controls necessary to ensure that it maintains adequate and accurate books and records.   Section 13(b)(2) of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall
>
> A.   make and keep books, records, and accounts, which, in reasonable detail,   accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--

i.      transactions are executed in accordance with management's general or specific authorization;

ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

137.    In 1992, a report by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") entitled *Internal Control – Integrated Framework* ("COSO Report") defined internal control within a framework consisting of five components: control environment, risk assessment, control activities, information and communication, and monitoring. The COSO Report requires that financial statements prepared for external use be fairly presented in conformity with GAAP and regulatory requirements.

138.    According to the COSO Report, a system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.  Furthermore, a system of internal controls encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance.   It includes the actions taken by a company's board of directors, management at all levels, and employees running the business.

139.    In its 2006 10-K, Apollo disclosed that management had performed an assessment of the effectiveness of the Company's internal controls over financial reporting as of August 31, 2006, utilizing the criteria described in COSO Report to determine whether the Company's internal controls over financial reporting were effective as of August 31, 2006.   The Company disclosed that management had

determined that the Company did not maintain effective controls over, among other things, the recording of allowance for doubtful accounts, and that the control deficiencies constituted material weaknesses in internal controls over financial reporting as of August 31, 2006.  The control deficiencies identified by management resulted in the restatement of prior years' financial statements for the fiscal years ended August 31, 2005 and 2004.

140.    In discussing the recording of allowance for doubtful accounts as one of four material weaknesses in internal controls over financial reporting, Apollo disclosed that the Company had understated its allowance for doubtful accounts by failing to consider available information related to:

> (a) the cumulative differences between actual write-offs and [its] allowance for doubtful accounts and (b) significant increases in the "Return to Lender" dollars for Title IV recipients who withdraw from University of Phoenix, Inc. ("UPX") or Western International University, Inc.("WIU"). When a student with Title IV loans withdraws from UPX or WIU, [the Company is] sometimes required to return a portion of Title IV funds to lenders.  [The Company is] generally entitled to collect these funds from the students, but the collection of these receivables is significantly lower than [its] collection of receivables from students who remain in its educational programs.

The restatement related to Apollo's allowance for doubtful accounts resulted in increases in the Company's pretax bad debt expense in the amounts of $11.7 million and $4.1 million for the fiscal years ended 2005 and 2004, respectively.

141.    In its 2006 10-K, the Company further stated that it had implemented significant changes and improvements in internal controls during the first and second quarters of fiscal year 2007, including standardization of the process and documentation required for the allowance for doubtful accounts.  Additionally, in the Company's Forms 10-K and 10-Q filed with the SEC during the Class Period, various Individual Defendants signed Sarbanes-Oxley Certifications attesting that they had properly designed, implemented and supervised internal controls over financial reporting and disclosed any material weaknesses in such internal controls.  However, this was not true

because the very issues that were identified concerning the allowance for doubtful accounts in 2006 continued to existed throughout the Class Period.

142. As the Defendants knew but concealed from investors, the Company's internal controls were deficient, and no plans or procedures were implemented that would cure the previously-disclosed deficiencies. As of today, Apollo is still experiencing collection issues from students who withdraw from Apollo schools, including those whose Title IV loans are returned to lenders. Just like in 2005 and 2004, throughout the Class Period Apollo failed to adequately consider all the information available when recording allowances for doubtful accounts and bad debt expense.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

143. During the Class Period, Defendants made a number of materially false and misleading statements, including statements in its filings with the SEC, in press releases, and in analyst conference calls and interviews. These false and misleading statements are detailed below.

### A. Defendants Concealed From Investors That Apollo's Enrollment And Revenue Growth Were Due to Deceptive Marketing Practices, And Falsely Attributed Them To The Purported Quality Of The Company's Services

144. As described above, the Company achieved significant enrollment growth during the Class Period as a result of a plethora of unsavory, unethical, and deceptive recruitment practices. However, in describing the Company's success to investors, Defendants never disclosed these deceptive and unsustainable recruitment practices, but instead falsely attributed Apollo's enrollment growth – and its concomitant net revenue growth – to other factors, such as UOP's increased service offerings and purported focus on academic quality. Thus, Defendants created the false impression of a Company with a solid foundation and a legitimate, sustainable potential for growth.

145. For example, during an October 28, 2008 conference call with analysts following the release of Apollo's fourth quarter 2008 earnings result (the "4Q 2008

Earnings Call"), Defendant D'Amico stated: "Regarding revenues, for the fourth quarter we reported consolidated net revenues of 831 million, a 16.5% increase.  The primary contributor to this growth was our 15.4% total enrollment growth, which was driven by very strong new enrollment growth of 19.1% and continued improvement in student retention . . .  Academic quality is key to the success of our business and is the foundation on which we are able to achieve the results I just discussed."

146.   In its Second Quarter 2009 10-Q, Apollo stated that during the first six months of fiscal year 2009, it achieved 19.4% growth in average UOP Degreed Enrollment and 24.4% growth in average UOP New Degreed Enrollment.  Degreed Enrollment for a quarter represents individual students enrolled in a UOP degree program who attended a course during the quarter and did not graduate as of the end of the quarter.  Degreed Enrollment also includes any student who previously graduated from one degree program and started a new degree program in the quarter (for example, a graduate of the associate's degree program who returns for a bachelor's degree).  In addition, Degreed Enrollment includes students participating in UOP certificate programs of at least 18 credit hours in length with some course applicability in a related degree program.  Apollo stated that it believed this "enrollment growth is primarily attributable to continued investments in enhancing and expanding University of Phoenix service offerings and academic quality, which has attracted new students and increased student retention," and that this enrollment growth, in turn, was the "primary" cause of its 25.3% increased revenue for the six months ended February 28, 2009.

147.   In its Third Quarter 2009 10-Q, Apollo stated that during the first nine months of fiscal year 2009, it achieved 20.3% growth in average UOP Degreed Enrollment and 23.7% in UOP New Degreed Enrollment.  Apollo stated that it believed this "enrollment growth is primarily attributable to continued investments in enhancing and expanding University of Phoenix service offerings and academic quality, which has attracted new students and increased student retention," and that this enrollment

growth, in turn, was the "primary" cause of its 25.5% increased revenue for the nine months ended May 31, 2009.

148.    In its 2009 10-K, Apollo stated that during the 2009 fiscal year, it achieved 20.8% in average UOP Degreed Enrollment and 23.5% in UOP aggregate New Degreed Enrollment.  Once again, Apollo stated that it believed this "enrollment growth is primarily attributable to continued investments in enhancing and expanding University of Phoenix service offerings and academic quality, which has attracted new students and increased student retention, and to enhancements in our marketing capabilities," and that this enrollment growth, in turn, was the "primary" cause of its 26.5% increase in revenue and its 38.7% increase in income from operations for the 2009 fiscal year.

149.    In its First Quarter 2010 10-Q, Apollo stated that for the three months ended November 30, 2009, it achieved 18.4% UOP Degreed Enrollment and 13.7% UOP New Degreed Enrollment.  Apollo stated that it believed this "enrollment growth is primarily attributable to enhancements in our marketing capabilities, along with continued investments in enhancing and expanding University of Phoenix service offerings and academic quality," and that this enrollment growth, in turn, was the "main" cause of the 21.5% of the total 30.8% revenue increase contributed to the Company by UOP.

150.    In its Second Quarter 2010 10-Q, Apollo stated that during the three months ended February 28, 2010, it achieved 15.3% growth in UOP Degreed Enrollment and 9.4% increase in UOP New Degreed Enrollment.  Apollo stated that it believed this "enrollment growth is primarily attributable to enhancements in our marketing capabilities, along with continued investments in enhancing and expanding University of Phoenix service offerings and academic quality," and that this enrollment growth, in turn,  was the "main" cause of the UOP's 17.9% increase in net revenue.

151.    In its Third Quarter 2010 10-Q, Apollo stated that the "$209.0 million, or 20.8%, increase in net revenue in our University of Phoenix segment was primarily due

to growth in its Degreed Enrollment," and that this growth in Degreed Enrollment was "primarily attributable," *inter alia*, to "[e]nhancements in our marketing capabilities, along with continued investments in enhancing and expanding [UOP] service offerings and academic quality."  Apollo also stated that its operating income at UOP increased 22.4% during the third quarter of 2010, and that this increase in operating income was "primarily attributable," *inter alia*, to the "20.8% increase in [UOP] net revenue," which, in turn, was primarily due to enrollment growth.

152.    These statements were materially false and misleading because the Defendants knew, but failed to disclose, that Apollo's enrollment growth – and its concomitant growth in net revenue and income from operations – were attributable not to "continued investments in enhancing and expanding [UOP] service offerings and academic quality" but, rather, to the deceptive recruiting tactics described above, which were not geared toward enrolling students who were likely to be successful at Apollo's schools, but rather toward attracting anyone – regardless of ability – who would be eligible for Title IV aid.  By putting the source of its revenue growth in issue, Apollo became obligated to disclose the truth about the source of that growth.

153.    Similarly, Apollo's 2006 10-K and 2007 10-K stated:

> We believe that our track record for enrollment and revenue growth is attributable to our offering comprehensive services combining quality educational content, teaching resources and customer service with formats that are accessible and easy to use for students as well as corporate clients.  We maintain a single-minded focus on providing quality education to serve the needs of working students.

154.    These statements were materially false and misleading because Defendants knew, but failed to disclose, that Apollo's "track record for enrollment and revenue growth" was attributable to the improper recruiting and accounting practices described above, and not to the stated factors.  Further, Defendants knew that the Company's "single-minded focus" was not on providing a quality education, but on

increasing enrollment at all costs, without regard for students' likelihood of academic success.

**B.  Defendants Made Materially False Statements Regarding Apollo's Organizational Values And Management Integrity**

155.   During the Class Period, Apollo repeatedly trumpeted its commitment to integrity and business ethics.  For example, in the context of discussing the Company's recent corporate governance changes during a May 22, 2007 conference call with analysts (the "Q2 2007 Earnings Call"), Defendant D'Amico emphasized that "the organization is committed to conducting its business ethically and with integrity."

156.   In its 2006 10-K, Apollo stated:  "We have adopted a code of ethical conduct that applies to all employees, including our directors, executive officers, and all members of our finance department, including the principal financial officer and principal accounting officer.  This code of ethical conduct is available on the Company's website …"  Similarly, Apollo's 2008 10-K stated:  "Our employees must act ethically at all times and in accordance with the policies in our Code of Business Conduct and Ethics.  We require full compliance with this policy from all designated employees including our Chief Executive Officer, President, Chief Financial Officer, and Chief Accounting Officer."

157.   References to the Company's Code of Business Conduct and Ethics were also made in the Company's proxy statements that were sent to stockholders on December 28, 2007, December 17, 2008 and December 29, 2009.  In all three, Apollo expressly recognized that its "credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee" and that it "expects its directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty."

158.   Apollo's published Code of Business Conduct and Ethics stated, in pertinent part:

> It is the Company's belief that a strong commitment to principles of ethical conduct is essential for its success.

64

Accordingly, Apollo has adopted the Code of Ethical Conduct to outline expectations and provide standards for all employees and officers, regardless of the position he or she holds.  The Code promotes:

-        Honest and ethical conduct;

-        Full, fair, accurate, timely, and understandable disclosure in reports and public communications; [and]

-        Compliance with applicable laws, rules and regulations ….

159.   In their "Letter to Our Shareholders in Apollo's fiscal 2009 Annual Report, Cappelli and Edelstein stated:  "We emphasize the importance of operating with integrity and responsibility in everything we do.  We have advocated a culture focused on operating with the highest of ethical standards and making decisions based, first and foremost, on the best interests of our students."

160.   The ethics and integrity of a Company and its management are highly material to investors.  Unfortunately, contrary to false impression created by the Company's public statements, neither Apollo nor its management were conducting themselves ethically and with integrity during the Class Period, nor were they complying with applicable rules and regulations or providing full, fair and accurate disclosure to investors.  Instead, dishonest, unethical and deceptive practices were rampant throughout the Company's recruitment, compensation, accounting, compliance and financial aid functions.

**C.     Defendants Made Materially False Statements Regarding Apollo's Business Focus**

161.   Throughout the Class Period, Apollo attempted to portray itself to the investing public as an institution primarily focused on providing a quality education to its students and dedicated to changing lives through education.  For example, during the Q2 2007 Earnings Call, Defendant Capelli stated:  "Our primary focus is providing the highest-quality educational product and services for our students in order for them to maximize the benefits through our educational experience."

162.    During the earnings conference call for the first quarter of 2008 on January 8, 2008 (the "1Q 2008 Earnings Call"), Apollo President Brian Mueller stated, "Retention continues to be the number one focus at Apollo as it impacts so many aspects of our results including enrollment, revenue, profit levels, bad debt and student default rates."  Similarly, during the earnings conference call on July 1, 2008 for the third quarter of 2008 (the "Q3 2008 Earnings Call"), Capelli stated, "On the topic of retention, this continues to be our number one focus, as successful student outcomes ultimately lead to maximizing revenue and profitability."

163.    Similarly, Apollo's 2008 10-K stated:

> Our mission is to strengthen and capitalize on our position as a leading provider of high quality, accessible education for individuals around the world by affording strong returns for all of our key stakeholders: students, faculty, employees, and investors.  ***Our principal focus is providing the highest quality educational products and services for our students in order for them to maximize the benefits of their educational experience.***  A superior educational experience, combined with engaged and energized faculty and employees, should, in turn, enable our shareholders to achieve attractive returns on their capital over time.

(emphasis added).

164.    During an October 27, 2009 earnings conference call, Co-CEO Capelli said:  "[O]ur management team is completely aligned in the belief that none of this would be possible without always remembering to put our students first.  We strongly believe that maximizing the returns of our students will ultimately drive the magnitude of our long term success.  With this as our foundation we can successfully work to further improve the quality and access to higher education around the globe.  We believe that if we achieve these goals over the next three to five years our organization can continue to grow responsibly and we have internal objectives to generate low double-digit revenue growth and mid teens operating profit growth at Apollo Group globally."

165.    Apollo's 2009 10-K contained materially identical statements concerning its commitment to providing quality education services to its students and changing

lives through education as were contained in its 2008 10-K.  In the "Letter to Out Shareholders" in Apollo's Annual Report for the 2009 fiscal year, Cappelli and Edelstein similarly stated that the Company's "principal focus is to provide access to high quality educational products and services to our students in order for them to maximize the benefit of their educational experience."   The "Letter to Our Shareholders" further stated:

> …   *We are committed to providing access to high quality education but want to balance this with our responsibility to ensure that only students who have a reasonable chance to succeed enroll in our universities.*   To this end, we are investing in initiatives to help students become responsible borrowers and determine if they are prepared for the rigors of higher education and committed to making the effort required to succeed in our programs before they enroll or incur debt.
>
> *        *        *
>
> *Apollo Group makes every effort to ensure that its students enjoy academic and professional success*.   The Company introduces them to a unique environment replete with learning opportunities, modern facilities, vast educational resources, and an engaged and interactive faculty.   *It also closely monitors, measures, and refines the quality and success of its programs, constantly seeking ways to improve student completion and retention.*

(emphasis added).

166.   In its 2009 10-K as well as its First and Second Quarter 2010 10-Qs, Apollo similarly stated:

> We believe that a critical element of generating successful long-term growth and attractive returns for our stakeholders is to provide high quality educational products and services for our students in order for them to maximize the benefits of their educational experience.   *Accordingly, we are intensely focused on student success.*   We are continuously enhancing and expanding our current service offerings and investing in academic quality.   We have developed customized computer programs for academic quality management, faculty recruitment and training, student tracking, and marketing to help us more effectively manage toward this objective.   We believe we utilize one of the most comprehensive postsecondary learning assessment programs in the U.S.   We are also focused on improving student retention by enhancing student services, promoting instructional innovation and improving academic support.   *All of these efforts are designed to help our students stay in school and succeed.*

1    (emphasis added).

2        167.    Likewise, in its Third Quarter 2010 10-Q, Apollo stated:

3            We believe that a critical element of generating successful
             long-term growth and attractive returns for our stakeholders is
4            to provide high quality educational products and services for
             our students in order for them to maximize the benefits of
5            their educational experience. ***Accordingly, we are intensely
             focused on student success and better identifying and
6            enrolling students who have a reasonable chance to succeed
             in our rigorous programs.***
7

8    (emphasis added).

9        168.    In a January 7, 2010 press release issued in connection with the release of

10   Apollo's first quarter 2010 results, filed with the SEC on Form 8-K that day, Defendant

11   Capelli – who had by this time risen to the level of Co-Chief Executive Officer and

12   Global Chairman of Apollo – stated, "We remain committed to providing access to

13   high-quality education, while ensuring that ***only students who have a reasonable***

14   ***chance to succeed*** enroll in our institutions." (emphasis added).  Apollo's other Co-

15   Chief Executive Officer, Defendant Edelstein, made a virtually identical statement in

16   the February 19, 2010 press release filed with the SEC on Form 8-K that day, stating:

17   "Apollo Group remains dedicated to providing access to high-quality education and has

18   recently take additional steps to ensure that ***only students who are committed to the***

19   ***program and have a reasonable chance to succeed*** enroll in our institutions.

20   Importantly, ***we want to help students make this determination prior to burdening***

21   ***themselves with debt***." (emphasis added).

22       169.    All of these statements were materially false and misleading because

23   Apollo's principal focus was on enrolling students in its institutions, regardless of their

24   suitability for college or their likelihood of success, and not on "provid[ing] high

25   quality educational products and services to [its] students in order for them to maximize

26   the benefit of their educational experience" and "changing lives through education."

27   To the contrary, Apollo's recruiting practices led to the enrollment of a student body

28   the majority of which would never earn a degree.  Defendants' claims to be "intensely

                                           68

focused on student success" were simply false and created the false impression that Apollo was enrolling the types of students who were likely to remain in school and be successful, thus providing a strong foundation for Apollo's future growth and profitability, when in fact this "foundation" was built on shifting sands.

### D.  Defendants Made Materially False And Misleading Statements About Apollo's Compensation Practices

170.    During the Class Period, Apollo repeatedly made false and misleading statements about its compensation practices.  For example, in its 2006 10-K, 2007 10-K, 2008 10-K and 2009 10-K, Apollo stated:

> The Higher Education [Opportunity] Act prohibits an institution from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruitment, admission, or financial aid awarding activity.  Title IV regulations provide safe harbors for activities and arrangements that an institution may carry out without violating the Higher Education Act, which include, but are not limited to, the payment of fixed compensation (annual salary), as long as that compensation is not adjusted up or down more than twice during any 12-month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.  [UOP, WIU and IPD] believe that their current methods of compensating enrollment counselors and financial aid staff comply with the Title IV regulations.

171.    The Second Quarter 2008 10-Q and each subsequent Form 10-Q during the Class Period likewise stated:  "We believe that our compensation programs and practices at all relevant times were in compliance with the requirements imposed in our Program Participation Agreements."  The Program Participation Agreements were the agreements between Apollo's schools and the DOE, whereby the schools' eligibility for Title IV funding was conditioned upon not compensating employees based on success in securing financial aid or enrollments.

172.    Defendants' claims of compliance with the compensation rules governing Apollo's eligibility for Title IV funding were highly material to investors, because failure to comply with those rules would have jeopardized the Company's ability to continue receiving the Title IV revenue that was its lifeblood.  However, Defendants'

statements were materially false and misleading because, as numerous Confidential Witnesses have attested, during the Class Period UOP's enrollment staff were being compensated based on the number of students they were able to enroll, in violation of the Higher Education Opportunity Act.   These compensation practices were implemented and followed by Apollo and all of its schools, all of which were well aware of the regulatory restrictions on recruiter compensation, and thus there was no reasonable basis for any "belief" by UOP, WIU or IPD that their compensation practices complied with regulations.

**E.** **Defendants Made Materially False And Misleading Statements About Apollo's Practices Regarding The Return Of Federal Loan Funds For Students Who Withdraw**

173.   In its 2007 Form 10-K and 2008 Form 10-K, Apollo stated that the DOE's Office of Inspector General had issued an audit report in December 2005 indicating that UOP "returned Title IV funds for withdrawn students in a timely manner and used appropriate methodologies for most aspects of calculating the return of Title IV funds [with the exception of calculations of funds earned between September 1, 2002 and December 7, 2004]."   Apollo further stated that "[s]ince December 8, 2004, [UOP] has adopted the policies deemed appropriate by the [DOE]."   This was untrue. The DOE commenced an investigation in early 2008 into student complaints about UOP's failure to acknowledge their withdrawals on a timely basis.   While UOP claimed in July 2009 that it had fixed the problem, the DOE conducted a program review of UOP in February 2009 and found that throughout 2008, UOP had failed to timely withdraw students, resulting in UOP's untimely return of Title IV funds.   Accordingly, the Company was not following appropriate practices with respect to the timely return of Title IV funds, as it had represented to investors.

174.   Additionally, in many of its SEC filings during the Class Period, Apollo made statements suggesting that when students withdrew from Apollo's schools, the Company would only return to the lenders that portion of the students' federal loans that were required to be returned under applicable Title IV regulations, and would then

seek to recover that portion – and that portion only – directly from the students.  For example, the 2006 10-K, Second Quarter 2007 10-Q, 2007 10-K and 2008 10-K stated:

> When a student with Title IV loans withdraws from UPX or WIU, the Company is sometimes required to return a portion of Title IV funds to the lenders.  The Company is generally entitled to collect these funds from the students, but collection of these receivables is significantly lower than its collection of receivables for students who remain in the Company's educational programs.

175.   Similarly, the 2009 10-K stated:

> When a student with Title IV loans withdraws from University of Phoenix or Western International University, Title IV rules determine if we are required to return a portion of Title IV funds to the lenders.  We are then entitled to collect these funds from the students, but collection rates for these types of receivables is significantly lower than our collection rates for receivables for students who remain in our educational programs.

176.   These statements were misleading in material respects because Apollo was not simply returning to lenders (and seeking to collect from students) the portion of the loans that it was required to return.  Rather, for a very large number of withdrawing students, Apollo was returning the entirety of the students' federal loan monies and was seeking to collect the full amount from the students.  This information would have been material to investors, because it would have led them to understand that Apollo was giving away cash that it was entitled to keep, and was replacing that cash with uncollectible student receivables – a practice that was contrary on its face to the Company's financial interests and could have no logical explanation except that the Company was manipulating its student default rates in order to achieve compliance with the Cohort Default Rate and the 90/10 Rule.  Knowledge that the Company felt it necessary to achieve compliance with Title IV regulations through such manipulative practices would have alerted investors that the Company was not only walking a fine line between compliance and non-compliance, but that there could be severe adverse consequences for the Company and its stock price if the DOE discovered these manipulative practices.

177.    On January 8, 2009, Apollo filed its First Quarter 2009 10-Q, in which it disclosed the filing of the *Russ* class action by three former UOP students against Apollo and UOP, alleging that UOP improperly returned the entire amount of students' federal loan funds to the lenders when students withdrew from school.  The Company stated that it "intend[ed] to vigorously oppose plaintiffs' allegations," thus misleading investors into believing that the allegations were unfounded and lacked merit, when in reality those allegations were absolutely correct.  Subsequently, on March 30, 2009, Apollo filed an answer in the students' class action lawsuit, denying all of the claims.  Apollo reported to investors in its Second Quarter 2009 10-Q that it had filed this denial, again lulling investors into a false sense of security that the allegations were without merit.  Because class certification was ultimately denied and the named plaintiffs reached a confidential settlement, there was never any judicial determination on the merits of the students' lawsuit.

**F.    Defendants' Disclosure Of The "Risks" Associated With Apollo's Regulatory Requirements Were Materially Misleading Because Defendants Knew, But Failed To Disclose, That These "Risks" Were Virtual Certainties**

178.    During the Class Period, Apollo's SEC filings described a variety of "risk factors" associated with the Company's operations, including in particular its need to comply with Title IV regulations.  For example, in its 2006 10-K, Apollo stated:

> ***If we fail to comply with the extensive regulatory requirements for our business, we could face significant monetary liabilities, fines and penalties, including loss of access to federal student loans and grants for our students.***
>
> As a provider of higher education, we are subject to extensive regulation on both the federal and state levels.  In particular, the Higher Education Act and related regulations subject UPX and WIU, and all other higher education institutions that participate in the various federal student financial aid programs under Title IV of the Higher Education Act ("Title IV programs") to significant regulatory scrutiny.  We collected approximately 62% of our 2006 revenues from receipt of Title IV funds.
>
> These regulatory requirements cover virtually all phases of our schools' and programs' operations, including educational program offerings, facilities, instructional and administrative staff, administrative procedures, marketing and recruiting,

72

financial operations, payment of refunds to students who withdraw, acquisitions or openings of new schools or programs, addition of new educational programs and changes in our corporate structure and ownership.

\*      \*      \*

If we are found to be in noncompliance with any of these regulations, standards or policies, any one of the regulatory agencies could do one or more of the following:

- Impose monetary fines or penalties;

- Limit or terminate our operations or ability to grant degrees and diplomas;

- Restrict or revoke our accreditation, licensure or other approval to operate;

- Limit, suspend or terminate our eligibility to participate in Title IV programs or state financial aid programs;

- Require repayment of funds received under Title IV programs or state financial aid programs;

- Require us to post a letter of credit with the U.S. Department of Education;

- Subject our schools to heightened cash monitoring by the U.S. Department of Education;

- Transfer us from the U.S. Department of Education's advance system of receiving Title IV program funds to its reimbursement system, under which a school must disburse its own funds to students and document the students' eligibility for Title IV program funds before receiving such funds from the U.S. Department of Education;

- Subject us to other civil or criminal penalties; and

- Subject us to other forms of censure.

Consequently, any of the penalties, injunctions, restrictions or other forms of censure listed above could have a material adverse effect on our business.

179.    Apollo's 2007 10-K, 2008 10-K, and 2009 10-K contained language substantially identical to that set forth above.

180.    Apollo's SEC filings also noted the importance of maintaining compliance with the Cohort Default Rate and the 90/10 Rule, and that failure to do so

could result in a loss of eligibility to receive Title IV funds, which would have a material negative effect on the Company.  For example, in its 2006 10-K Apollo stated:

> **Student loan defaults could result in the loss of eligibility to participate in Title IV programs.**
>
> In general, under the Higher Education Act, an educational institution may lose its eligibility to participate in some or all Title IV programs if its student loan cohort default rate equals or exceeds 25% for three consecutive years or 40% for any given year.  If we lose our eligibility to participate in Title IV programs because of high student loan default rates, it would have a material adverse effect on our business.  In addition, if its student loan default rate equals or exceeds 10%, the educational institution is required to delay for 30 days the release of federal student loan proceeds for first time borrowers and permanently loses the ability to participate in the "school-as-lender" program, among other penalties.  If our student loan cohort default rate exceeds 10%, the limitations on our business could have a material adverse impact.
>
> \*        \*        \*
>
> **Our schools and programs would lose their eligibility to participate in federal student financial aid programs if the percentage of our revenues derived from those programs were too high.**
>
> A proprietary institution loses its eligibility to participate in the federal student financial aid programs if it derives more than 90% of its revenues, on a cash basis, from federal student financial aid programs in any fiscal year.  If we become ineligible to participate in federal student financial aid programs, it would have a material adverse effect on our business.

181.   Apollo's 2007, 2008, and 2009 10-K, along with the Third Quarter 2010 10-Q, contained statements materially similar to those contained in its 2006 10-K concerning the risks associated with increased student loan defaults.  With regard to the 90/10 Rule, Apollo's 2007 10-K contained a materially identical disclosure to that set forth above in the 2006 10-K, while Apollo's 2008 10-K contained a more detailed disclosure:

> **Our schools and programs would lose their eligibility to participate in federal student financial aid programs if the percentage of our revenues derived from those programs is too high.**

Under a provision of the Higher Education Act commonly referred to as the "90/10 Rule," as revised by the Higher Education Opportunity Act, a for-profit institution would no longer be eligible to participate in Title IV programs if, it derived more than 90% of its cash-basis revenues, as defined pursuant to the Higher Education Act and Department of Education regulations, from Title IV programs for any two consecutive fiscal years. An institution that violates this 90/10 Rule for two consecutive fiscal years becomes ineligible to participate in Title IV programs for a period of not less than two institutional fiscal years. An institution that derived more than 90% of its revenue from Title IV programs for any single fiscal year will be placed on provisional certification and will be subject to possible additional sanctions by the Department of Education. If an institution violated the 90/10 Rule and became ineligible to participate in Title IV programs but continued to disburse Title IV program funds, the Department of Education would require the institution to repay all Title IV program funds received by the institution after the effective date of the loss of eligibility. University of Phoenix's and Western International University's percentages were approximately 82% and 50%, respectively for the year ended August 31, 2008. In May 2008, the Ensuring Continued Access to Student Loans Act increased the annual loan limits on federal unsubsidized student loans by $2,000 for certain students, and also increased the aggregate loan limits (over the course of a student's education) on total federal student loans for certain students. This increase in student loan limits will increase the amount of Title IV program funds used by students to satisfy tuition, fees and other costs incurred, which will increase the proportion of our revenue from Title IV programs. However, the Higher Education Opportunity Act excludes from the calculation of the 90/10 Rule the amounts received from these increased annual loan limits between July 1, 2008 and July 1, 2011, providing some temporary relief. Absent any extension of this temporary relief, our 90/10 percentages will increase when the exclusion of these funds from the calculation expires in 2011. If we become ineligible to participate in Title IV federal student financial aid programs, it would have a material adverse effect on our business, financial condition, results of operations and cash flows.

182. Apollo's Third Quarter 2009 10-Q and 2009 10-K contained materially the same language regarding the risks of non-compliance with the 90/10 Rule as was contained in the 2008 10-K.

183. All of the foregoing statements regarding the consequences that could befall Apollo if it failed to maintain compliance with the Cohort Default Rate, the 90/10 Rule, and Title IV regulations generally, while literally true, were materially

misleading.  These were more than simply the inchoate risks that Apollo's SEC filings suggested.  Rather, Defendants were so concerned that the Company was on the verge of violating these regulations and losing Title IV eligibility that they were manipulating Apollo's revenue numbers to maintain compliance with the 90/10 Rule, and were improperly returning "earned" Title IV funds to the lenders for large numbers of students in order to stay within the Cohort Default Rate.  Had investors been told how close these "risks" were to becoming reality, and that the materialization of these risks was being staved off through improper manipulative conduct by the Company, they would have known that the Company's value (and, in turn, the value of its stock) was much lower than they were being led to believe.

### G.  Apollo Made Materially False And Misleading Statements About Its Financial Condition

184.  On May 21, 2007, Apollo issued a press release on Form 8-K reporting its quarterly results for the second quarter of fiscal 2007, ending February 28, 2007.  The release also announced the filing of the Company's 2006 10-K, Third Quarter 2006 10-Q, First Quarter 2007 10-Q, and Second Quarter 2007 10-Q.  The Company announced that these filings contained financial statements that were restated as a result of Apollo's investigation into its past stock option practices, as well as other items.  The Company stated that it had "identified four material weaknesses in internal controls over financial reporting," including the recording of allowance for doubtful accounts, but represented that it had "made significant progress in remediating" the control deficiencies.  Brian Mueller, president of Apollo, stated in the press release that the Company had "significantly strengthened the governance and internal controls of the Company."

185.  On May 22, 2007, the Company filed its 2006 10-K with the SEC, reporting consolidated revenues of $2,477,533,000 and net income of $414,833,000 for the fiscal year ended August 31, 2006.  The Company also reported earnings per diluted share of $2.35, tuition accounts receivables of $214,257,000, current portion of deferred

revenue of $135,911,000, long-term deferred revenue of $384,000, charges to bad debt expense of $101,600,000, write-offs net of recoveries of $81,639,000 and an ending allowance for doubtful accounts of $65,184,000.

186.    The 2006 10-K contained the following false and misleading statements:

> The Company reduces accounts receivable by an allowance for amounts that may become uncollectible in the future. Estimates are used in determining the allowance for doubtful accounts and are based on historical collection experience and current trends.  In determining these amounts, the Company looks at the historical write-offs of its receivables.   The Company monitors its collections and write-off experience to assess whether adjustments are necessary.  When a student with Title IV loans withdraws from UPX or WIU, the Company is sometimes required to return a portion of Title IV funds to the lenders.  The Company is generally entitled to collect these funds from the students, but collection of these receivables is significantly lower than its collection of receivables for students who remain in the Company's educational programs.  An increase in the amount of return to the lenders and a lower collection rate are factored into the determination of an appropriate allowance amount. Management periodically evaluates the standard allowance estimation methodology for propriety and modifies as necessary.  In doing so, the Company believes its allowance for doubtful accounts reflects the most recent collections experience and is responsive to changes in trends.   The Company's accounts receivable are written off once the account is deemed to be uncollectible.  This typically occurs once the Company has exhausted all efforts to collect the account, which include collection attempts by Company employees and outside collection agencies.

187.    In their "Letter to Our Shareholders" in the fiscal 2006 Annual Report, John Sperling and Mueller stated:

> 2006 was a year of transition for Apollo Group, Inc., but we are pleased to report significant progress in providing high-quality, accessible education for individuals around the world and delivering strong returns for all of our stakeholders: students, employees, the faculty and investors. In fiscal 2006, our achievements resulted in net income attributed to Apollo Group common stock of $414.8 million, or $2.35 per diluted share, on consolidated revenue of $2.5 billion, which increased 10% over fiscal 2005.  As of August 31, 2006, our degreed enrollments increased 4.0% over the prior year, reaching 282,300 students.
>
> While our mission has not changed dramatically over the past 30 years, we continue to refine our strategy over time, and the

challenges that we faced in 2006, specifically a stock option investigation, resulted in much review, introspection and improvement. We made changes in senior management and in our board of directors over the past year, as well as in our financial controls and corporate governance; as a result, Apollo Group is a stronger company today.

\*     \*     \*

In November 2006, we hired a new chief financial officer, Joseph D'Amico, who worked tirelessly with his team to get us back in compliance with our reporting obligations as well as to implement remedial actions addressing the issues identified by the special committee. We completed this process in late May 2007, making us fully compliant from a reporting perspective; equally important, we have put systems and procedures in place that we believe will prevent any such further issues going forward.

188.   On May 22, 2007, the Company also filed its Second Quarter 2007 10-Q, in which it reported its financial results for the period ended February 28, 2007, including consolidated revenues of $608,693,000, net income of $60,338,000, and earnings per share of $0.35, as compared to $0.46 in the second quarter 2006. The Company reported current portion of deferred revenue of $146,201,000 and long-term deferred revenue of $588,000.

189.   Some of the financial metrics contained in the Second Quarter 2007 10-Q, including consolidated revenues, were presented by D'Amico and Mueller in an analyst conference call on May 22, 2007 in which John Sperling and Cappelli also participated. During that call, D'Amico discussed the remedial actions the Company had purportedly taken as a result of its identification of material internal control weaknesses, including the maintenance of an inadequate allowance for doubtful accounts, and assured investors that "We believe that we have made substantial progress in remediating these material weaknesses, and we do not believe they will repeat when we are required to reassess the effectiveness of our controls at the end of fiscal 2007." D'Amico further stated that "Our priority is to report accounting results accurately, irrespective of the outcome," and that "we believe our allowance for doubtful accounts is adequate."

190.   The Company's financial results that were reported in the May 21, 2007 press release, the 2006 10-K, the Second Quarter 2007 10-Q, and the May 22, 2007 conference call were false and misleading and violated GAAP for the following reasons, among others:

a.   Apollo had improperly recorded revenue from students before the money was earned, realized or realizable;

b.   Apollo had improperly failed to reduce recorded revenue and deferred revenue by the amount of the Title IV funds returned to lenders for students who withdrew from Apollo schools, and instead had improperly recorded such amounts as accounts receivable directly from the students, despite knowing that there was no reasonable prospect of collecting those amounts;

c.   Apollo had recorded insufficient allowances for doubtful accounts and failed to properly consider the nature of the students who withdrew, or Apollo's historical collection experience or current trends, which all demonstrated that it was extremely unlikely that students who withdrew would ever pay their tuition bills to Apollo; and

d.   Apollo had failed to write off accounts receivable that Defendants knew would never be collected, and thus the Company's statement that its "accounts receivable are written off once the account is deemed to be uncollectible" was false.

191.   As a result of Apollo's improper accounting practices and violations of GAAP, Apollo's revenues, net income, accounts receivable and deferred revenue were artificially and falsely inflated, and its allowance for doubtful accounts, bad debt expense and write-offs were artificially and falsely under-reported.

192.   Additionally, the Company's and Mueller's representations about remediating control deficiencies and strengthening internal controls were false, as were D'Amico's statements about the adequacy of the Company's allowance for doubtful accounts, because the Company continued to maintain an insufficient allowance for doubtful accounts, as it had done in the past.  The Company did not, as it represented, consider the increase in the amount of funds returned to lenders and the lower collection rate for withdrawn students when determining an appropriate allowance amount, and it failed to consider that the prospect of ever collecting from such students was almost non-existent.  Furthermore, the Company did not, as it represented, believe

that its allowance for doubtful accounts reflected its most recent collections experience or was responsive to changes in trends, as it knew that it was extremely unlikely that it would collect from students who withdrew, requiring additional charges to the allowances in future quarters as well as additional write-offs of accounts receivable.

193.    On June 28, 2007, Apollo filed a Form 8-K containing a press release and also filed its Third Quarter 2007 10-Q, both reporting its quarterly results for the third quarter of fiscal 2007 ending May 31, 2007.  In the press release and the Third Quarter 2007 10-Q, the Company reported consolidated revenues of $733.4 million (a 12.2% increase over the third quarter of fiscal 2006), net income of $131.4 million, earnings per diluted share (adjusted to exclude share-based compensation and special items) of $0.81 as compared to $0.78 in the third quarter 2006, and basic earnings per share of $0.76, which was the same as the third quarter 2006.  The Company reported tuition accounts receivables of $262,255,000, current portion of deferred revenue of $149,665,000, long-term portion of deferred revenue of $357,000, charges to bad debt expense of $34,368,000, write-offs net of recoveries of $18.2 million, and an ending allowance for doubtful accounts of $92,129,000.

194.    Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were presented by D'Amico and Mueller in a conference call on June 28, 2007, in which John Sperling and Cappelli also participated.  During this call, D'Amico stated:  "We continue to believe our allowance for doubtful accounts is adequate …"

195.    On October 29, 2007, Apollo filed its 2007 10-K with the SEC for the year ended August 31, 2007, reporting revenues of $713.9 million and net income of $103.2 million for the three months ended August 31, 2007, and revenues of $2.72 billion and net income of $408.8 million for the full year ended August 31, 2007.  The Company also reported tuition accounts receivables of $281,834,000, current portion of deferred revenue of $167,003,000, long-term deferred revenue of $295,000, charges to bad debt expense for the fiscal year of $120,614,000, write-offs net of recoveries for the

fiscal year of $85,980,000, and an ending allowance for doubtful accounts of $99,818,000.

196.    Some of these same financial metrics, including the fourth quarter and full year revenues and net income and the end-of-year allowance for doubtful accounts, were reported in a Company press release on October 22, 2007 and presented by D'Amico and Mueller in a conference call that day in which John Sperling and Cappelli also participated.  As he had done in previous quarters, D'Amico assured analysts and investors during this call that "We continue to believe our allowance for doubtful accounts is adequate ..."

197.    The 2007 10-K contained the following statements:

> We reduce accounts receivable by an allowance for amounts that may become uncollectible in the future. Estimates are used in determining the allowance for doubtful accounts and are based on historical collection experience and current trends. In determining these amounts, we look at the historical write−offs of our receivables.  We monitor our collections and write−off experience to assess whether adjustments are necessary. When a student with Title IV loans withdraws from UPX or WIU, we are sometimes required to return a portion of Title IV funds to the lenders.  We are generally entitled to collect these funds from the students, but collection of these receivables is significantly lower than our collection of receivables for students who remain in our educational programs. An increase in the amount of funds returned to the lenders and a lower collection rate are factored into the determination of an appropriate allowance amount. Management periodically evaluates the standard allowance estimation methodology for propriety and modifies as necessary.  In doing so, we believe our allowance for doubtful accounts reflects the most recent collections experience and is responsive to changes in trends. Our accounts receivable are written off once the account is deemed to be uncollectible. This typically occurs once we have exhausted all efforts to collect the account, which include collection attempts by our employees and outside collection agencies.

198.    In their "Letter to Our Shareholders" included in the fiscal 2007 Annual Report, John Sperling and Mueller stated:

> This was a rewarding year for Apollo Group and its stakeholders.  We began to reap the benefits of the substantial investment and management decisions we made over the last couple of years, and we are very pleased with advances we

have achieved in both our campus and our corporate operations.

Financially, our achievements resulted in net income of $408.8 million, or $2.35 per diluted share, on consolidated revenue of $2.7 billion, a 9.9% increase over fiscal 2006. Average quarterly degreed enrollments grew by 10.5%, and we ended the fiscal year with 313,700 students enrolled in our degree programs.  We continue to generate positive cash flow as well, and ended the year with $339 million in unrestricted cash.

*        *        *

We also invested actively in our people during the last year. We strengthened our management team, particularly in the finance area, and added additional talent and expertise to our board of directors.  We additionally fortified our financial controls and corporate governance, making Apollo Group a stronger company today and better poised for growth into the future.  As a result of our improved controls and governance, we were able to remedy the material weaknesses identified in last year's audit.

199.    The Company's financial results as reported in the press releases and conference calls on June 28, 2007 and October 22, 2007 and in the Third Quarter 2007 10-Q and 2007 10-K were false and misleading and violated GAAP in material respects for the following reasons, among others:

a.     Apollo had improperly recorded revenue from students before the money was earned, realized or realizable;

b.     Apollo had improperly failed to reduce recorded revenue and deferred revenue by the amount of the Title IV funds returned to lenders for students who withdrew from Apollo schools, and instead had improperly recorded such amounts as accounts receivable directly from the students, despite knowing that there was no reasonable prospect of collecting those amounts;

c.     Apollo had recorded insufficient allowances for doubtful accounts and failed to properly consider the nature of the students who withdrew, or Apollo's historical collection experience or current trends which all demonstrated that it was extremely unlikely that students who withdrew would ever pay their tuition bills to Apollo; and,

d.     Apollo had failed to write off accounts receivable that Defendants knew would never be collected, and thus the Company's representation that its "accounts receivable are written off once the account is deemed to be uncollectible" was false.

82

200.   As a result of Apollo's improper accounting practices and violations of GAAP, Apollo's revenues, net income, accounts receivable and deferred revenue were artificially and falsely inflated, and its allowance for doubtful accounts, bad debt expense and write-offs were artificially and falsely under-reported.

201.   The Company also did not, as it represented, consider the increase in the amount of funds returned to lenders and the lower collection rate for withdrawn students when determining an appropriate allowance amount, and failed to consider that the prospect of ever collecting from such students was almost non-existent. Furthermore, the Company did not, as it and D'Amico represented, believe that its allowance for doubtful accounts was adequate.  Defendants knew that allowance did not reflected Apollo's most recent collections experience and was not "responsive to changes in trends," as they knew it was extremely unlikely that the Company would collect from students who withdrew, requiring additional charges to the allowances in future quarters as well as additional write-offs of accounts receivable.  Additionally, contrary to the representations in the Letter to Shareholders, the Company had not remedied the material weaknesses identified in the prior year's audit.

202.   On January 8, 2008, Apollo filed with the SEC its First Quarter 2008 10-Q, for the first quarter of fiscal 2008 ending November 30, 2007.  The Company reported consolidated revenues of $780.7 million, net income of $139.9 million, and earnings per share of $0.83 as compared to $0.65 for the three months ended November 30, 2007.  The Company also reported tuition accounts receivables of $276,091,000, current portion of deferred revenue of $159,724,000, long-term portion of deferred revenue of $237,000, charges to bad debt expense of $32,385,000, write-offs net of recoveries of $27,551,000, and an ending allowance for doubtful accounts of $104,652,000.

203.   Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were reported in a Company press release on January

8, 2008 and presented by D'Amico and Mueller in a conference call that day in which John Sperling and Cappelli also participated.

204.    On March 27, 2008, Apollo filed with the SEC its Second Quarter 2008 10-Q, for the second quarter of fiscal 2008 ending February 29, 2008.  The Company reported consolidated revenues of $693.6 million (a 13.9% increase over the second quarter of fiscal 2007), a net loss of $32 million, and a loss per share of $0.19 for the quarter, as compared to net income of $60.3 million, or $0.35 per share, in the second quarter of 2007.   The Company also reported tuition accounts receivables of $242,779,000, current portion of deferred revenue of $174,210,000, long-term portion of deferred revenue of $230,000, charges to bad debt expense of $26.6 million, write-offs net of recoveries of $37,835,000, and an ending allowance for doubtful accounts of $93,418,000.

205.    Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were reported in a Company press release on March 27, 2008 and presented by D'Amico and Mueller in a conference call that day in which Peter Sperling and Cappelli also participated.

206.    On July 1, 2008, Apollo filed its Third Quarter 2008 10-Q, for the third quarter of fiscal 2008 ending May 31, 2008, reporting consolidated revenues of $835.2 million (a 13.9% increase over the third quarter of fiscal 2007), net income of $139.1 million, and earnings per share of $0.85, as compared to $0.76 in the third quarter 2007. The Company also reported tuition accounts receivables of $250,661,000, current portion of deferred revenue of $205,795,000, long-term portion of deferred revenue of $210,000, charges to bad debt expense of $20,269,000 million, write-offs net of recoveries of 28,423,000, and an ending allowance for doubtful accounts of $85,264,000.

207.    Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were also reported in a Company press release that

day and presented by D'Amico in a conference call in which John Sperling and Cappelli also participated.

208.   On October 28, 2008, Apollo filed with the SEC its 2008 Form 10-K, for the fiscal year ended August 30, 2008.  For the quarter ended August 30, 2008, the Company reported consolidated revenues of $831.4 million (a 16.5 % increase over the fourth quarter of fiscal 2007), net income of $229.6 million, and earnings per share of $1.43, as compared to $.60 in the fourth quarter 2007.  For the full year ended August 30, 2008, the Company reported net revenues of $3,140,931,000, net income of $476,525,000, and earnings per share of $2.87.  The Company also reported tuition accounts receivables of $279,841,000, current portion of deferred revenue of $231,179,000, long-term deferred revenue of $104,000, charges to bad debt expense for the fiscal year of $104.2 million, write-offs net of recoveries for the fiscal year of $125,657,000, and an ending allowance for doubtful accounts of $78,362,000.

209.   Some of these same financial metrics, including quarterly and full-year revenues, net income and allowance for doubtful accounts, were reported in a Company press release that day and presented by D'Amico in a conference call that day in which John Sperling and Edelstein also participated.

210.   The 2008 10-K contained the following statements:

> We reduce accounts receivable by an allowance for amounts that may become uncollectible in the future.  Estimates are used in determining the allowance for doubtful accounts and are based on historical collection experience and current trends.  In determining these amounts, we look at the historical write-offs of our receivables.  We monitor our collections and write-off experience to assess whether adjustments are necessary.  When a student with Title IV loans withdraws from University of Phoenix or Western International University, we are sometimes required to return a portion of Title IV funds to the lenders.  We are generally entitled to collect these funds from the students, but collection of these receivables is significantly lower than our collection of receivables for students who remain in our educational programs.  Management periodically evaluates the standard allowance estimation methodology for appropriateness and modifies as necessary.  In doing so, we believe our allowance for doubtful accounts reflects the most recent collections experience and is responsive to changes in trends.  Our

accounts receivable are written off once the account is deemed to be uncollectible. This typically occurs once we have exhausted all efforts to collect the account, which include collection attempts by our employees and outside collection agencies.

211. In their "Letter to Our Shareholders" included in the Annual Report for fiscal 2008, John Sperling and Edelstein stated that Apollo's "financial performance once again improved, with consolidated net income of $476.5 million, or $2.87 per diluted share, on consolidated revenue of $3.1 billion, a 15% increase. This represented a 22% increase in earnings per share over fiscal 2007, the first meaningful increase in several years. Average quarterly degreed enrollments increased 12% over the previous year and, during the fourth quarter, we achieved a record 362,100 in degreed enrollments, a 15% increase over the fourth quarter of fiscal 2007."

212. The Company's financial results as reported in the aforementioned press releases and conference calls (on January 8, March 27, July 1, and October 28, 2008) and in the First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third Quarter 2008 10-Q, and 2008 10-K were false and misleading and violated GAAP in material respects for the following reasons, among others:

    a.    Apollo had improperly recorded revenue from students before the money was earned, realized or realizable;

    b.    Apollo had improperly failed to reduce recorded revenue and deferred revenue by the amount of the Title IV funds returned to lenders for students who withdrew from Apollo schools, and instead had improperly recorded such amounts as accounts receivable directly from the students, despite knowing that there was no reasonable prospect of collecting those amounts;

    c.    Apollo had recorded insufficient allowances for doubtful accounts and failed to properly consider the nature of the students who withdrew, or Apollo's historical collection experience or current trends, which all demonstrated that it was extremely unlikely that students who withdrew would ever pay their tuition bills to Apollo; and,

    d.    Apollo had failed to write off accounts receivable that Defendants knew would never be collected, and thus the Company's statement that its "accounts receivable are written off once the account is deemed to be uncollectible" was false.

213.   As a result of Apollo's improper accounting practices and violations of GAAP, Apollo's revenues, net income and accounts receivable were artificially and falsely inflated, and its allowance for doubtful accounts and write-offs were artificially and falsely under-reported.

214.   On January 8, 2009, Apollo filed with the SEC its First Quarter 2009 10-Q, for the quarter ending November 30, 2008.  The Company reported consolidated revenues of $971 million (a 24.4% increase over the first quarter of fiscal 2008), net income of $180.4 million, and earnings per share of $1.12, as compared to $0.83 in the first quarter 2008.   The Company also reported tuition accounts receivables of $263,294,000, current portion of deferred revenue of $217,710, long-term portion of deferred revenue of $7,000, charges to bad debt expense of $34.9 million, write-offs net of recoveries of $24,945,000, and an ending allowance for doubtful accounts of $88,274,000.

215.   Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were reported in a Company press release on January 8, 2009 and presented by D'Amico and Edelstein in a conference call that day in which Cappelli and Swartz also participated.

216.   On March 31, 2009, Apollo filed with the SEC its Second Quarter 2009 10-Q, for the second quarter ending February 28, 2009.   The Company reported consolidated net revenue for the three months ended February 28, 2009 of $876.1 million (a 26.3% increase over the second quarter of fiscal 2008), net income of $125.3 million, and earnings per share of $0.77, as compared to a net loss of $0.19 per share in the second quarter of 2008.  The Company also reported student accounts receivables of $262,854,000, deferred revenue (listed under current liabilities) of $247,466,000, charges to bad debt expense of 4.1% of net revenue for the quarter, write-offs net of recoveries of $28,615,000, and an ending allowance for doubtful accounts of $95,715,000.

217.   Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were reported in a Company press release on March 31, 2009 and presented by D'Amico and Edelstein in a conference call that day in which Cappelli and Swartz also participated.

218.   On June 29, 2009, the Company filed with the SEC its Third Quarter 2009 10-Q, for the third quarter of fiscal 2009 ending May 31, 2009, reporting consolidated revenue of $1,051,343,000 (a 25.9% increase over the third quarter of fiscal 2008), net income of $201,104,000, and earnings per share of $1.26, compared to $0.85 for the third quarter of 2008.   The Company also reported student accounts receivables of $269,937,000, deferred revenue (listed under current liabilities) of $261,158,000, charges to bad debt expense of 3.4% of net revenue for the quarter, write-offs net of recoveries of $31,775,000, and an ending allowance for doubtful accounts of $99,917,000.

219.   Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were also reported in a Company press release on June 29, 2009 and presented by Swartz in a conference call that day in which Edelstein, Cappelli and D'Amico also participated.

220.   On October 27, 2009, Apollo filed with the SEC its 2009 10-K, for the fiscal year ended August 31, 2009.   The Company reported consolidated net revenues for the three months ended August 31, 2009 of $1,075,763,000 (a 29.4% increase over the fourth quarter of 2008), net income of $91,509,000, and earnings per share of $0.59, compared to $1.43 for the fourth quarter of 2008.   The Company also reported student accounts receivables of $380,226,000, deferred revenue (listed under current liabilities) of $333,041,000, charges to bad debt expense of 3.8% of net revenue for the fiscal year, write-offs net of recoveries for the fiscal year of $120,432,000, and an ending allowance for doubtful accounts of $110,420,000.

221.   Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts were also reported in a Company press release on

October 27, 2009 and presented by Edelstein and Swartz in a conference call that day in which Cappelli and D'Amico also participated.

222.    The 2009 10-K contained the following statements:

> We reduce accounts receivable by an allowance for amounts that may become uncollectible in the future.  Estimates are used in determining the allowance for doubtful accounts and are based on historical collection experience and current trends.  In determining these amounts, we consider and evaluate the historical write-offs of our receivables.  We monitor our collections and write-off experience to assess whether adjustments are necessary.  When a student with Title IV loans withdraws from University of Phoenix or Western International University, Title IV rules determine if we are required to return a portion of Title IV funds to the lenders. We are then entitled to collect these funds from the students, but collection rates for these types of receivables is significantly lower than our collection rates for receivables for students who remain in our educational programs. Management periodically evaluates the standard allowance estimation methodology for propriety and modifies as necessary.  In doing so, we believe our allowance for doubtful accounts reflects the most recent collections experience and is responsive to changes in trends.  Our accounts receivable are written off once the account is deemed to be uncollectible. This typically occurs once we have exhausted all efforts to collect the account, which include collection attempts by our employees and outside collection agencies.

223.    In their "Letter to Our Shareholders" in the Company's fiscal 2009 Annual Report, Cappelli and Edelstein stated that Apollo's "financial performance continued to show strong momentum in fiscal 2009, as consolidated revenue grew to $4.0 billion, a 27 percent increase over the prior year, and net income increased to $598.3 million, or $3.75 per diluted share.  These results are a testament to the success we are seeing in the marketplace as we advance our mission of providing high quality, accessible education to individuals around the world.  Average quarterly degreed enrollment at University of Phoenix increased 21 percent over the previous year, and during the fourth quarter, we achieved a record 443,000 in degreed enrollment, a 22 percent increase over the fourth quarter of fiscal 2008."

224.    The Company's public statements concerning Apollo's financial metrics for fiscal year 2009, including statements in the press releases and conferences calls on

January 8, March 31, June 29, and October 27, 2009, and in the First Quarter 2009 10-Q, the Second Quarter 2009 10-Q, the Third Quarter 2009 10-Q, and the 2009 10-K, were materially false and misleading and its financial statements violated GAAP for the following reasons, among others:

    a.    Apollo had improperly recorded revenue from students before the money was earned, realized or realizable;

    b.    Apollo had improperly failed to reduce recorded revenue and deferred revenue by the amount of the Title IV funds returned to lenders for students who withdrew from Apollo schools, and instead had improperly recorded such amounts as accounts receivable directly from the students, despite knowing that there was no reasonable prospect of collecting those amounts;

    c.    Apollo had recorded insufficient allowances for doubtful accounts and failed to properly consider the nature of the students who withdrew, or Apollo's historical collection experience or current trends which all demonstrated that it was extremely unlikely that students who withdrew would ever pay their tuition bills to Apollo; and,

    d.    Apollo had failed to write off accounts receivable that Defendants knew would never be collected, and thus the Company's statement that its "accounts receivable are written off once the account is deemed to be uncollectible" was false.

225.  As a result of Apollo's improper accounting practices and violations of GAAP, Apollo's revenues, net income and accounts receivable were artificially and falsely inflated, and its allowance for doubtful accounts and write-offs were artificially and falsely under-reported.

226.  On January 7, 2010, Apollo filed with the SEC its First Quarter 2010 10-Q, for the first quarter of fiscal 2010 ending November 30, 2009.  The Company reported consolidated net revenue of $1,270,301,000 (a 30.8% increase over the fourth quarter of 2009), net income of $240,132,000, and earnings per share of $1.54, compared to $1.12 per share for the first quarter of 2009.  The Company also reported student accounts receivables of $442,825,000, deferred revenue (listed under current liabilities) of $377,134,000, charges to bad debt expense equal to 4.9% of net revenue for the quarter, write-offs net of recoveries of $34,713,000, and an ending allowance for doubtful accounts of $138,405,000.

227.    Some of these same financial metrics, including revenue, net income and allowance for doubtful accounts were also reported in a Company press release on January 7, 2010 and presented by Cappelli and Swartz in a conference call that day in which Edelstein and D'Amico also  participated.

228.    On February 19, 2010, Apollo published a press release announcing preliminary results for the second quarter of fiscal 2010, reporting that it expected "consolidated net revenue from continuing operations for the second quarter of fiscal 2010 of approximately $1.07 billion and diluted earnings per share from continuing operations of between $0.77-$0.82."  In addition, the release quoted Cappelli as stating, in part, that:  "Current bad debt levels are higher than we would like; however, we are taking the necessary steps to reverse current trends."  However, Capelli knew at the time that the Company was continuing its improper practice of improperly reporting revenue and accounts receivable, and booking insufficient allowances and write-offs, so that the Company was not "taking the necessary steps to reverse current trends."

229.    On February 22, 2010, Edelstein and Cappelli appeared at the Credit Suisse 12th Annual Global Services Conference at the Arizona Biltmore Resort & Spa in Phoenix, and on February 24, 2010, they appeared at the Robert W. Baird Business Solutions Conference, held at the Four Seasons Hotel in Boston, Massachusetts.  At each conference they discussed many of the same financial metrics reported in the First Quarter 2010 10-Q and the January 7 and February 19, 2010 press releases.

230.    On March 29, 2010, Apollo filed with the SEC its Second Quarter 2010 10-Q, for the second quarter of fiscal 2010 ending February 28, 2010.  The Company reported consolidated net revenue of $1,070,336,000 (a 23.1% increase from the second quarter of 2009), net income of $90,514,000, and earnings per share of $0.67.  The Company also reported student accounts receivables of $404,904,000, deferred revenue of $344,555,000 (listed under current liabilities), charges to bad debt expense equal to 6.9% of net revenue for the quarter, write-offs net of recoveries of $41,291,000, and an ending allowance for doubtful accounts of $170,138,000.

231.    Some of these same financial metrics, including revenue, net income and allowance for doubtful accounts, were also reported in a Company press release on March 29, 2010 and presented by Edelstein and Swartz in a conference call that day in which Cappelli and D'Amico also participated.

232.    On May 24-26, 2010, Edelstein and Cappelli appeared at the Bank of America Merrill Lynch Services Conference at the Millennium Broadway Hotel in New York City, and on June 15-17, 2010, they appeared at the 30th Annual William Blair Growth Stock Conference at the Four Seasons Hotel in Chicago, Illinois, where they discussed many of the same financial metrics and other information reported in the Second Quarter 10-K and the March 29, 2010 press release.

233.    On June 30, 2010, the Company filed with the SEC its Third Quarter 2010 10-Q, for the third quarter of fiscal 2010 ending May 31, 2010.  The Company reported consolidated net revenue of $1,337,404,000 (a 27.7% increase over the third quarter of 2009), net income of $179,283,000, and earnings per share of $1.16.  The Company also reported student accounts receivables of $409,136,000, deferred revenue of $333,972,000, charges to bad debt expense of 5.4% of net revenue for the quarter, write-offs net of recoveries of $57,260,000, and an ending allowance for doubtful accounts of $184,889,000.

234.    Some of these same financial metrics, including revenues, net income and allowance for doubtful accounts, were reported in a Company press release on June 30, 2010 and presented by Swartz in a conference call that day in which Edelstein, Cappelli and D'Amico also participated.

235.    The Company's public statements concerning Apollo's financial metrics for fiscal year 2010, including statements in the press releases and conference calls on January 7, February 19, March 29 and June 30, 2010, the conferences held on February 22 and 24, May 24-26, and June 15-17, 2010, and in the First Quarter 2010 10-Q, Second Quarter 2010 10-Q and Third Quarter 2010 10-Q, were false and misleading for the following reasons.

    a.    Apollo had improperly recorded revenue from students before the money was earned, realized or realizable;

    b.    Apollo had improperly failed to reduce recorded revenue and deferred revenue by the amount of the Title IV funds returned to lenders for students who withdrew from Apollo schools, and instead had improperly recorded such amounts as accounts receivable;

    c.    Apollo had recorded insufficient allowances for doubtful accounts with respect to students who had withdrawn from Apollo's schools; and,

    d.    Apollo had failed to write off accounts receivable that Defendants knew would never be collected.

236.    As a result of Apollo's improper accounting practices and violations of GAAP, Apollo's revenues, net income and accounts receivable were artificially and falsely inflated, and its allowance for doubtful accounts and write-offs were artificially and falsely under-reported.

**H.    Defendants Made Materially False And Misleading Statements Concerning Disclosure Controls and Procedures and Internal Controls Over Financial Reporting**

237.    Starting on the first day of the Class Period, when Apollo issued a restatement of fiscal years 2004 and 2005 financial statements due, in part, to errors in recording bad debt expense and the allowance for doubtful accounts, Defendants repeatedly issued false statements regarding Apollo's disclosure controls and procedures and its internal controls over financial reporting.

238.    For example, in its 2006 10-K, Apollo stated:    "Management is committed to remediating the control deficiencies that constitute the material weaknesses described herein by implementing changes to our internal control over financial reporting . . .   We have implemented a number of significant changes and improvements in our internal control over financial reporting during the first and second quarters of fiscal year 2007.   Our President and CFO of the Company have taken responsibility to implement changes and improvements in the internal control

over financial reporting and remediate the control deficiencies that gave rise to the material weaknesses."

239.    In the earnings conference call with the investment community that Apollo held on May 22, 2007 to discuss Apollo's second quarter fiscal 2007 results, D'Amico stated that "we identified four material weaknesses in internal controls over financial reporting" including accounting for bad debt expense and the related allowance for doubtful accounts.  He went on to state:  "We believe that we have made substantial progress in remediating these material weaknesses, and we do not believe they will repeat when we are required to reassess the effectiveness of our controls at the end of fiscal 2007."

240.    Apollo's Form 10-Q for the period ended May 31, 2007 similarly stated that "[a]s of May 31, 2007, the Company believes it has made substantial progress towards remediating the material weaknesses described above relating to the Company's internal control over financial reporting" and that "[m]anagement is committed to remediating the control deficiencies that constitute the material weaknesses described above by implementing changes to the Company's internal control over financial reporting. . . .   In addition, management has established procedures to consider the ongoing effectiveness of both the design and operation of the Company's internal control over financial reporting."

241.    In reporting its financial results for the fourth quarter and fiscal year ended August 31, 2007, Apollo issued a press release on (filed with the SEC on Form 8-K on October 22, 2007) in which Mueller stated:  "We also fortified our financial controls and corporate governance, and as a result, Apollo Group is a stronger company today."  In the earnings conference call with the investment community that same day, D'Amico explained:  "From a financial perspective, fiscal 2007 has been a year of building financial expertise and capabilities . . . while significantly strengthening our corporate governance and internal controls.  As evidence of our improved controls, I am very pleased to report that each of the four material weaknesses identified in last

year's audit were remediated, and we will report no material weaknesses in internal controls this year.  We are entering fiscal 2008 as a company poised for continued growth."

242.   The statements in Apollo's 2006 10-K, its Form 10-Q for the period ended May 31, 2007, its press release filed on Form 8-K on October 22, 2007, and the statements made during the May 22, 2007 and October 22, 2007 earnings conference calls, were materially false and misleading because they created the false impression that Defendants had actually changed and improved Apollo's internal control over financial reporting and remediated the control deficiencies that gave rise to the material weaknesses when, in fact, the same material weaknesses that plagued its 2004 and 2005 financial reporting continued to exist throughout the Class Period as the Company continued to improperly record the allowance for doubtful accounts and bad debt reserves in violation of GAAP.

243.   In its 2006 10-K and its 2007 10-K, Apollo included the following risk disclosures:

> Our management, including our President and Chief Financial Officer, does not expect that our internal controls over financial reporting will prevent all error and all fraud.  A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met.  Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs.  Controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls.  Over time, controls may become inadequate because changes in conditions or deterioration in the degree of compliance with policies or procedures may occur. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

> As a result, we cannot assure you that significant deficiencies or material weaknesses in our internal control over financial reporting will not be identified in the future.  Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in significant deficiencies or material weaknesses, cause us to fail to timely meet our periodic reporting

obligations, or result in material misstatements in our financial statements.  Any such failure could also adversely affect the results of periodic management evaluations and annual auditor attestation reports regarding disclosure controls and the effectiveness of our internal control over financial reporting required under Section 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder.  The existence of material weaknesses could result in errors in our financial statements that could result in a restatement of financial statements, cause us to fail to timely meet our reporting obligations and cause investors to lose confidence in our reported financial information, leading to a decline in our stock price.

244.   These disclosures were materially misleading because they failed to disclose that Apollo, in fact, was not maintaining sufficient internal controls at the time of these disclosures, and was instead languishing in a reporting environment that allowed it to materially understate its bad debt expense and reserves, and overstate its accounts receivable, revenue and net income.

245.   Starting with the Company's Form 10-Q for the period ended May 31, 2007, each Form 10-Q and each Form 10-K issued during the Class Period included a disclosure concerning "Controls and Procedures" that stated in part, in nearly identical form, that:

We intend to maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934 (the "Act") is recorded, processed, summarized and reported within the specified time periods and accumulated and communicated to management, including its President (Principal Executive Officer) and CFO, as appropriate to allow timely decisions regarding required disclosure.

Management, under the supervision and with the participation of its President (Principal Executive Officer) and CFO, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a−15(e) or 15d−15(e) promulgated under the Act), as of the end of the period covered by this report.  Based on that evaluation, management concluded that, as of that date, [the Company's] disclosure controls and procedures were effective at the reasonable assurance level.

246.   In addition, all of the Company's Form 10-K filings during the Class Period included "Management's Report on Internal Control Over Financial Reporting."

96

In the 2007 10-K, this report stated: "In its assessment of the effectiveness of internal control over financial reporting as of August 31, 2007, management reviewed, among other things, the internal control deficiencies identified as material weaknesses in its previous Report on Internal Control Over Financial Reporting and determined that the previously identified control deficiencies have been resolved and that our internal control over financial reporting was effective as of August 31, 2007."

247.    Similarly, Management's Report on Internal Control Over Financial Reporting in Apollo's 2008 10-K and 2009 10-K each stated: "Management performed an assessment of the effectiveness of our internal control over financial reporting as of [the end of the fiscal year], utilizing the criteria described in the 'Internal Control — Integrated Framework' issued by the Committee of Sponsoring Organizations of the Treadway Commission. The objective of this assessment was to determine whether our internal control over financial reporting was effective as of [the fiscal year end]. Based on our assessment, management believes that, as of [the fiscal year end], the Company's internal control over financial reporting is effective."

248.    The foregoing disclosures in each Form 10-Q and Form 10-K issued during the Class Period were materially false and misleading because Apollo in fact did not maintain effective internal controls over financial reporting. Rather, throughout the Class Period, Apollo continued to report financial results that violated GAAP, including under-reporting of allowances for doubtful accounts and bad debt reserves related to collection of receivables from students, and overstatement of net revenues and net income.

249.    Each Form 10-Q and 10-K filed during the Class Period included Sarbanes-Oxley Certifications signed by D'Amico, Cappelli, Edelstein, Swartz and/or Mueller, whereby the signing Defendants certified, in relevant part, that they were responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over

financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f) for Apollo, and that they had:

> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

250.    The Sarbanes-Oxley Certifications were materially false and misleading because, throughout the Class Period, Apollo failed to adequately maintain internal controls.

**VII.    AS INVESTORS BEGIN TO LEARN THE TRUTH ABOUT APOLLO, ITS STOCK PRICE DROPS, BUT THE COMPANY CONTINUES TO DECEIVE THE INVESTING PUBLIC WITH ADDITIONAL FALSE AND MISLEADING STATEMENTS**

251.    Over time, information revealing the false and misleading nature of Defendants' Class Period statements has gradually become public.  These revelations began during the Class Period, but were met with continuing false statements and assurances by Defendants that prevented the full truth from coming out.  Indeed, to this day, investors do not yet know the whole truth about Apollo.  Described below are some of the disclosures and events that have revealed, at least in part, the false and

misleading nature of Defendants' public statements during the Class Period, and the true nature of the risks facing Apollo.

252.   After the close of trading on March 31, 2009, in its press release with respect to its financial results for the second quarter of fiscal 2009, Apollo reported an increase in bad debt expense of 30 basis points (as a percentage of revenue) from the second quarter of 2008, and 50 basis points (as a percentage of revenue) from the first quarter of 2009, "primarily due to the increased risk of collecting aged receivables and lower collection rates on those receivables given the current economic downturn."  The Company also revealed that its New Degreed Enrollments had declined by 9% from the first quarter of 2009, and that its year-over-year growth in New Degreed Enrollments was declining (from a 25.6% growth rate between the first quarters of 2008 and 2009, to a 23.1% growth rate between the second quarters of 2008 and 2009).  The declining growth in new enrollments, the declining collection rate on student receivables, and the increase in bad debt expense were all materializations of risks Defendants had theretofore been concealing through their manipulative practices.   Although the manipulative practices were still unknown to investors, their manifestation in Apollo's financial results caused the Company's Class A common stock price to drop $11.87 per share, on unusually high volume, between the close of trading on March 31 and the close of trading on April 1, 2009.  This was a 15.15% price decline, and a $1.9 billion loss of market capitalization.

253.   On October 27, 2009, after the market closed, Apollo disclosed in an earnings press release that the SEC's Enforcement Division had commenced an informal inquiry into the Company's revenue recognition policies.  Neither Apollo nor the SEC disclosed the precise "policies" at issue, and investors were forced to wait for additional details that slowly trickled into the market.  Associated Press reports on October 28 suggested that the issue "revolves around how Apollo determines when a student drops out of a class and how much income Apollo can leave on its balance sheet, and for how long."  However, during a conference call with investors on the

1 evening of October 27, Defendant Swartz reassured investors that "we believe that our

2 revenue recognition practices are appropriate and in accordance with GAAP," and

3 Defendant Cappelli further pointed out that the Company had just released its Form 10-

4 K for fiscal 2009, with an audit opinion signed by Deloitte.

5     254.   Despite Apollo's assurances, trading volume in Apollo shares was

6 significantly greater than average in response to the October 27, 2009 press release, as

7 the stock price plummeted $12.91 per share, or 17.7%, from a closing price of $72.97

8 on October 27, 2009 to a closing price of $60.06 on October 28, 2009.  Nearly another

9 $2 billion in market capitalization was wiped out in a single day.  The Company's stock

10 price continued to trade lower over the next several months, with an average closing

11 price of $58.80 per share over the 90 days subsequent to the October 27 press release.

12     255.   In its earnings press release and Form 10-Q dated January 7, 2010, in

13 addition to discussing its financial results for the first quarter of fiscal 2010, Apollo

14 disclosed its receipt on December 31, 2009 of the DOE's preliminary Program Review

15 Report regarding its February 2009 program review.  The report itself was not publicly

16 disclosed at that time (or at any time prior to June 21, 2010), but the Company

17 described it as citing "six findings and one concern" regarding the Company's financial

18 aid policies, including "untimely return of unearned Title IV funds."  The Company

19 also stated that the DOE had "expressed a concern that some students enroll and begin

20 attending classes before completely understanding the implications of enrollment,

21 including their eligibility for student financial aid," and that the DOE had "stated its

22 belief that prospective students would be better served if they were more extensively

23 counseled prior to incurring any tuition liability about total program charges, the

24 number of credits that are transferable, the total number of credits required to complete

25 their chosen program and the financial aid available for each academic year of the

26 program."  Apollo stated that it expected the DOE's findings to result in liability of

27 approximately $1.5 million, as well as the posting of a $125 million letter of credit due

28

to the Company's failure to timely return unearned funds for more than 10% of the sampled students.

256.   During the earnings conference call on January 7, 2010, Defendant Edelstein tried to downplay the DOE's findings, stating:   "Three of the findings generally relate to our procedures for determining the date of student withdrawals, which is relevant for calculating the date on which we must return unearned Title IV funds.   No errors were identified in our calculation of the amount of Title IV funds to be returned.   Another finding relates to isolated clerical errors in verifying student supplied information.   The two remaining findings were self-reported by University of Phoenix, and involve our calculation of student financial need in certain cases without taking into account tuition and fee waivers and discounts, as well as the use of Title IV funds for non-program purposes like transcript application and late fees."   Additionally, D'Amico stated during the call:   "I want to be sure everybody understands [the Program Review Report] is totally unrelated to the recognition of revenue."   This was a misleading statement because it suggested that the DOE had found no revenue recognition problem, when in fact the DOE was focused on the timing of the return of Title IV funds and never purported to address the propriety of Apollo's revenue recognition.   The truth is that by improperly deferring the students' withdrawal dates, Apollo was recognizing revenue during the deferral period which it had not earned and was not entitled to recognize.

257.   In response to the disclosures of January 7, 2010, between January 7 and January 8, Apollo's stock price dropped by $3.44, or approximately 5.4%.

258.   During a March 29, 2010 conference call with investors, the Company provided an update regarding the ongoing SEC inquiry into Apollo's revenue recognition policies.   Defendant Edelstein stated that the SEC had requested information and documents from the Company and its auditors "related to revenue recognition practices and other matters including *policies and practices relating to student refunds, the return of Title IV funds to lenders and bad debt reserves*."

(emphasis added).   Thus, what analysts had suspected based on the October 27 disclosure now appeared to be confirmed:  the revenue recognition practices under review include those relating to the amount of revenues that could be recognized following a student withdrawal and the refund of the student's Title IV loans.  Edelstein stated that both Apollo and its auditors had provided information to the SEC on these topics, and once again assured the investing public that "[w]e continue to believe that our accounting policies are appropriate and in accordance with GAAP."

259.    Before the markets opened on June 21, 2010, Apollo issued a press release announcing UOP's receipt of the DOE's Final Program Review Determination Letter in conjunction with the February 2009 Program Review of UOP's financial aid practices.  The press release, the Final Program Review Determination Letter, and a copy of the preliminary Program Review Report were filed as exhibits to a Form 8-K filing that same day.  The press release and Final Program Review Determination Letter indicated that the Company had successfully completed corrective actions with regard to the findings set forth in the preliminary report, and that the Company had posted a letter of credit of approximately $125 million to cover future problems, based on UOP's untimely return of unearned Title IV funds for more than 10% of the sampled students.  According to the Final Program Review Determination Letter, Apollo had failed to make timely returns of unearned Title IV funds for 29% of the sampled students for the 2008-2009 award year – well above the 10% threshold.  Apollo also stated in its press release that it had paid $660,000 to reimburse the DOE for costs associated with the untimely return of Title IV funds.  What the press release did not say, but what is set forth in the Final Program Review Determination Letter, is that in addition to the payment to DOE, the UOP had paid over $1.15 million in liabilities that were owed to student loan accounts, bringing to more than $1.8 million the total liability payments resulting from the DOE review.

260.    The June 21, 2010 publication of the preliminary Program Review Report provided details that were not previously known to investors about the DOE's findings,

such as the DOE's determination that, despite concerns the DOE had raised with UOP in March 2008 about the failure to timely recognize withdrawal of students, "throughout 2008, UOP continued to fail to timely withdraw students who expressed a desire to withdraw, resulting in UOP's untimely return of Title IV funds." The preliminary report – which had been sent to D'Amico's attention and received by UOP and Apollo in December 2009 – further stated that "UOP's procedure of disregarding students' attempts to withdraw is systemic in nature," that the actions taken by UOP to address concerns raised by the DOE in March 2008 were "ineffective," and that as a result Title IV funds had not been timely returned for fully 29% of the sampled students in 2008-2009. This negative news was tempered, however, with assurances that the DOE's findings had been fully resolved during the six months since the Company received the preliminary report. Apollo's stock price declined only moderately in response to the June 21, 2010 announcement, from a closing price of $48.39 on June 18 (the previous trading day) to a closing price of $48.01 on June 21.

261. In the wake of the disclosure of UOP's improper financial aid practices and the SEC inquiry into its revenue recognition policies, and given the concerns that had been raised about the for-profit education industry in general and the substantial volume of federal dollars that flow into that industry in the form of financial aid, the U.S. Senate's Health, Education, Labor and Pensions ("HELP") Committee commenced hearings regarding the federal government's investment in for-profit institutions of higher education. During the first such hearing, on June 24, 2010, the HELP Committee chairman, Senator Tom Harkin of Iowa, commented that "[t]here are growing questions about whether all students – and taxpayers by extension – are receiving value for their educational dollar" at for-profit institutions.

262. In conjunction with the June 24 hearing, the HELP committee issued a report entitled "Emerging Risk?: An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education," calling for increased oversight over the for-profit education industry, where "schools charge higher tuition than

comparable public schools, spend a large share of revenues on expenses unrelated to teaching, experience high dropout rates, and, in some cases, employ abusive recruiting and debt-management practices."  During the June 24 hearing, Senator Harkin outlined some of the HELP committee report's key findings, including that enrollment in for-profit institutions had grown 225% over the past ten years, that a whopping 98% of these institutions' students borrowed money to pay their tuition (compared to 38% of community college students), that for-profit students are eight times more likely than community college students to graduate with student loan debt exceeding $20,000, and that for-profit college students are more likely to default on their loans than their peers at non-profit schools.

263.   The HELP Committee also heard testimony on June 24 from Steve Eisman, an investment analyst who analogized the for-profit education industry to the subprime mortgage lending industry.  Eisman expressed the view that "the default rates the industry reports are artificially low" because "[t]here are ways the industry can and does manipulate the data to make their default rates look better," and also that "schools manipulate the receipt, disbursement and especially the return of Title IV dollars to their students to remain under the 90/10 threshold."  The DOE Inspector General also testified, lending some credence to Eisman's statements by disclosing that her office's investigations had identified several types of fraud involving for-profit institutions, including miscalculation and manipulation of numbers to create the illusion of compliance with the 90/10 Rule, as well as failure to make timely and accurate refunds of Title IV loans when students withdraw.

264.   During the June 24, 2010 hearing, Senator Harkin also noted that the for-profit sector enrolls approximately 10% of all higher education students but received approximately 23% of all Title IV funds (over $23 billion) in 2008, and accounts for 44% of all student loan defaults.  The HELP committee report attributed this to the for-profit schools' active recruitment of primarily low-income students.  Senator Harkin expressed grave concerns about whether these Title IV dollars were being spent wisely,

particularly given the lack of transparency regarding student graduation, withdrawal and job placement rates, and the evidence of "huge student turnover" at for-profit institutions.  As he explained:

> For the four publicly traded schools that disclose detailed enrollment numbers, ***more students left over the course of one year than were at the school to begin the semester***. Experts describe this as the student "churn." ***It's as though Iowa State University were turning over its entire student body and refilling the school with new students every year, rather than every four years***. The important question is "What is happening to these students?"  Are they graduating or dropping out?  We just don't know.  Given the number of students enrolled in for-profit colleges, the billions of dollars in Federal aid that these institutions receive, and the lack of clear data on student outcomes, I believe Congress must devote more attention to this sector and its impact on our postsecondary education system.  [emphasis added]

265.   In July 2010, the DOE proposed a new "gainful employment" rule.  The rule, proposed in response to reports of shady marketing and recruiting practices at for-profit schools and the rising default rate among their students, was designed to help protect students from taking on too much debt without the prospect of a job that will enable them to pay it back.  The gainful employment provision would tie a school's eligibility for federal financial aid to one of two factors: the student loan repayment rate or the relationship between a graduate's total student loan debt and average earnings.  For a program to be fully eligible for financial aid under the proposed rule, more than 45% of former students must be paying down the principal on their loans or the graduates must have a debt-to-earnings ratio of less than 20% of discretionary income or less than 8% of total income.

266.   On August 4, 2010, the HELP Committee continued its hearings on for-profit education firms.  The GAO Report was prepared for presentation at the August 4 hearing, but was leaked to the press on August 3, 2010.  The GAO Report described how an undercover investigation of fifteen for-profit universities had revealed the rampant use of fraudulent and deceptive marketing practices to lure prospective students.  The report indicated that personnel at all fifteen schools had made "deceptive

and questionable" statements to investigators, while four of them had actively encouraged the prospective students to commit fraud when applying for financial aid. *Reuters* reported the following on August 3:

> U.S. government investigators found that for-profit colleges encouraged fraudulent practices and made deceptive statements to prospective students, according to a study released on Tuesday.
>
> Investigators from the Government Accountability Office posed as students and applied for admission at 15 for-profit colleges across the United States.   School personnel encouraged GAO staff to falsify financial aid forms, misled them about costs and gave false information about accreditation.
>
> * * *
>
> GAO's investigators also found that tuition at the for-profit colleges was "substantially more" than for comparable programs at nearby public colleges, but often misled prospective students about total costs.
>
> The study found that a massage therapy program certificate cost $14,000 at a for-profit college but was just $520 at a local community college.
>
> * * *
>
> Investigators found that on average, tuition for an associate's degree was between 6 and 13 times as much at a for-profit school than at a nearby public college.   The average of the for-profit schools investigated was $33,467, compared to just over $4,000 for public schools.
>
> A bachelor's degree at a for-profit college averaged $55,000, almost twice as expensive as local public institutions.
>
> * * *
>
> The GAO findings add to pressure the industry, which has already faced a crackdown by the Obama administration.
>
> The U.S. Department of Education proposed rules on July 22 that would force for-profit schools to show their former students are either paying off their loans or are capable of doing so.

267.   In an effort to reassure investors and stem the effects of this disclosure, Apollo issued the following statement on August 3, 2010:

> The recent GAO study sampled recruiting practices at a number of for-profit colleges.  ***While we have not been informed whether or not Apollo Group schools were involved in this study***, we take very seriously the issues raised in the recent GAO study.  We have clear policies in place to protect students.  If we are made aware of violations of our code of conduct we will promptly and thoroughly investigate the matter and, if found true, will take disciplinary action up to, and including, termination of the employee involved. [emphasis added]

268.   However, Apollo was doing little or nothing to "protect" students, as the Company and its management were intently focused on increasing enrollments at all costs, regardless of students' financial wherewithal or likelihood of academic success.  Only by increasing enrollments could the Company maintain the illusions of growth, profitability, and compliance with the regulatory requirements of Title IV.  Thus, Apollo engaged in the very improper practices uncovered in the Congressional investigations.

269.   Indeed, while the GAO Report itself did not identify the fifteen schools that were the subject of the investigation, a GAO representative testified during the Senate committee hearing on August 4, 2010 that UOP was one of them, and that the GAO investigators had visited two different UOP campuses.  The GAO representative stated that these UOP campuses – in Arizona and Pennsylvania – were described as schools #1 and #11, respectively, in the GAO Report.

270.   In his introductory remarks at the August 4 hearing, Senator Harkin noted that the GAO's findings "make it disturbingly clear that abuses in for-profit recruiting are not limited to a few rogue recruiters or even a few schools with lax oversight," but rather that "the evidence points to a problem that is systemic to the for-profit industry: a recruitment process specifically designed to do whatever it takes to drive up enrollment figures, more often than not to the disadvantage of students."  Michale McComis, head of the Accrediting Commission of Career Schools and Colleges (which

sets and enforces standards in the industry) stated, "Clearly, the GAO Report puts forth some troubling practices, and I believe those institutions need to be investigated and held accountable."   Senators on the Committee were particularly disturbed that for-profit schools were targeting students who can least afford to pay, including ex-military personnel, then charging much more than traditional public and private universities, leaving students who could least afford to pay saddled with debt.   "It's a rip-off of the student, it's a rip-off of the taxpayer, and I think it's despicable," said Senator Barbara Mikulski of Maryland.   Senator Al Franken stated that "[b]ecause the numbers [i.e., the amount of federal funding going to the for-profit sector] are so ridiculous…I think we've located a place where there are a tremendous high percent of bad actors, and we've got to get after them."   At the conclusion of the hearing, Senator Harkin stated: "I continue to be amazed by the questionable, and sometimes outright illegal, practices occurring within the for-profit sector."

271.   In reaction to the disclosures of August 3 and 4, Apollo's closing stock price declined from a closing price of $47.14 on August 2 to $44.76 on August 4, 2010.

272.   A revised version of the GAO's August 3, 2010 report was issued on November 30, 2010.  According to GAO spokesman Chuck Young, the revised report was issued following the GAO's review of audio recordings taken during the investigation, and that "[n]othing changed with the overall message of the report, and nothing changed with any of our findings."  A spokesman for Senator Harkin similarly has stated that the revisions "do not change the substance of the report" or its conclusions that the for-profit schools at issue "used deceptive or fraudulent recruiting techniques to enroll new students."

273.   In a Form 8-K filed with the SEC on August 6, 2010, Apollo announced that it had received a request from the HELP Committee for information in connection with the Committee's ongoing hearings relating to for-profit universities receiving Title IV student financial aid.  According to the Form 8-K:

The request seeks information to more accurately understand how the Company uses Federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars.  The request also seeks an understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window.

In furtherance of this, the Committee has requested that the Company provide information about a broad spectrum of the Company's business, including detailed information relating to financial results, management, operations, personnel, recruiting, enrollment, graduation, student withdrawals, receipt of Title IV funds, institutional accreditation, regulatory compliance and other matters …

Apollo stated that it intended to cooperate and comply with the request and that it had commenced its own internal investigation, and acknowledged that it was going to significantly tighten its enrollment practices.  Apollo's stock price touched a new low of $41.11 on August 6 before closing at $42.49 per share.

274.   On August 13, 2010, the DOE released data regarding student loan repayment rates at U.S. higher education institutions.  Overall repayment rates were only 36% at for-profit colleges, compared to 54% at public universities.  According to the DOE's data, UOP's repayment rate was only 44%, *i.e.*, below the 45% threshold in the proposed new gainful-employment rules.  It was also disclosed on August 13 that the DOE had vowed to expand its enforcement staff, increase the number of program reviews by 50%, and develop its own undercover program to test colleges' compliance with the law.  In response to these disclosures, Apollo's stock price fell 3.8% from an August 12 closing price of $40.47 to an August 13 closing price of $38.94.

275.   On September 30, 2010, the Senate HELP Committee conducted a third hearing regarding the for-profit education industry, and issued a report entitled "The Return on the Federal Investment in For-Profit Education:  Debt Without a Diploma."

As Senator Harkin stated during the hearing, the report shows that "for-profit colleges have turned higher education into a high-stakes gamble for low-income students," and that "[f]or millions of students at for-profits, the gamble has not paid off" because they have found themselves saddled with crushing debt after failing to complete the program.  Based on information provided by UOP and fifteen other schools in the for-profit industry, 57% of the students who entered these schools between July 2008 and June 2009 had withdrawn by August 2010.  As Senator Harkin aptly noted:  "These students take with them thousands of dollars in student loan debt and none of the earning potential that comes with a college degree….  Going to college should not be like going to a casino, where the odds are stacked against you and the house usually wins."

276.    The September 30 HELP Committee report contained other disturbing statistics that show what a house of cards Apollo and other for-profit schools are.  For example, in 2008-2009, one school started the year with enrollment of 71,246, added 120,638 students during the year, and ended with an enrollment of 89,479.  In other words, recruiters had to enroll 120,000 new students in order to increase enrollment by a net of 18,000.  "Fourteen out of 16 schools analyzed recruited a greater number of new students than their entire starting enrollment in 2008-09, however their net enrollment only increased by 22 percent."  For students who withdrew from these schools during 2008-09, the median attendance was approximately 20 weeks, and the tuition owed for those 20 weeks would be between $8,800 and $11,000.

277.    On October 13, 2010, after the close of trading, Apollo issued a press release reporting declining enrollment and slowing revenue growth for its most recent quarter, and withdrew its financial forecast for fiscal 2011, citing increased regulatory scrutiny and the implementation of new initiatives that would result in further declining enrollment of new students.  In the press release, Apollo stated that it expects fiscal 2011 "to be a year of continuing transition in its operations as it implements initiatives, primarily at University of Phoenix, aimed at enhancing the student experience,

expanding student protections and shifting the mix of enrollment to more experienced students who have a greater likelihood of succeeding in the Company's programs." During a conference call with analysts on the evening of October 13, Defendant Capelli explained that these initiatives included a requirement that new UOP students with fewer than 24 transfer credits attend an orientation program to see if they are ready for UOP's curriculum, so as to weed out those at risk of leaving school before earning degrees.  Additionally, the Company was accelerating the implementation of a new compensation system for enrollment counselors that would eliminate admissions results as a component of employee compensation, and announced that it was monitoring 30,000 conversations every day between its employees and prospective students in response to allegations of deceptive marketing tactics.  All of these remedial measures were taken as a direct result of the public revelation of previously-undisclosed fraudulent and deceptive practices by Apollo and its peers in the for-profit education industry, and the increased regulatory scrutiny that those revelations had engendered.

278.   During the October 13, 2010 analyst call, Defendant Edelstein acknowledged that "[b]ecause of the significant number of changes we're implementing, we are entering a period of transition and as result we expect that it will be challenging financially."  Similarly, Defendant Capelli stated that "[i]mplementing these new programs throughout the university next month will result in a significant decline in new degree enrollment at both the associate and bachelor level."  Defendant Swartz acknowledged that Apollo could experience a year-over-year decline in excess of 40% in new degreed enrollments, and that the pilot of the orientation program had already caused a 10% decline in enrollments in the fourth quarter of fiscal 2010, compared to the same period in fiscal 2009.

279.   During the October 13 call, Swartz further stated that the Company had received 88% of its revenue from federal aid in fiscal 2010 (up from 86% in fiscal 2009), and that it expected that percentage to exceed 90% by fiscal 2012, which would

violate the 90/10 Rule.  Apollo would be ineligible for federal financial aid dollars, its primary source of revenue, if it violated the 90/10 Rule two years in a row.

280.   In response to Apollo's announcement of these radical changes in its business practices and their negative effect on the Company's financial prospects, Apollo's stock lost nearly a quarter of its value overnight, dropping 23% from its October 13 closing price of $49.50 to close at $38.00 on October 14.  Suzanne Stein and Vance Edelson, Morgan Stanley analysts, issued a report on October 14 describing Apollo's new practices as "a massive change to its operating strategy."  Jeff Siber, an analyst at BMO Capital Markets in New York, was quoted in various newspapers as stating:  "People knew enrollment was going to decline but my jaw dropped when I heard that number."

281.   In all, Apollo's stock price declined by more than 51% ($40.33 per share) from March 31, 2009 to October 14, 2010, representing a loss of more than $6 billion in market capitalization.

## VIII.  LOSS CAUSATION

282.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Apollo's stock price and operated as a fraud or deceit on purchasers of Apollo's stock by misrepresenting, *inter alia*, the Company's financial results, business focus, student loan refund practices, and sources of enrollment growth, and by concealing from investors, *inter alia*, that the Company was achieving revenue and enrollment growth through manipulative recruitment, enrollment, compensation and financial aid practices.  Over a period of more than three years, Defendants issued false and misleading statements that caused Apollo's Class A shares to trade at artificially inflated levels throughout the Class Period — reaching a Class Period high of over $89 per share on January 16, 2009.

283.   As alleged above, through a series of disclosures during the Class Period, investors began to learn that Defendants' portrayal of Apollo as a stable and growing

company with strong revenue growth and a promising future was materially misleading, as the risks that Defendants were so desperately trying to conceal began to materialize. These disclosures included, among others: the March 31, 2009 disclosure that the Company's bad debt expense was increasing while its new enrollment growth was decelerating; the October 27, 2009 disclosure of the SEC's inquiry into Apollo's revenue recognition practices; the January 7, 2010 disclosure that the DOE had found UOP to have failed to timely return unearned Title IV funds; the June 21, 2010 disclosure of the full DOE report describing UOP's "systemic" disregard of students' attempts to withdraw; the August 3-6, 2010 disclosures that the GAO had found fraud and deceptive recruiting practices at for-profit schools including UOP, that the DOE had made follow-up requests for information from UOP and its auditor, and that the Senate HELP committee's investigation had led its Chairman to conclude that for-profit schools were systematically targeting unqualified students in order to gain access to Title IV funds; the August 13, 2010 disclosure of UOP's low student loan repayment rate and the DOE's expansion of its enforcement activities in response to recent revelations of rampant violations; and the October 13, 2010 withdrawal of Apollo's financial forecast due to increased regulatory scrutiny and implementation of new initiatives to remedy the historical bad practices that had enabled the Company to overstate its financial results.

284.    As a result of the truth about the Company reaching the market through this series of corrective disclosures and materialization of concealed risks, investors realized that the risks facing the Company were substantially greater and more immediate than Defendants had represented, and that the Company's past financial results and growth had been accomplished largely through accounting manipulations and improper business practices that could no longer be sustained.  These revelations caused the Company's stock price to collapse, and eradicated much of the artificial inflation brought about by the Defendants' false and misleading statements and omissions.

285.   The decline in Apollo's stock price during the Class Period was, in substantial part, a result of the public revelation of facts that had previously been misrepresented or concealed by Defendants in violation of the securities laws.

286.   Plaintiffs and other members of the Class suffered economic losses as a direct and proximate result of Defendants' violations of the federal securities laws. Specifically, Plaintiffs and the Class purchased Apollo Class A stock at prices that were artificially inflated because of Defendants' misrepresentations and concealment of material facts, and they suffered losses when the value of that stock declined significantly as the true state of affairs was revealed.

## IX.   POST-CLASS PERIOD EVENTS

### A.   The Attorneys General of Florida and Kentucky Launch Investigations

287.   On or about October 22, 2010, Florida's Attorney General launched an investigation into UOP, among other schools, on allegations of unfair and deceptive enrollment practices, including "alleged misrepresentations regarding financial aid" and "alleged unfair/deceptive practices regarding recruitment, enrollment, accreditation, placement, graduation rates, etc.," according to the Attorney General's website.  Apollo disclosed in a Form 8-K dated October 22, 2010 that a notice it had received from the Florida Attorney General included a subpoena to produce documents and detailed information for the period from 2006 to the present, about a broad spectrum of UOP's business.

288.   On December 15, 2010, the Kentucky Attorney General's office announced an investigation into six for-profit colleges that do business in Kentucky, to determine whether their business practices violate Kentucky's Consumer Protection Act and other state laws.   In connection with the investigation, the Attorney General's office has subpoenaed documents from the schools regarding, *inter alia*, their student-loan default rates, advertising claims, student recruitment practices, claims about job placement, how financial aid funds are managed and dispersed, and accreditation

claims.  As the Attorney General stated in a press release:  "I want to make sure these institutions are as interested in educating their students as they are in collecting federal loan money."  The colleges under investigation have not been publicly identified.

### B.    The SEC Expands Its Inquiry Into Apollo

289.    On October 26, 2010, Apollo filed a Form 8-K announcing that the SEC had widened its "ongoing informal inquiry" into Apollo and had asked the Company to provide information about its insider trading policies and procedures, a chronology of the internal processing and availability of information about the DOE's program review of UOP commenced in early 2009, and information relating to non-Title IV revenue sources.

### C.    The DOE Commences The Second Program Review Of Apollo's Financial-Aid Practices In Just Two Years

290.    On November 4, 2010, Apollo filed a Form 8-K disclosing that the DOE would be conducting another review of UOP's administration of federal student financial aid programs in which UOP participates.   The review was scheduled to commence December 6, 2010, and "initially will cover federal financial aid years 2009-2010 and 2010 to date."   This review is the second by the agency in two years, the previous one (in 2009) having resulted in Apollo paying $1.8 million in late charges and loan refunds and posting a $125 million letter of credit with the DOE.  In an earlier, more extensive program review that concluded in 2004, the DOE had issued a scathing report about the school's recruiting practices and levied a $9.8 million penalty, a record at the time.  On announcement of this new review, Apollo's shares dropped 8% to close at a new 52-week low of $35.38, with a high volume of shares traded.

### D.    The Senate HELP Committee Continues To Investigate

291.    The HELP Committee's investigation of the for-profit education industry is still ongoing.  During a February 8, 2011 speech on the Senate floor, Senator Harkin described the HELP Committee's findings to date as follows:

> For-profit colleges receive more than $26 billion in federal
> student aid each year.  While some of these schools may be

doing a good job, taxpayers deserve to know that their education dollars are being spent wisely…. According to data released last week by the Department of Education, 25 percent of for-profit college student loan borrowers default within three years of leaving school.

For-profit colleges have correctly pointed out that they educate a disproportionate number of low-income and minority students. And they argue that if they weren't doing a good job, students would not continue to enroll. How then is it possible that schools with very high rates of withdrawal, high rates of loan debt, and high rates of default continue to enroll more and more students each year?

The answer, according to my Committee's investigation, lies in the enormous expenditure of money and effort that for-profit colleges put into their recruitment process. There have been many stories about abusive recruitment practices in newspapers and television programs across the country. Last August, the Government Accountability Office documented many of those abuses in undercover videos that were presented at the HELP Committee hearing. The industry argued that these misleading and deceptive practices were the work of a few rogue actors. But the overwhelming evidence of misleading, deceptive and even fraudulent conduct documented by GAO cannot be attributed to anything but a systemic effort to enroll students at any costs.

292. Senator Harkin has also released details on his website regarding the student withdrawal rates of particular for-profit companies, to supplement the industry-wide information presented in the HELP Committee's September 30, 2010 report. This company-specific data reveals that Apollo enrolled 177,368 new students in Associates Degree programs between August 2008 and July 2009 – over three times more than any other for-profit education company – but that the median attendance time for these students was only 4.2 months, and 66.4% of them had withdrawn by August 2010 without completing the program. *See* http://harkin.senate.gov/forprofitcolleges.cfm.

**E.     Under Increasing Regulatory and Congressional Scrutiny, Apollo Makes Fundamental Changes To Its Business Practices**

293. On November 24, 2010, Apollo filed a Form 8-K announcing major improvements to its corporate governance: it will add five performance criteria, some based on student achievement, to its executive officers' incentive bonus plan. The biggest weight – 40 percent – will be calculated based on Apollo's operating income

1  during the first three quarters of fiscal year 2011.  The others – student satisfaction,

2  students who complete a class, faculty engagement, and responding to students'

3  concerns – will be weighted 15 percent each.  Ryan Rauzon, a Company spokesperson,

4  was quoted in the November 26, 2010 edition of the *Arizona Republic* stating "[i]t is the

5  first time that such measures have been added to executive compensation."

6      294.    On November 29, 2010, Apollo announced that it had eliminated 700 full-

7  time positions at its UOP facilities throughout the nation.  According to news sources,

8  Company officials confirmed that most of the cuts were from the school's admissions

9  personnel.    Having put the brakes on many of its improper marketing (or

10 euphemistically called by Apollo "enrollment") practices that were the driving force

11 behind Apollo's continuous Title IV revenue streams, Apollo now no longer needed as

12 many sales people.

13 **X.    ADDITIONAL SCIENTER ALLEGATIONS**

14     295.    Defendants acted with scienter in that each of them knew that their own

15 public statements, and the public documents and statements issued in the name of the

16 Company, were materially false and misleading; knew that such statements or

17 documents would be issued or disseminated to the investing public; and knowingly and

18 substantially participated in the preparation and/or dissemination of such statements or

19 documents as primary violators of the federal securities laws.

20     296.    As discussed below, the Individual Defendants, by virtue of their receipt

21 of information reflecting the true facts regarding Apollo, and/or their roles and

22 responsibilities with the Company which made them privy to confidential proprietary

23 information concerning Apollo, knew or recklessly disregarded that the Company's

24 disclosures to investors were materially false and misleading.    Additionally, the

25 Individual Defendants were motivated to deceive the investing public regarding

26 Apollo's business, operations, and the intrinsic value of Apollo common stock, because

27 doing so (a) inflated Apollo's stock price, enabling certain Defendants to sell over $440

28 million of their privately held Apollo Class A shares while in possession of material

adverse non-public information about the Company, (b) enabled the Individual Defendants to receive bonuses and restricted stock awards that were tied largely to Apollo's earnings results, and (c) enabled Defendants John Sperling and Peter Sperling, through their substantial ownership and control of the Company, to continue raking in substantial wealth by preying upon the vulnerabilities of those the Company claimed to be helping.

### A. Senior Officers at Apollo and UOP Knew of the Company's Improper Financial Aid and Financial Reporting Practices, and of the True Source of Apollo's "Growth"

297. Apollo's internal reporting systems were directed toward providing information to Apollo's senior-most members of management. According to CW7, Senior Director of Product Marketing for UOP from November 2008 to February 2010, UOP was run on a regional basis with six Regional Vice Presidents. The different campuses would "roll up" to the Regional Vice Presidents on a regional basis. The regions were: Midwest, Southwest, Western, Mountain Plains, Southwest and Northeast. Specifically with regard to accounting reports, according to CW8, an Accounting Supervisor employed by UOP at its Greenville, South Carolina campus from 2003 to October 2010, UOP's Regional Accounting manager for the South Region reported to corporate accounting at Apollo, and specifically to Defendant Swartz. CW8 and CW8's colleagues prepared weekly reports of the campuses' financial results that were sent to Swartz. These weekly reports encompassed all accounting aspects of UOP, including the general ledger, balance sheet and income statement, as well as information concerning student enrollments, dropouts, refunds to students of Title IV funds, return to lender amounts, and accounts receivables from students who had dropped out. According to CW8, this practice of weekly reporting occurred across all educational segments of Apollo, including WIU and the Institute for Professional Development. CW8 stated that UOP/Apollo's corporate accounting policy was to write off these receivables after 90 days if they were not collected, although oftentimes these receivables would be kept on UOP's books for 180 days. According to CW8, it was

widely known at the corporate accounting level, including by the Chief Financial Officer, that collecting on student accounts receivables was "impossible" whether the receivables were one day old or 180 days old.

298.   CW10 was a member of Apollo's executive team during the Class Period and reported directly to the President of WIU, who in turn reported to the President of Apollo (Mueller until June 2008, and thereafter D'Amico).   According to CW10, Defendant D'Amico approved the Company's compensation system while financial and compliance issues were handled at the Apollo corporate level by Defendants Edelstein, Cappelli, D'Amico, and a few other individuals.  CW10 characterized Apollo as a "very tight organization" where "[t]he people who really tell you what to do and are developing what the company is are confined to a small group and it's a men's club, a close-knit group that works very closely and tightly with each other."

299.   In addition to being in the chain of reporting on the Company's financial and compliance issues, senior executives at Apollo, including at least D'Amico and Pepicello, were in direct communications with the DOE regarding Apollo's improper financial aid practices.  For example, in its Program Review Report prepared for UOP, dated December 28, 2009, the DOE noted that on March 28, 2008, D'Amico, Pepicello, and other Apollo executives attended a meeting with the DOE where the DOE indicated it had received a number of complaints from students regarding UOP's practices and policies concerning student withdrawal and financial aid obligations.  During the July 7, 2009 exit conference for the DOE's review, the DOE met with UOP officials who indicated (falsely) that UOP had taken action to address the DOE's concerns. The DOE's Final Program Review Determination dated June 16, 2010, was addressed to D'Amico, with copies to Shawn Tebben, Vice President, Apollo Financial Aid and Kristen Vedder, Associate Vice President, Apollo Group.  Thus, D'Amico, Pepicello and other senior Apollo officers were well apprised of the DOE's concerns about Apollo's practices concerning withdrawing students' loan obligations.

300.    Moreover, given their senior-level positions within Apollo or UOP, and the fact that UOP enrollment represented the core of Apollo's revenue base, each of the Individual Defendants knew and understood the true nature and source of the Company's enrollment and revenue growth.  Specifically, they knew that this growth was being fueled primarily by aggressive marketing efforts directed at largely unqualified students, and not by the quality of Apollo's educational services.  Likewise, they knew that UOP's increasing year-over-year enrollment figures masked the fact that huge numbers of students were withdrawing from UOP each year, requiring the Company to enroll larger and larger numbers of students each year in order to be able to report net revenue growth – a pattern that could not be sustained over the long term.

**B.    The Individual Defendants' Compensation Was Tied To Apollo's Financial Results**

301.    Throughout the Class Period, the Individual Defendants' bonuses and restricted stock awards were tied largely to Apollo's earnings results, and therefore they had a motive to present to the investment community the best operating results possible, even if they were falsely inflated.  For example, in fiscal year 2007, John Sperling and Mueller earned cash bonuses under Apollo's Executive Annual Bonus Plan of $606,157 and $356,563, respectively, which amounts were tied to quarterly revenues and pre-tax income.  In fiscal year 2008, John Sperling received a $1,700,000 bonus and D'Amico and Cappelli each received $1,000,000 cash bonuses under the Company's Executive Officer Incentive Bonus Plan.  These bonuses were tied to revenue and operating profit attainment set for each year.  In fiscal 2009, John Sperling, Peter Sperling, Edelstein, Cappelli, D'Amico and Swartz all received cash bonuses under the same plan, in the amounts of $1,700,000, $200,000, $1,200,000, $1,000,000, $1,000,000 and $300,000, respectively.    In fiscal 2010, John Sperling, Peter Sperling, Edelstein, Cappelli, D'Amico, Swartz and Pepicello received cash bonuses under the plan of $1,462,000, $172,000, $1,032,000, $1,032,000, $903,000, $483,750 and $451,500, respectively.  During the Class Period all of the Individual Defendants, except for Iverson, were also

awarded restricted stock units, the vesting of which was likewise tied to the Company's attainment of specific net income levels.

C.   **Insider Trading By Defendants John Sperling, Peter Sperling, D'Amico and Pepicello Supports A Strong Inference Of Scienter**

302.   Certain Defendants also took personal advantage of the artificial inflation of Apollo's stock price – inflation that they had created – by offloading large blocks of their own shares into the public market at those inflated prices.  Specifically, during the Class Period, Defendants John Sperling, Peter Sperling, D'Amico and Pepicello (the "Insider Trading Defendants") reaped huge personal benefits from Apollo's inflated stock price, collectively selling more than 6.3 million shares of Apollo common stock, for total proceeds exceeding $440 million.  Of these proceeds, John Sperling received over $220 million (including over $40 million in January 2009 sales and over $100 million in July 2009 sales), Peter Sperling received approximately $200 million (including over $25 million in January 2009 sales and over $35 million in July 2009 sales), Pepicello received $3,991,275 (of which $3,494,000 was received in a January 2009 sale), and D'Amico received $14,553,362 in a single sale in January 2009.

303.   The Insider Trading Defendants' sales of Apollo common stock during the Class Period are listed below:

| Date | Defendant | # Shares Sold | Sales Price(s) Per Share |
|------|-----------|---------------|--------------------------|
| 10/26/07 | Peter Sperling | 40,000 | $75.85 |
| 10/29/07 | Peter Sperling | 110,000 | $75.27 |
| 10/30/07 | Peter Sperling | 85,000 | $75.27 |
| 10/31/07 | Peter Sperling | 265,000 | $78.08 |
| 01/14/08 | John Sperling | 250,000 | $79.38 - $79.95 |
| 01/14/08 | Pepicello | 6,250 | $78.00 |
| 01/15/08 | John Sperling | 405,825 | $79.06 - $80.65 |
| 01/15/08 | Peter Sperling | 275,000 | $78.47 - $80.67 |
| 01/16/08 | Peter Sperling | 15,997 | $80.03 |
| 01/16/08 | John Sperling | 30,000 | $80.10 |
| 07/11/08 | John Sperling | 141,250 | $55.16 |
| 07/14/08 | John Sperling | 2,100 | $55.15 |
| 07/15/08 | John Sperling. | 75,223 | $54.45 - $55.34 |
| 07/16/08 | John Sperling | 47,500 | $55.51 |

| | | | | |
|---|---|---|---|---|
| 1 | 07/16/08 | Peter Sperling | 47,500 | $55.51 |
| 2 | 07/17/08 | John Sperling | 29,823 | $56.23 - $58.27 |
| | 07/17/08 | Peter Sperling | 137,500 | $56.23 - $58.27 |
| 3 | 07/21/08 | Peter Sperling | 11,500 | $60.00 |
| | 07/22/08 | Peter Sperling | 40,000 | $60.19 |
| 4 | 07/23/08 | Peter Sperling | 13,500 | $61.74 - $62.25 |
| 5 | 07/29/08 | Peter Sperling | 100,000 | $60.42 - $62.00 |
| | 10/31/08 | Peter Sperling | 188,067 | $68.76 - $70.02 |
| 6 | 01/15/09 | Peter Sperling | 61,100 | $87.99 |
| 7 | 01/15/09 | John Sperling | 59,500 | $87.40 - $88.14 |
| | 01/15/09 | D'Amico | 166,667 | $87.32 |
| 8 | 01/15/09 | Pepicello | 40,000 | $87.36 |
| 9 | 01/16/09 | John Sperling | 190,500 | $87.56 - $89.27 |
| | 01/16/09 | Peter Sperling | 188,900 | $88.49 - $89.26 |
| 10 | 01/22/09 | Peter Sperling | 51,179 | $89.37 |
| | 01/22/09 | John Sperling | 250,000 | $86.74 - $89.48 |
| 11 | 07/13/09 | Peter Sperling | 156,250 | $64.54 - $65.23 |
| 12 | 07/13/09 | John Sperling | 281,250 | $65.25 |
| | 07/14/09 | John Sperling | 281,250 | $66.03 - $66.96 |
| 13 | 07/14/09 | Peter Sperling | 100,000 | $66.00 - $67.12 |
| 14 | 07/17/09 | Peter Sperling | 2,000 | $67.10 |
| | 07/20/09 | Peter Sperling | 48,000 | $67.18 |
| 15 | 07/21/09 | Peter Sperling | 82,500 | $67.46 |
| | 07/21/09 | John Sperling | 211,202 | $66.58 - $67.50 |
| 16 | 07/22/09 | John Sperling | 80,298 | $68.80 - $69.54 |
| 17 | 07/22/09 | Peter Sperling | 80,100 | $68.94 - $69.87 |
| | 07/23/09 | Peter Sperling | 41,000 | $67.50 |
| 18 | 07/23/09 | John Sperling | 38,500 | $67.50 |
| 19 | 07/24/09 | John Sperling | 165,000 | $66.90 - $67.05 |
| | 07/27/09 | John Sperling | 20,311 | $66.21 - $67.11 |
| 20 | 07/28/09 | John Sperling | 150,000 | $66.97 |
| | 07/29/09 | Peter Sperling | 46,400 | $67.80 - $68.55 |
| 21 | 07/29/09 | John Sperling | 100,000 | $69.63 |
| 22 | 07/30/09 | John Sperling | 200,000 | $69.64 - $70.43 |
| | 07/31/09 | John Sperling | 50,000 | $69.78 |
| 23 | 04/28/10 | John Sperling | 79,001 | $61.65 |
| | 04/28/10 | Peter Sperling | 78,332 | $61.62 |
| 24 | 04/29/10 | Peter Sperling | 106,279 | $57.80 |
| 25 | 04/30/10 | Peter Sperling | 113,821 | $57.44 - $58.20 |
| | 07/08/10 | Peter Sperling | 150,000 | $43.77 |
| 26 | 07/13/10 | Peter Sperling | 100,000 | $43.84 |
| | 07/20/10 | Peter Sperling | 100,000 | $47.67 |
| 27 | 07/22/10 | Peter Sperling | 20,000 | $46.56 |
| 28 | 07/23/10 | Peter Sperling | 75,000 | $50.55 |
| | 07/29/10 | Peter Sperling | 55,000 | $47.01 |

| | |
|---|---|
| Total for Peter Sperling | 2,984,925 |
| Total for John Sperling | 3,138,533 |
| Total for Pepicello | 46,250 |
| Total for D'Amico | 166,667 |
| TOTAL | 6,336,375 |

**1. The Sales Were Unusual In Timing And Amount**

304. The Insider Trading Defendants' Class Period sales were not made pursuant to a Rule 10b5-1 trading plan, were inconsistent with their prior trading patterns, and were unusual in timing and amount, as set forth below.

305. Prior to his first Class Period sale in October 2007, Peter Sperling had not sold any shares since July 28, 2005. Peter Sperling's sales during the three years before the Class Period – all in December 2004 and July 2005 – totaled less than 232,000 shares, and were all the result of his exercise of stock options that were soon to expire. By contrast, he sold nearly 3 million shares during the Class Period, the vast majority of which were open market sales, unrelated to the exercise of stock options. Peter Sperling's Class Period sales amounted to approximately 21% of the number of Class A shares he beneficially owed at the beginning of the Class Period.

306. Prior to his first Class Period sale in January 2008, John Sperling had not sold any Apollo shares in four years (having sold 250,000 shares in January 2004). In contrast, during the 18-month period from January 2008 through July 2009, John Sperling sold more than 3 million shares, or approximately 14% of the number of Class A shares he beneficially owned at the beginning of the Class Period. His July 2009 sales were particularly large and unusual, totaling 1,577,811 shares, more than twice the number of shares he had sold in any previous month.

307. Pepicello has owned Apollo stock and/or vested and currently exercisable stock options since, at the latest, August 31, 2005. Prior to January 14, 2008, he had never sold any Apollo shares. His sale of Apollo shares on January 14, 2008 represented 30.46% of his holdings, and his January 15, 2009 sale amounted to 94% of the Apollo shares in which he had a vested interest at that time. The shares that he sold

in January 2008 were obtained through his exercise of stock options that were not due to expire until October 10, 2013 and August 6, 2014, and the shares he sold in January 2009 were the product of his exercises of options not due to expire until June 23, 2016. The purpose of stock option compensation is to encourage management to perform well by providing a financial incentive for them to increase the stock price, and thus to increase the value of their ownership interest in the stock, over the long term. Instead, Pepicello exercised these options early and immediately sold his shares at a profit. Specifically, in January 2008, Pepicello exercised options at prices of $60.90 and $71.23 per share, and immediately sold them for $78.00 per share. In January 2009, he exercised options at $51.33 per share and sold them for $87.36 per share. These early exercises and immediate sales of option shares support a strong inference that Pepicello knew Apollo's stock price was artificially inflated during the Class Period and could not be sustained over the long term, that he knew Company's business was a house of cards whose inevitable collapse would render the stock options worthless, and that he withheld this information in order to personally profit from the artificial inflation.

308.   D'Amico first received stock options and restricted stock units of Apollo on July 3, 2007, which vested and became exercisable in annual installments beginning June 15, 2008. D'Amico's first sale of Apollo stock was on January 15, 2009, and amounted to 89% of the shares in which he had a vested interest at that time. The shares that he sold were the product of his exercise of stock options that were not due to expire for more than two years, on July 3, 2011. D'Amico exercised those options at the strike price of $58.03, and immediately sold them for a weighted average price of $87.32. Like Pepicello, D'Amico exercised his options and sold the shares well before the options were due to expire because he knew the Company's stock price was inflated, and he wanted to profit from that inflation before the inevitable disclosure of the truth rendered the options worthless.

## 2.   The Sales Are Suspicious Because They Coincided With Massive Stock Repurchases By Apollo

309.   The Insider Selling Defendants' vigorous Class Period sales are particularly suspicious because they coincided with Apollo's initiation of a massive stock repurchase program whereby it repurchased 24.9 million shares of stock between October 2007 and July 2010.   Companies typically repurchase their own shares when they believe those shares are undervalued in the marketplace.   Conversely, insiders typically sell their personal holdings when they believe the stock is overvalued.   The fact that the Insider Selling Defendants were selling shares while the Company was repurchasing them suggests that the Insider Selling Defendants knew the stock price was inflated and were trying to realize profits on their shares while the inflation continued.

310.   Moreover, stock repurchases generally result in an increase in a company's stock price, and this was true of Apollo.   By selling shares simultaneously with the repurchase program, the Insider Selling Defendants took advantage of not only the artificial inflation caused by the fraud, but also the support that the repurchase program provided for the stock price, thereby reaping substantial profits on the sales.

311.   On October 5, 2007, Apollo's board – which included (and was beholden to) John Sperling and Peter Sperling – authorized an increase in the amount available to fund the repurchase of the Company's own shares, from approximately $2.5 million to $500 million.   This was announced to the public in an earnings release issued after the close of trading on October 22, 2007, and the stock price jumped from its $65.93 closing price on October 22 to a closing price of $72.45 on October 23.   The price continued to increase, and just four days after the announcement, Peter Sperling began selling shares into the market for the first time in over two years, at a price of $75.85.

312.   After the close of trading on July 1, 2008, Apollo announced in conjunction with its earnings release that it had repurchased 9.8 million shares for $454 million during the quarter ended May 31, 2008, and that its board had authorized the expenditure of an additional $500 million under the repurchase program.   The stock

1   price swiftly increased from a close of $46.26 on July 1 to $54.78 on July 2.  During the

2   thirty days following that announcement, Peter Sperling and John Sperling sold a

3   significant number of shares into the market at prices between $54.45 and $62.25.

4       313.   The following year, Apollo announced on June 29, 2009 that it had

5   repurchased 7.2 million more of its shares for a total of $444.4 million during the

6   quarter ended May 31, 2009, and that the board had authorized an increase in the

7   amount available for share repurchases to an aggregate of $500 million (*i.e.*, it

8   authorized an additional $444.4 million).  In response to this announcement and the

9   positive earnings release that accompanied it, the stock price increased from a close of

10  $65.99 on June 29 to a close of $71.12 on June 30.  During the thirty days following the

11  announcement, John Sperling and Peter Sperling sold a substantial number of their own

12  shares at prices ranging from $64.54 to $70.43 per share.

13      314.   On June 30, 2010, after the close of trading, the Company announced the

14  repurchase of approximately 2.5 million shares for $139.3 million between February

15  28, 2010 and May 31, 2010, and another 2 million shares for approximately $100

16  million during June 2010.  The stock price increased following the announcement, from

17  a close of $42.47 on June 30 to a close of $43.34 on July 1.  Peter Sperling proceeded to

18  sell 500,000 more shares into the market during July 2010 at prices between $43.77 and

19  $50.55 per share, beginning just eight days after the June 30, 2010 disclosure of the

20  recent repurchases.

21      **3.**    **The Timing Of the 2009 and 2010 Sales Is Particularly**
22            **Suspicious Given Defendants' Knowledge Of Material, Adverse Information**

23      315.   The Insider Trading Defendants' sales of Apollo common stock in 2009

24  and 2010 are particularly suspicious given their knowledge of material undisclosed

25  information at those times.   Indeed, the SEC has requested information from the

26  Company regarding stock sales by insiders in 2009, during the time when the DOE's

27  program review was ongoing.

28

316.   The Insider Trading Defendants sold over 1 million shares of Apollo stock during the week prior to January 22, 2009, when the stock price peaked at $90 per share, its highest point since July 2004.   This week-long spate of sales began on January 15, 2009, just two days after a DOE official sent an email to Robert Collins, Apollo's Vice President, Student Financial Aid, requesting information about the Company's "policies and procedures for certifying and disbursing [federal student] loans, including post-withdrawal disbursements."   The email referenced a number of student complaints the DOE had received relating to UOP's loan disbursement practices, and noted that "[t]hese examples could be seen to indicate that (1) the push to get students started in attendance, (2) students left with the assumption that financial aid will pay for tuition charges, and (3) a delay in financial aid processing are combining to cause a problem when students don't qualify for aid for one reason or another or have dropped out and Title IV loan funds are not disbursed."   The email also made reference to the class action complaint (in the *Russ* action) regarding UOP's alleged failure to make post-withdrawal disbursements.   D'Amico was copied a January 15, 2009 email from Collins acknowledging receipt of the DOE's email, and on that very same day, D'Amico sold 166,667 shares of his stock for over $14.5 million in proceeds – his only sale of stock during the Class Period – and each of the other Insider Trading Defendants made significant sales as well.   As the Insider Trading Defendants anticipated based on this informal inquiry, the DOE's inquiries threatened to reveal the Company's improper financial aid practices, thereby jeopardizing its continued eligibility for Title IV funds.

317.   In July 2009, Peter Sperling and John Sperling sold massive amounts of Apollo stock, totaling 2.1 million shares.   These sales occurred while Apollo management was in the midst of communications with the DOE about UOP's policies regarding student withdrawals and Title IV refunds.   According to the DOE's Program Review Report dated December 28, 2009 (which was not publicly disclosed until June 21, 2010), the DOE conducted an exit conference with UOP officials on July 7, 2009, during which UOP gave assurances that it had addressed concerns raised by the DOE in

early 2008 about the university's failure to give timely effect to students' notices of withdrawal. However, the Program Review Report noted that "[r]eview of the student files in the program review process revealed … that throughout 2008, UOP continued to fail to timely withdraw students who expressed a desire to withdraw, resulting in UOP's untimely return of Title IV funds." Knowing that the falsity of UOP's July 7, 2009 assurances was sure to be revealed, and that a negative DOE program review could cause the DOE to revoke Apollo's Title IV participation, the Sperlings dumped massive amounts of stock while the price remained inflated.

318. In July 2010, Peter Sperling sold 500,000 more shares of Apollo stock for over $23 million in proceeds. These sales came after the Company's stock price had declined approximately 25% from the prices at which he had sold stock just three months earlier, in April 2010. The fact that he was continuing to sell shares even after such a decline supports an inference that he knew the decline was only going to continue. Indeed, these sales occurred while Peter Sperling knew the Senate HELP Committee was actively investigating the for-profit education industry. Knowing that this investigation was likely to uncover Apollo's fraudulent practices, Peter Sperling dumped these shares into the market before the price declined further. Indeed, within thirty days after these sales, the HELP investigation led to the release of the GAO Report, describing widespread consumer fraud in the for-profit education industry.

**D.    The Sperlings Had Utter Control Over Apollo, and Profited Handsomely By Preying Upon Those Less Fortunate**

319. Apollo's Class A common stock, which is owned by public shareholders, has no voting rights. John Sperling controls approximately 51% of Apollo's only class of voting securities, the Apollo Group Class B common stock, and Peter Sperling controls the rest. Together, they control all actions requiring the vote or consent of the Company's shareholders, including the election of all members of Apollo's Board of Directors.

320.    Over the years of running Apollo, John and Peter Sperling have become mega-rich from profits made off the backs of people who are likely to be in debt for the rest of their lives.  Both are on the Forbes 400 list for 2010, which lists the 400 richest Americans, measured by a net worth of at least one billion dollars.  Peter Sperling's net worth is $1.15 billion and John Sperling's is $1.05 billion.  They also made the Forbes World Billionaires list released this past spring 2010.  Peter Sperling owns at least three large properties in San Francisco alone:  a Presidio Heights mansion that he bought for approximately $15.5 million in 2001 but never moved into; an uncompleted piece of property in Pacific Heights that he bought for approximately $32 million; and a house in Russian Hill he bought in 2003 for approximately $14 million.  According to news reports, after the truth about Apollo's improper practices began to come to light, Peter Sperling started trying to liquidate those holdings.

321.    To maintain the flow of money into their own pockets from Apollo, the Sperlings and other top Company insiders have caused Apollo to spend large sums of money to fund lobbyists' efforts, most recently to stave off DOE rule changes that are designed to prevent the continuing malfeasance perpetrated by Apollo.  As reported on October 22, 2010 by *The Washington Post*, records analyzed by the Center for Responsive Politics show that the for-profit school industry spent more than $3 million from January 2010 through September 2010 on lobbying, with Apollo alone spending $490,000.

## XI.    CLASS ACTION ALLEGATIONS

322.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Class A common stock of Apollo between May 21, 2007, and October 13, 2010, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs,

1  successors, or assigns, any entity in which Defendants have or had a controlling

2  interest, and Defendants' insurers.

3       323.    The members of the Class are so numerous that joinder of all members is

4  impracticable.  Throughout the Class Period, Apollo's Class A common shares were

5  actively traded on the NASDAQ.  As of October 12, 2010, the Company had over 147

6  million shares of Class A stock issued and outstanding.  While the exact number of

7  Class members is unknown to Plaintiffs at this time and can only be ascertained through

8  appropriate discovery, Plaintiffs believe that there are thousands of members in the

9  proposed Class that are geographically dispersed throughout the United States and

10  abroad.  Members of the Class may be identified from records maintained by Apollo or

11  its transfer agent and may be notified of the pendency of this action by mail, using the

12  form(s) of notice customarily used in securities class actions.

13       324.    Plaintiffs' claims are typical of the claims of the members of the Class, as

14  all members of the Class were similarly affected by Defendants' wrongful conduct in

15  violation of federal law that is complained of herein.

16       325.    Plaintiffs will fairly and adequately protect the interests of the members

17  of the Class and have retained counsel competent and experienced in class and

18  securities litigation.

19       326.    Common questions of law and fact exist as to all members of the Class

20  and predominate over any questions solely affecting individual members of the Class.

21  Among the numerous questions of law and fact common to the Class are:

22
23          (a)    whether the federal securities laws were violated by Defendants'
                acts as alleged herein;

24
25          (b)    whether statements made by Defendants to the investing public
                during the Class Period misrepresented or omitted to disclose
                material facts;

26          (c)    whether Defendants acted with scienter;

27
28          (d)    whether reliance upon Defendants' alleged false statements can be
                presumed pursuant to the fraud-on-the-market rule;

(e)    whether the Individual Defendants were "control" persons of Apollo;

(f)    whether the Insider Trading Defendants traded in Apollo stock while in possession of material adverse non-public information;

(g)    whether and to what extent the market price of Apollo's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(h)    to what extent the members of the Class have sustained damages resulting from Defendants' violations, and the proper measure of damages.

327.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   PRESUMPTION OF RELIANCE

328.    At all relevant times, the market for Apollo's Class A common stock was an efficient market for the following reasons, among others:

(a)    Apollo's Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Apollo filed periodic public reports with the SEC and NASDAQ;

(c)    Apollo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Apollo was followed by a number of securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

329.    As a result of the foregoing, the market for Apollo Class A common stock promptly digested current information regarding Apollo from all publicly available sources and reflected such information in the stock price.

330.    Under these circumstances, all purchasers of Apollo Class A common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

331.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the statement was false, and/or the statement was authorized and/or approved by an executive officer of Apollo who knew the statement was false when made.

## XIV.   CLAIMS FOR RELIEF

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10(b)-5**
**Promulgated Thereunder, Against Apollo, John Sperling,**
**Peter Sperling, Joseph D'Amico, William Pepicello, Gregory Capelli,**
**Charles Edelstein, Brian Swartz, Brian Mueller and Gregory Iverson**

332.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

333.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Apollo, John Sperling, Peter Sperling,

1  D'Amico, Pepicello, Capelli, Edelstein, Swartz, Mueller and Iverson, by Plaintiffs on

2  behalf of themselves and the Class.

3      334.   During the Class Period, the Defendants carried out a plan, scheme and

4  course of conduct which was intended to and, throughout the Class Period, did: (i)

5  deceive the investing public regarding Apollo's business, operations, management,

6  revenues, income and earnings  and the intrinsic value of Apollo common stock; (ii)

7  artificially inflate the price of Apollo shares; (iii) enable the Insider Trading Defendants

8  to sell over $440 million dollars of their privately held Apollo shares while in

9  possession of material adverse non-public information about the Company; and (iv)

10 cause Plaintiffs and other members of the Class to purchase Apollo common stock at

11 artificially inflated prices.

12     335.   In furtherance of this unlawful scheme, plan and course of conduct, the

13 Defendants, jointly and individually (and each of them), by the use, means, or

14 instrumentalities of interstate commerce and/or of the mails: (a) employed devices,

15 schemes, and artifices to defraud; (b) made untrue statements of material fact and/or

16 omitted to state material facts necessary to make the statements not misleading; and/or

17 (c) engaged in acts, practices, and a course of business which operated as a fraud and

18 deceit upon the purchasers of the Company's Class A common stock, in violation of

19 Section 10(b) of the Exchange Act and Rule 10b-5.

20     336.   The deceptive acts and devices employed by the Insider Trading

21 Defendants included their sales of Apollo Class A common stock into the market on the

22 basis of material, non-public information, in violation of their fiduciary duties and

23 positions of trust as corporate insiders.  They made these sales with the intent to profit

24 personally from their knowledge of material, non-public information, or with reckless

25 disregard for the fact that they would be profiting at the expense of public investors, in

26 violation of Section 10(b).

27     337.   Additionally, as alleged herein, each of the Defendants but Pepicello

28 made material false or misleading statements, or omitted to disclose material facts to

investors that they were required to disclose in order to make their statements not misleading, during the Class Period.  These Defendants had actual knowledge of the false and misleading nature of their misrepresentations and omissions, or acted with deliberate disregard for the truth.  These Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, for the purpose and effect of concealing Apollo's true financial and operating condition and future business prospects from the investing public and supporting the artificially inflated price of its Class A common stock.  The Defendants, if they did not have actual knowledge of their misrepresentations and omissions, deliberately and recklessly refrained from taking those steps necessary to discover whether those statements were false or misleading.

338.   As a result of the Defendants' material false and misleading statements and failure to disclose material facts, the market price of Apollo Class A common stock was artificially inflated throughout the Class Period.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by the Defendants and/or upon the integrity of the market in which the securities trade, Plaintiffs and the other members of the Class purchased Apollo Class A common stock during the Class Period at artificially high prices.

339.   At the time of their Class Period purchases of Apollo Class A common stock, Plaintiffs and the other members of the Class were ignorant of the false and misleading nature of the Defendants' statements, and were unaware of the material facts the Defendants were withholding from the investing public.  Had Plaintiffs and the other members of the Class and the marketplace known the truth, they would not have purchased Apollo Class A common stock during the Class Period, or, if they had purchased such stock, they would not have done so at the artificially inflated prices which they paid.

340.   As the true facts that had been misrepresented and/or concealed by the Defendants began to be publicly revealed, the market price of Apollo's Class A

common stock dropped as the artificial inflation began to be removed from the stock price, causing losses and damage to Plaintiffs and the Class.

341.   By virtue of the foregoing, each of the Defendants has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

342.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against John Sperling, Peter Sperling, Joseph D'Amico, Gregory Capelli,**
**Charles Edelstein, Brian Swartz, Brian Mueller and Gregory Iverson**

343.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

344.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Defendants John Sperling, Peter Sperling, D'Amico, Capelli, Edelstein, Swartz, Mueller and Iverson (the "Section 20(a) Defendants"), by Plaintiffs on behalf of themselves and the Class.

345.   Each of the Section 20(a) Defendants was a controlling person of Apollo within the meaning of Section 20(a) of the Exchange Act.   Each had direct and supervisory involvement in the day-to-day operations of the Company and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.   Additionally, Defendants John Sperling and Peter Sperling possessed the power to direct Apollo's management and policies, including the content of its public statements, by virtue of their stock ownership and voting control of the Company, including their election of all of Apollo's directors.

346.    Apollo violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint, and as a direct and proximate result of those violations, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

347.    By virtue of their control of Apollo, each of the Section 20(a) Defendants is jointly and severally liable pursuant to Section 20(a) of the Exchange Act for Apollo's violations of Section 10(b) and Rule 10b-5, to the same extent as Apollo.

**COUNT III**
**Violation of Section 20A of the Exchange Act**
**Against John Sperling, Peter Sperling,**
**Joseph D'Amico and William Pepicello**

348.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

349.    This Count is asserted pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against the Insider Trading Defendants, by Plaintiffs Oregon and Amalgamated on behalf of themselves and all other Class members who purchased Apollo Class A common stock contemporaneously with sales by the Insider Trading Defendants during the Class Period.

350.    The Insider Trading Defendants, by reason of their roles and responsibilities as senior executive officers of Apollo and/or UOP, had access to material non-public information about the Company during the Class Period.  The Insider Trading Defendants had a duty to disclose or abstain from trading on the basis of this undisclosed information, in order to avoid taking unfair advantage of investors who lacked access to such information.

351.    In violation of Sections 10(b) and 20A of the Exchange Act, the Insider Trading Defendants collectively sold more than 6.3 million shares of Apollo Class A common stock during the Class Period, reaping total proceeds of over $440 million, while in possession of material, non-public information indicating that the market price of the stock was materially inflated.

352.    Plaintiffs Oregon and Amalgamated, and numerous other members of the Class, purchased Apollo Class A common stock contemporaneously with Class Period sales of Apollo Class A common stock by the Insider Trading Defendants.   The contemporaneous purchases by Oregon and Amalgamated are reflected on the certifications attached hereto, and include numerous purchases on the same day as, and otherwise close in time to, sales by the Insider Trading Defendants.

353.    As alleged herein, the Insider Trading Defendants used material, non-public information when deciding to engage in their Class Period sales of Apollo stock, knowing that their ability to sell shares at artificially inflated prices was short-lived because of the inevitable public disclosure of adverse information know to the Insider Trading Defendants.  By using inside information when selling their Apollo shares, the Insider Trading Defendants intentionally timed their sales to maximize their own profits, to the detriment of those contemporaneously purchasing Apollo shares.

354.    The Insider Trading Defendants' Class Period sales were not effected pursuant to a Rule 10b5-1 trading plan, and were unusual in timing and amount.

355.    Under Section 20A of the Exchange Act, the Insider Trading Defendants are liable to Oregon, Amalgamated, and all Class members who purchased shares of Apollo Class A common stock contemporaneously with the Insider Trading Defendants' Class Period sales, for all profits gained and losses avoided by the Insider Trading Defendants as a result of these contemporaneous transactions.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Grant & Eisenhofer P.A. as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that each of the Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding preliminary and permanent injunctive relief in favor of Plaintiffs and the Class against Defendants and their counsel, agents and all persons acting under, in concert with, or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on the Insider Trading Defendants' insider trading proceeds;

E.      Ordering disgorgement of the Insider Trading Defendants' unlawful insider trading profits;

F.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and fees and costs incurred by consulting and testifying expert witnesses; and

G.      Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

.      .      .

.      .      .

.      .      .

1

Dated:  February 18, 2011                  TIFFANY & BOSCO P.A.

2

3

By:___/s/ *Richard G. Himelrick*_____

4

RICHARD G. HIMELRICK
J. JAMES CHRISTIAN

5

Third Floor Camelback Esplanade II

6

2525 East Camelback Road
Phoenix, AZ  85016-9240

7

Tel:    602-255-6000

8

Fax:   602-255-0103
*Local Counsel for Lead Plaintiffs and the*

9

*Class*

10

STUART M. GRANT

11

MEGAN D. MCINTYRE
JOHN C. KAIRIS

12

DIANE ZILKA

13

MICHELE CARINO
CHRISTINE M. MACKINTOSH

14

GRANT & EISENHOFER P.A.

15

1201 N. Market Street
Wilmington, DE  19801

16

Tel:    302-622-7000
Fax:   302-622-7100

17

*Lead Counsel for Plaintiffs and the Class*

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail notice list, and I hereby certify that I will mail the foregoing document or paper via the United State Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____s/ *J. James Christian*_____
J. James Christian