1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   IN   RE   APOLLO   GROUP,   INC.)   Lead Case No. CV-10-1735-PHX-JAT
    SECURITIES LITIGATION           )
10                                   )   Consolidated With:
                                     )   No. CV-10-2044-PHX-JAT
11                                   )   No. CV-10-2121-PHX-JAT
                                     )
12                                   )   **ORDER**
                                     )
13                                   )
    _____)

14

15        Pending before the Court are: Defendants' Motion to Dismiss (Doc. 69), Request for

16   Judicial Notice in Support of Defendants' Motion to Dismiss (Doc. 69-1), Defendants'

17   Motion to Strike Portions of the Consolidated Class Action Complaint (Doc. 71), Plaintiffs'

18   Request for Judicial Notice (Doc. 78), and Defendant's Supplemental Request for Judicial

19   Notice in Support of Defendants' Motion to Dismiss (Doc. 92).  The Court now rules on

20   these motions.

21   **I.      BACKGROUND**

22        This is a consolidated class action proceeding.  The lead Plaintiffs are: Oregon Public

23   Employees Retirement Fund, "a state pension fund for retired public employees of the State

24   of Oregon," Amalgamated Bank, "a New York bank that manages approximately $12 billion

25   for institutional investors," as trustee for the LongView LargeCap 500 Index Fund, the

26   LongView LargeCap 500 Index VEBA Fund, the LongView Quantitative LargeCap Fund,

27   and the LongView Quantitative LargeCap VEBA Fund, and Mineworkers' Pension Scheme,

28   "a pension fund located in Sheffield, United Kingdom."  (Doc. 45 at ¶¶ 21-23).  Defendant

Apollo Group, Inc. ("Apollo")  is an Arizona based company that owns and operates proprietary postsecondary education institutions and is one of the largest private education providers in the United States (Doc. 45 at ¶ 24; Doc. 69 at 4).  The remaining Defendants are various individuals who served as Apollo officers and directors between May 21, 2007 and October 13, 2010 (the "Class Period").  Plaintiffs all purchased Apollo stock during the Class Period.

Plaintiffs' Consolidated Class Action Complaint (Doc. 45) (the "CAC") contains three counts.  In Count I, Plaintiffs allege that, during the Class Period, Defendants made false and misleading statements of material fact regarding Apollo's financial condition, business focus, ethics, compensation and recruitment practices, and compliance with Title IV of the Higher Education Act, 20 U.S.C. §1070, *et seq.* ("Title IV")[1] and/or failed to disclose material facts necessary to make the statements not misleading in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10(b)-5.  Plaintiffs further allege that these false and misleading statements and/or omissions resulted in artificial inflation of Apollo stock that led Plaintiffs to purchase common stock at artificially inflated prices.

In Count II, Plaintiffs allege that, during the Class Period,  Defendants John Sperling, Peter Sperling, Joseph D'Amico, Gregory Capelli, Charles Edelstein, Brian Swartz, Brian Mueller, and Gregory Iverson violated § 20(a) of the Exchange Act because each was a controlling person who had direct and supervisory involvement in day-to-day operations of

---

[1]  Plaintiffs have included all of these allegations in Count I of the CAC.  However, upon careful reading of the CAC and Plaintiffs' Opposition to the Motion to Dismiss, the Court finds that Plaintiffs are actually pleading five separate categories of § 10(b) and Rule 10(b)-5 violations, i.e. misrepresentations regarding Apollo's: (1) financial condition, (2) business focus, (3) ethics, (4) compensation and recruitment practices, and (5) compliance with Title IV of the Higher Education Act.  To properly analyze Plaintiffs' allegations and determine whether Plaintiffs have stated a claim upon which relief may be granted, the Court must treat these five categories as if they were five different Counts of the CAC.  If Plaintiffs choose to amend the CAC, they should break each violation into separate Counts or adequately plead how these five categories amount to only one violation of § 10(b) and Rule 10(b)-5.

1  Apollo and, as such, each is jointly and severally liable for the violations of § 10(b) and Rule

2  10(b)-5 of the Exchange Act described in Count I.

3          In Count III, Plaintiffs allege that, during the Class Period, Defendants John Sperling,

4  Peter Sperling, Joseph D'Amico, and William Pepicello sold Apollo stock while in

5  possession of material, adverse, non-public information in violation of § 20(a) of the

6  Exchange Act.

7          Defendants move to dismiss the CAC based on Plaintiffs' alleged failure to plead a

8  plausible theory of fraud as required by FED.R.CIV.P. 8(a), failure to state a claim upon

9  which relief can be granted as required by FED.R.CIV.P. 12(b)(6), failure to plead fraud with

10 particularity as required by FED.R.CIV.P. 9(b), and for failure to meet the heightened

11 pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

12 **II.    LEGAL STANDARD**

13         A pleading that states a claim for relief must contain "a short and plain statement of

14 the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2). The complaint

15 must allege enough facts so that the claim is plausible on its face.   *Bell Atl. Corp. v.*

16 *Twombly,* 550 U.S. 544, 570 (2007).   Securities fraud actions are also subject to the

17 heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires

18 Plaintiffs to "state with particularity the circumstances constituting fraud." To satisfy this

19 standard, the party alleging fraud must include an account of the "time, place, and specific

20 content" of any "false representations as well as the identities of the parties to the

21 misrepresentation." *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1066 (9th Cir. 2004).

22         Further, when seeking to enforce federal antifraud securities laws, private plaintiffs

23 must meet the higher, more exacting pleading standards contained in the PSLRA.  *See*

24 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-314 (2007). "The required

25 elements of a private securities fraud action are: (1) a material misrepresentation or omission

26 of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction

27 and loss causation, and (5) economic loss." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,

28 540 F.3d 1049, 1061 (9th Cir. 2008). To meet the pleading requirements for such an action,

the PSLRA requires that "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Metzler*, 540 F.3d at 1066.

The PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This requirement of specificity "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

In ruling on a 12(b)(6) motion to dismiss in a securities fraud action, the Court must accept all factual allegations in the complaint as true. *See Tellabs*, 551 U.S. at 322. The Court must consider the complaint in its entirety, materials incorporated into the complaint by reference, and matters of which a court may take judicial notice.[2] *Id.* at 322-23.

## III.   COUNT I

### A.   Defendants' Alleged Misrepresentations and/or Omissions

Plaintiffs seek to establish that Defendants violated the Exchange Act when they made misleading statements of material fact regarding Apollo's financial condition, business focus, ethics, compensation and recruitment practices, and compliance with Title IV and/or failed to disclose material facts necessary to make the statements not misleading. Plaintiffs also claim that these allegedly false and misleading statements and/or omissions resulted in

---

[2] Both Defendants and Plaintiffs have asked the court to take judicial notice of certain documents. The Court grants both Plaintiffs' and Defendants' Requests for Judicial Notice to the extent that the documents were referenced in the CAC and denies them in all other respects.

artificial inflation of Apollo stock that led Plaintiffs to purchase common stock at artificially

inflated prices.  The Court will briefly summarize Plaintiffs' theory for each of these five

categories.

### 1.    Statements regarding Recruitment/Marketing Practices

Plaintiffs allege that Defendants used a number of unethical and deceptive recruiting

tactics to increase enrollment while publicly attributing their success to enhancing service

offerings and academic quality.  (CAC ¶¶ 6, 15, 53, 69-71, 81-84, 145-150, 165).  Plaintiffs

allege that revisions to Title IV, which allowed for-profit institutions to participate in federal

student aid funding, motivated Defendants to engage in unethical and deceptive recruiting

practices in order to increase enrollment, thus gaining access to large amounts of Title IV

funds.  (CAC ¶ 5).  Plaintiffs allege that Defendants' improper recruiting practices included:

- recruiting intellectually and/or financially unqualified people (including those at homeless shelters) (CAC ¶¶ 60-72);
- misleading prospective students about the cost of obtaining an education and providing false information about the terms of the financial aid the students received and their obligation to repay loans borrowed through Title IV programs (CAC ¶¶ 49, 100-102);
- using inappropriate and deceptive sales practices to pressure prospective students into enrolling (CAC ¶¶ 73-85); and
- incentivizing enrollment personnel to maximize the number of students they were able to enroll, without regard to the students' qualifications (CAC ¶¶ 52-59).

(Doc. 76 at 2).

Plaintiffs allege that they were misled by Defendants' statements regarding the

reasons for enrollment increases at Apollo's campuses, because, rather than disclosing these

practices, which Plaintiffs allege were the actual cause of the increase of enrollment,

Defendants claimed Apollo's success and revenue growth resulted from:

- "continued investment in enhancing and expanding [UOP] service offerings and academic quality" (CAC ¶¶ 146-52);
- "a single-minded focus on providing quality education to serve the needs of working students" (CAC ¶ 153);
- being "intensely focused on student success" and "retention" and "constantly seeking ways to improve student completion and retention" and putting "students first" (CAC ¶¶ 162, 164-65); and
- "ensur[ing] that only students who have a reasonable chance to succeed enroll in our universities" (CAC ¶¶ 165, 168).

(Doc. 76 at 3) (quotation marks in original).

- 5 -

1    Plaintiffs claim that their allegations regarding these unethical and deceptive

2  recruiting practices are supported by an investigation conducted by the Government

3  Accountability Office and an ABC News Hidden Camera Investigation. (CAC ¶¶ 67, 69-71;

4  Doc. 76 at 1-2).  Plaintiffs further claim that the Senate HELP Committee and "numerous

5  States Attorneys General" are currently conducting investigations regarding these practices.

6  (CAC ¶¶ 287-88, 291-93; Doc. 76 at 2).

7             **2.       Statements regarding Compensation Practices**

8    Plaintiffs allege that "during the Class Period, UOP's enrollment staff were being

9  compensated based on the number of students they were able to enroll, in violation of the

10  Higher Education Opportunity Act." (CAC ¶ 172).  Plaintiffs allege that they were misled

11  by Defendants' statements, during the Class Period, that Apollo was in compliance with the

12  Higher Education Opportunity Act when, in fact, it was violating the Act. (CAC ¶¶ 170-172).

13    In their Motion to Dismiss, Defendants argue that basing compensation on enrollment

14  was not a violation of the Higher Education Opportunity Act and thus, statements made by

15  Defendants that Apollo was in compliance could not have misled investors because they were

16  true.  In Response, Plaintiffs appear to acknowledge that the compensation practices they

17  allege did not violate DOE regulations:

18         Defendants argue that their compensation practices did not violate DOE
           regulations. This too is irrelevant.  Apollo's compensation practices fueled its
19         undisclosed business strategy of increasing enrollment at all costs, regardless
           of whether they were illegal.
20

21  (Doc. 76 at 3).  It appears to the Court that Plaintiffs are abandoning their theory that

    Defendants made misrepresentations regarding compliance with DOE regulations as stated
22
    in the CAC.  The Court must evaluate the Motion to Dismiss on the basis of what is alleged
23
    in the CAC.  Accordingly, the Court deems Plaintiffs to have withdrawn their allegations
24
    concerning Defendants' improper compensation practices for the purposes of the Court ruling
25
    on the Motion to Dismiss.[3]
26

27         [3] The Court's determination that Plaintiffs have withdrawn their argument does not

28  prohibit Plaintiffs from amending the CAC to possibly state a cognizable claim based on

1                    **3.      Statements regarding Compliance with Title IV**

2            Plaintiffs allege that, to maintain compliance with Title IV regulations, including a cap

3    on the ratio of government loan funds to cash revenue (the "90/10 Rule") and limits on the

4    percentage of student borrowers who default on Title IV loans (the "Cohort Default Rate"),

5    Defendants developed an improper accounting practice.  (CAC ¶ 7-8).

6            Plaintiffs' theory of this improper accounting practice is as follows: "When a student

7    withdrew from classes prior to completing a program or obtaining a degree, Apollo was

8    required to return to the lender the unearned portion of the proceeds of that student's Title

9    IV loans." (CAC ¶ 8). In many cases, instead of returning the unearned proceeds to the

10   lender, Apollo "returned the full amount of the Title IV funds, including the portion that had

11   been earned and that Apollo was legally entitled to keep, and which students had a legal right

12   to have applied to their tuition bills." (*Id.*).  In many cases, Apollo then sought to collect the

13   full amount of tuition from the students themselves, even though these students often "did

14   not have the means to pay Apollo once their federal loans were returned." (*Id.*).  Defendants

15   did this "to prevent these students from going into default and increasing Apollo's Cohort

16   Default Rate [and,] [b]y artificially inflating its revenue attributable to withdrawn students[,]

17   . . . Apollo also was able to improve its ratio of government loan-based revenue to cash

18   revenue, thereby helping to ensure its compliance with the 90/10 Rule."  (CAC ¶ 10).

19           Plaintiffs allege that they were misled by Defendants' disclosure of the negative

20   consequences that would flow from violating the Cohort Default Rate and/or the 90/10 Rule

21   while concealing the fact that Defendants were using improper practices to maintain

22   compliance with those regulations.  (CAC ¶¶ 180-183).  Plaintiffs further allege that they

23   were misled by Defendants' statements that suggested Defendants only returned a portion

24   of the Title IV funds, when the truth was that Apollo was returning the entire amount of the

25   Title IV funds. (CAC ¶¶ 173-176).

26           Further, Plaintiffs allege that, during the Class Period, Apollo failed to acknowledge

27   _____

28   Defendants' representations of their compensation practices.

1   student withdrawals on a timely basis, which resulted in an untimely return of Title IV Funds.

2   (CAC ¶ 173).  Prior to the Class Period, the DOE issued an audit report finding that Apollo

3   failed to return funds for withdrawn students in a timely manner.  (CAC ¶ 173).  Plaintiffs

4   allege that they were misled when Apollo made representations claiming that it had rectified

5   the problem identified in the DOE report, but, in fact, the problem was ongoing. (CAC ¶¶

6   173-77).

7       Plaintiffs allege that these claims regarding Defendants' improper practices relating

8   to Title IV funds are supported by a program review conducted by the DOE in February

9   2009, finding that UOP had failed to timely withdraw students which resulted in the untimely

10  return of Title IV funds throughout 2008 (CAC ¶ 173), and a lawsuit (that resulted in a

11  confidential settlement) filed by three former UOP students alleging that UOP improperly

12  returned the entire amount of their Title IV funds (CAC ¶ 177).

13              **4.       Statements Regarding Apollo's Financial Condition**

14      Plaintiffs allege that Defendants violated Generally Accepted Accounting Principals

15  ("GAAP") as follows:

16      First, Plaintiffs allege that Apollo improperly recognized revenue from students who

17  withdrew from school because it billed students for tuition and other charges that post-dated

18  their withdrawal even though Apollo did not earn those revenues (because no services were

19  provided after the students withdrew).  (CAC ¶ 125).

20      Second, Plaintiffs allege that:

21          as a result of its improper marketing and billing practices, Apollo knew that
            the overwhelming majority of withdrawn students would not be able to pay
22          their tuition bills for the postwithdrawal period, and when Apollo returned
            those students' Title IV loan funds for the pre-withdrawal period, it likewise
23          knew that it was highly unlikely to recoup that money from the students
            directly. Thus, the collectability of revenue from these withdrawn students was
24          highly 'doubtful' and not 'reasonably assured,' and under GAAP it should not
            have been booked until (if ever) cash was received. Accordingly, when these
25          students withdrew, Apollo should have immediately reduced its revenue and
            deferred revenue – which had been recorded when the Title IV loans were
26          received - by the amount owed by these students.

27  (CAC ¶ 125).

28      Third, Plaintiffs allege that:

                                    - 8 -

Defendants violated ASC No. 450 by Apollo's failure to take immediate and adequate allowances for the receivables from students who withdrew from school, including those whose Title IV funds were returned by Apollo, as Defendants knew from the outset that it was probable that those amounts would not be collected, and the amount of loss could be reasonably estimated based on, *inter alia*, Apollo's historic collections experience. Instead, the Company recorded revenue in one period (which it never should have recorded in the first place under CON No. 5) and then waited until a subsequent period to record bad debt allowances and bad debt expense for the corresponding account receivable. This inappropriate accounting allowed Apollo to overstate revenue dollars and growth rates.

(CAC ¶ 129).

Finally, Plaintiffs allege that "Apollo artificially increased the amount of tuition it could treat as "earned," thereby inflating its revenue and net income, by improperly delaying the effective dates of students' withdrawals from school." (CAC ¶ 106).

Plaintiffs allege that they were misled because Defendants did not disclose these practices and instead "repeatedly issued false statements regarding Apollo's disclosure controls and procedures and its internal controls over financial reporting." (CAC ¶ 237). Plaintiffs allege that these false statements include:

• [after having to issue restatements of 2004 and 2005 financial statements]: Our President and CFO of the Company have taken responsibility to implement changes and improvements in the internal control over financial reporting and remediate the control deficiencies that gave rise to the material weaknesses. (CAC ¶ 238);
• We believe that we have made substantial progress in remediating these material weaknesses, and we do not believe they will repeat. (CAC ¶ 239);
• I am very pleased to report that each of the four material weaknesses identified in last year's audit were remediated, and we will report no material weaknesses in internal controls this year. (CAC ¶ 241).

Plaintiffs allege that these statements "were materially false and misleading because they created the false impression that Defendants had actually changed and improved Apollo's internal control[s] [and] remediated control deficiencies" when these deficiencies continued to exist throughout the Class Period. (CAC ¶ 242).[4]

---

[4] The CAC alleges that Defendants made various other disclosures with substantially similar content, which constitute false and misleading statements concerning Apollo's disclosure controls and procedures and internal controls over financial reporting. (CAC ¶¶ 237-250).

### 5.   Business Focus

Plaintiffs allege that, throughout the Class Period, Defendants made statements that attempted to portray Apollo "as an institution focused on providing a quality education to its students and dedicated to changing lives through education," making statements like:

- Our primary focus is providing the highest-quality educational product and services for our students in order for them to maximize the benefits through our educational experience.  (CAC ¶ 161);
- Retention continues to be the number one focus at Apollo as it impacts so many aspects of our results including enrollment, revenue, profit levels, bad debt and student default rates. (CAC ¶ 162);
- none of this would be possible without always remembering to put our students first. (CAC ¶ 164);
- We are committed to providing access to high quality education but want to balance this with our responsibility to ensure that only students who have a reasonable chance to succeed enroll in our universities. (CAC ¶ 165);
- We remain committed to providing access to high-quality education, while ensuring that only students who have a reasonable chance to succeed enroll in our institutions. (CAC ¶ 168).

Plaintiffs allege that these statements were materially false and misleading because "Apollo's principal focus was on enrolling students in its institutions, regardless of their suitability for college or the likelihood for success" and they "created the false impression that  Apollo was enrolling the types of students who were likely to remain in school and be successful, thus providing a strong foundation for Apollo's future . . . profitability." (CAC ¶ 169).

### 6.   Ethics

Plaintiffs allege that, during the Class Period, Defendants "repeatedly trumpeted its commitment to integrity and business ethics" making statements like:

- "the organization is committed to conducting its business ethically and with integrity." (CAC ¶ 155);
- "Our employees must act ethically at all times and in accordance with the policies in our Code of Business Conduct and Ethics." (CAC ¶ 156);
- "none of this would be possible without always remembering to put our students first." (CAC ¶ 164);
- Apollo's "credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee" and Apollo "expects its directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty." (CAC ¶ 157).

Plaintiffs allege that these statements were materially false and misleading because

"neither Apollo nor its management were conducting themselves ethically and with integrity during the Class Period, nor were they complying with the applicable rules and regulations or providing full, fair and accurate disclosure to investors."  (CAC ¶ 160).

## B.    Corrective Disclosures

Plaintiffs allege that "Plaintiffs and the Class purchased Apollo Class A stock at prices that were artificially inflated because of Defendants' misrepresentations and concealment of material facts, and they suffered losses when the value of that stock declined significantly as the true state of affairs was revealed."  (CAC ¶ 286).  Plaintiffs allege that this "true state of affairs" was revealed "through a series of disclosures during the Class Period," which revealed to investors "that Defendants' portrayal of Apollo as a stable and growing company with strong revenue growth and a promising future was materially misleading."  (CAC ¶ 283).  Plaintiffs allege that these disclosures caused a decline in Apollo's stock price during the Class period because "they revealed facts that had previously been misrepresented or concealed by Defendants."  (CAC ¶ 285).

The relevant corrective disclosures and allegations relating to them are as follows:

March 31, 2009. In a press release announcing its second quarter fiscal 2009 results, Apollo reported increased bad debt expense and a 9% decline in New Degreed Enrollments from the previous quarter. As a result, Apollo's stock price dropped 15.15% ($11.87 per share) overnight. (Doc. 76 at 29-30; CAC ¶ 252).

October 27, 2009. In an earnings press release, Apollo announced that the SEC had begun an informal inquiry into the Company's revenue recognition policies, and an Associated Press article the next day suggested that the issue "revolve[d] around how Apollo determines when a student drops out of a class and how much income Apollo can leave on its balance sheet, and for how long." In unusually heavy trading of Apollo shares, the stock price dropped 17.7% ($12.91 per share). (Doc. 76 at 30; CAC ¶¶253-54).

January 7, 2010.  In its earnings press release and Form 10-Q, Apollo announced its receipt of a preliminary Program Review Report from the DOE. Although the report was not released, the Company revealed that it contained "six findings and one concern" regarding the Company's financial aid policies." (Doc. 76 at 31; CAC ¶ 255).  Later that day on an earnings conference call, Defendant Edelstein tried to downplay the DOE's findings. (CAC ¶ 256); In response to the disclosures of January 7, 2010, between January 7 and January 8, Apollo's stock price dropped by $3.44, or approximately 5.4%. (CAC ¶ 257).

June 21, 2010.  The Preliminary Program Report was published by the DOE

providing "details that were not previously known to investors about the DOE's findings, such as the DOE's determination that, despite concerns the DOE had raised with UOP in March 2008 about the failure to timely recognize withdrawal of students, 'throughout 2008, UOP continued to fail to timely withdraw students who expressed a desire to withdraw, resulting in UOP's untimely return of Title IV funds.'" "This negative news was tempered, however, with assurances that the DOE's findings had been fully resolved during the six months since the Company received the preliminary report. Apollo's stock price declined only moderately in response to the June 21, 2010 announcement, from a closing price of $48.39 on June 18 (the previous trading day) to a closing price of $48.01 on June 21." (CAC ¶ 260).

August 3 through August 6, 2010. On August 3, 2010, the GAO Report was leaked to the press. (CAC ¶ 265). It described how fifteen for-profit schools were investigated, and revealed widespread use of fraudulent and deceptive marketing practices to attract students. (CAC ¶ 265). At the HELP Committee hearing on August 4, a GAO official testified that two UOP campuses were among the fifteen schools described in the Report. (CAC ¶ 269). On August 6, Apollo filed a Form 8-K announcing that the HELP Committee had sought additional information regarding "a broad spectrum of the Company's business." (CAC ¶ 273). From closing on August 2 to closing on August 4, Apollo's stock price fell from $47.14 to $44.76 (CAC ¶ 271), and following the filing of the 8-K, it dropped to a new low of $41.11 before closing at $42.49 (CAC ¶ 273). (Doc. 76 at 32).

August 13, 2010. The DOE released data showing that overall student loan repayment rates were 36% at for-profit schools compared to 54% at public universities. (CAC ¶ 274). The repayment rate for UOP students was only 44%, which was below the 45% threshold required by proposed new gainful-employment rules. As a result of this disclosure, Apollo's stock price fell 3.8% between closing on August 12 ($40.47) and closing on August 13 ($38.94). (CAC ¶ 274). (Doc. 76 at 32).

October 13, 2010. In a press release, Apollo reported declining enrollment and slowing revenue growth for its most recent quarter, and announced the withdrawal of its financial forecast for fiscal 2011, citing increased regulatory scrutiny and the implementation of new initiatives that would result in further declining enrollment. (CAC ¶ 277). In its analyst call that day, Apollo further disclosed a new orientation program during which students could drop out free of charge, major changes in compensating enrollment counselors, and efforts to monitor 30,000 of their conversations. (*Id.*). Defendants further revealed that Apollo's percentage of revenue from federal aid had increased over the past year and was expected to exceed 90% by fiscal year 2012, triggering the 90/10 Rule and risking the loss of Title IV dollars. (CAC ¶ 279). As a result of these disclosures, Apollo's stock price dropped 23% during the next day's trading. (CAC ¶ 280). (Doc. 76 at 33).

## IV.   ANALYSIS

Defendants argue that Plaintiffs have not met the standard for pleading a securities fraud violation because they: (1) fail to adequately plead a cogent and compelling theory of scienter, (2) fail to adequately plead falsity, and (3) fail to satisfy loss causation pleading

requirements.  The Court finds that Plaintiffs have failed to plead a cogent and compelling theory of scienter and failed to satisfy loss causation pleading requirements with regard to each of the five categories of misrepresentations in Count I.

**A.    Scienter**

When proceeding under the PSLRA, Plaintiffs "can no longer aver intent in general terms of mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Metzler*, 540 F.3d at 1066 (internal quotations omitted).  Plaintiffs must state with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind.  *Id.* For such an inference to qualify as "strong," it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as an opposing inference of nonfraudulent intent."  *Id.* (quoting *Tellabs*, 551 U.S. at 324).

The Court "must engage in a comparative evaluation; it must consider, not only inferences urged by plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.  Under this standard, "the Court must consider *all* reasonable inferences to be drawn from the allegations, including references unfavorable to the plaintiffs."  *Metzler*, 540 F.3d at 1061 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original)).  Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference that misleading statements were made to investors knowingly or with deliberate recklessness, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

Plaintiffs have listed fraudulent practices engaged in by Defendants and have generally averred Defendants' knowledge.  Plaintiffs have made little attempt to link facts indicating actual knowledge on the part of each Defendant to actual fraudulent practices of Defendants and, to a great extent, have left it to the Court to try to match up Defendants' alleged fraudulent practices with their alleged scienter.  It is Plaintiffs' burden to establish a *strong inference* of scienter.  Further, the PSLRA specifically requires the Complaint to

1    "state with particularity facts giving rise to a strong inference that the defendant acted with
2    the required state of mind" "with respect to *each* act or omission."  15 U.S.C. § 78u-4(b)(2)
3    (emphasis added).

4        The CAC primarily relies on: (1) Defendants' stock purchases, (2) Confidential
5    Witness statements, and (3) alleged GAAP violations to establish scienter.[5]

6            **1.    Stock Purchases**

7        Plaintiffs assert that insider trading by Defendants John Sperling, Peter Sperling,
8    D'Amico, and Pepicello (the "insider trading Defendants") supports a strong inference of
9    scienter.

10       "While suspicious stock sales by corporate insiders may constitute circumstantial
11   evidence of scienter," such sales only give rise to an inference of scienter when they are
12   dramatically out of line with prior trading practices at times calculated to maximize the
13   personal benefit from undisclosed inside information."  *Metzler*, 540 F.3d at 1066-1067

14

_____

15       [5]   Plaintiffs also rely on other lawsuits filed against Defendants to support their
16   allegations.  (CAC ¶¶ 53, 100, 177).  Plaintiffs further state that, if given leave to amend, an
     amendment will include a "recently unsealed qui tam case against Apollo in which—contrary
17   to arguments made in Defendants' brief—former UOP employees allege that UOP has been
18   in continual violation of regulations prohibiting compensation of recruiters based on the
     number of students they enroll." (Doc. 76 at 7, n. 9).  Defendants argue that allegations from
19   other complaints are insufficient to satisfy the pleading requirements.  The Court agrees that
20   because allegations from other complaints are unproven and contested, they do not amount
     to "facts" sufficient to establish a strong inference of scienter.  *See In re Connetics Corp.*
21   *Secs. Litig.*, 542 F.Supp.2d 996, 1005 (N.D. Cal. 2008) ("an attorney has a nondelegable
     responsibility to personally validate the truth and legal reasonableness of the papers filed and
22   to conduct a reasonable factual investigation.  Given that this responsibility cannot be
23   delegated to another member of the attorney's firm, it would make little sense that an
     attorney somehow could rely on the analysis of attorneys in *different actions* and who are
24   presumably from different law firms.") (internal quotations omitted); *Geinko v. Padda*, No.
25   00C5070, 2002 WL 276236, at *6 (N.D. Ill. 2002) ("if this Court were to accept Plaintiffs'
     view of pleading fraud, two plaintiffs could file separate actions each relying on the
26   allegations in the other's complaint and both would state a claim for fraud. Clearly, Rule 11's
27   requirements do not allow this type of pleading loophole.").  This determination does not
     prohibit Plaintiffs from amending the CAC to plead that these "facts" have been
28   independently verified.

(internal quotations omitted). "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Id.* at 1067.

Plaintiffs allege that over the Class Period, Peter Sperling sold 21% of his Class A shares, John Sperling sold 14% of his Class A shares, Pepicello sold 34% of his shares, and D'Amico sold 26% of his shares. (CAC ¶¶ 305-308).

Plaintiffs allege that these sales were not consistent with the insider trading Defendants' trading history. Peter Sperling's sales in December 2004 and July 2005 totaled less than 232,000 shares. (CAC ¶ 305). During the Class Period, he sold nearly three million shares. (*Id.*). John Sperling sold shares more than twice the number of shares he had sold in any previous month. (CAC ¶ 306). Although Pepicello owned stock or currently exercisable stock options since August 31, 2005, his first sale was in January 14, 2008. (CAC ¶ 307). D'Amico's stock options became vested and exercisable in annual installments on June 15, 2008 and yet his first sale was January 15, 2009. (CAC ¶ 308).

Further, Plaintiffs allege that the timing of the insider trading Defendants' selling was unusual because Peter Sperling sold no shares between July 2005 and October 2007, John Sperling sold no shares between January 2004 and July 2009, Pepicello first sold shares on January 14, 2008, and D'Amico first sold shares on January 15, 2009. (CAC ¶¶ 305-308). Plaintiffs further allege that the stock sales are suspicious because they coincided with massive stock repurchases by Apollo. (CAC ¶ 309). Plaintiffs allege that the timing of the 2009 and 2010 sales coincided with Defendants' knowledge of material, adverse information. (CAC ¶ 315).

When determining whether Plaintiffs have pleaded a strong inference of scienter, the Court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Plaintiffs allege that only four of the nine Defendants engaged in suspicious stock sales, even though they allege that all Defendants were involved in a fraudulent scheme to defraud investors, and the insider trading Defendants only sold 21%,

14%, 34%, and 26% of their stock respectively.   Typically large sale amounts and "corroborative sales by other defendants" are required to "allow insider trading to support scienter." *Metzler*, 540 F.3d at 1067; *see Ronconi*, 253 F.3d at 436 ("[o]ne insider's well timed sales [of 75.3% of his holdings] do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterization of the company's affairs were known to be false when made.").[6]   Accordingly, these stock sales do not support a strong inference of scienter.

## 2.   Confidential Witness Statements

A complaint relying on statements from confidential witnesses to establish scienter must meet two elements: (1) the complaint must describe the confidential witnesses with sufficiency and particularity to establish their reliability and knowledge, and (2) the statements, which are reported by confidential witnesses with sufficient reliability and personal knowledge, must themselves be indicative of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).[7]

---

[6] Plaintiffs assert that they have established scienter because they have pleaded that Defendants' bonuses and restricted stock awards were tied to Apollo's earnings results, demonstrating that Defendants had a motive to inflate those earnings results. (CAC ¶ 301; Doc. 76 at 24).  While Plaintiffs are correct that "[a] strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter," where a complaint makes only a bare assertion that executive-level bonuses are based in part on financial performance and fails to provide comparisons with prior year bonuses, such "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements" of the PSLRA. *Zucco*, 552 F. 3d at 1004-1005.  Accordingly, Plaintiffs have not adequately alleged enough information about the bonuses and restricted stock awards to support a strong inference of scienter.

[7] To the extent that Plaintiffs rely on anonymous internet postings to establish scienter (CAC ¶¶ 78, 101, 102), the only appreciable difference that the Court can ascertain between anonymous internet postings and confidential witness statements is that anonymous internet postings are less reliable than confidential witness statements.  Accordingly, with regard to anonymous internet postings, it is Plaintiffs' burden to plead reliability and knowledge that are indicative of scienter to at least the same extent as it must when pleading scienter with

Defendants do not challenge Plaintiffs' description of the confidential witnesses, but do argue that: (1) the confidential witnesses lack the requisite personal knowledge because "all of the [confidential witnesses] are low-level employees with the possible exception of CW 10," and (2) the statements that the confidential witnesses attest to are not themselves indicative of scienter.

The confidential witnesses, their positions with Apollo, and their allegations in the CAC are as follows:[8]

**CW1** (an Enrollment Manager employed by UOP from March 2008 through November 2010): Enrollment Managers were evaluated on a "performance matrix," *seventy percent* of which related to enrollments and retention. Notably, a student was considered "retained" for purposes of this performance matrix if the student stayed on through only the second set of classes. Prior to September 2010, Enrollment Managers were given specific enrollment and retention numbers that they were required to hit. Employees were threatened (until 2009) with pay decreases for failing to enroll their target number of students. (CAC ¶¶ 56-57).

**CW2** (an Admissions Manager with UOP from March 2003 through June 2010): Enrollment Counselors were expected to enroll 4.5 students per month, Senior Enrollment Counselors were expected to enroll 6.5 students per month, and executives were expected to enroll 8.5 students per month. As an incentive for his recruiters to "hit the numbers," Mike Bibbe, Vice President for the Military Division, was known to tape a fake $500 bill in enrollment counselors' offices each time they enrolled a student because, according to CW2, "every registered student was worth $500 on your review." Many enrollment counselors would not talk to students about when they would be required to pay back financial aid loans, or would tell them the loans only had to be repaid when a student graduated. Consequently, many students took several years off from school erroneously thinking that the loans would not become due until they completed their degrees. CW2 heard enrollment counselors giving inaccurate information on financial aid to prospective students "on a daily basis." (CAC ¶¶ 57 & 65).

**CW3** (a Fraud Analyst/Examiner for UOP between 2003 and June 2010): Apollo had a practice and policy of enrolling students "whatever the cost." This policy was communicated from senior executive management down through the ranks of Enrollment and Finance Counselors. (CAC ¶ 60).

**CW4** (a Senior Enrollment Advisor): 66% of your performance-based compensation was based upon how many students you enroll, whether they are

regard to confidential witness statements. Because Plaintiffs have not pled such reliability and knowledge with regard to the anonymous internet postings, they do not support a strong inference of scienter.

[8] All confidential witness allegations are quoted directly from the CAC.

- 17 -

good or bad, can read or write, or whatever. It's all about the hard number of how many students you enroll. The culture is all about getting students. It's not about getting good, quality students as much as it is the number of students. You can enroll anybody. ***If they have a heartbeat and a social security number you can pretty much enroll them***.   CW4 estimated that "conservatively speaking at least 60% of UOP students aren't capable for or ready for school for a variety of reasons including not being able to type. They don't have computers. They don't have transportation to and from school, and other reasons." However, when CW4 raised concerns about a prospect's chances of successfully completing the required coursework, CW4 was essentially told to mind his/her own business. According to CW4, his/her supervisors would say, "Who are you to judge and say that they are not going to make it? You let that person start. It's not your call. If they fill out that application and they're approved for financial aid and they make that decision that's on them. You're not responsible for them." Enrollment counselors were trained not to take "no" for an answer if a prospective student indicated that he or she was not interested in attending UOP. Rather, enrollment counselors were trained – pursuant to the "Overcoming Objections" program – to "make the person feel bad for not going to school. They wanted you to make them cry." CW4's immediate supervisor, a Director of Enrollment, told CW4, "If you don't make that person cry by the time you get off the phone you haven't done your job." Similarly, CW4 stated that UOP trained its sales force on the "Drive Theory," pursuant to which enrollment counselors were trained "about helping the prospect get to their motivation by making them feel bad about what they didn't have and getting them to dream about what they do want." If a prospect indicated to an enrollment counselor that he or she was not ready to enroll, the enrollment counselor would say, "Well then you don't really want it that bad if you're not ready to sign up to go to school right now." (CAC ¶¶ 60, 61, 74, & 75).

**CW5** (a Senior Enrollment Counselor employed by Apollo from January 2007 through April 2010): CW5 was "encouraged not to discourage" students who indicated an inability to pay from enrolling. In certain instances, CW5 heard enrollment counselors touting the benefits of "excess funds" – *i.e.*, the amount of federal financial aid a student could receive over and above the cost of tuition. CW5 heard other counselors encouraging students to enroll in UOP because they would receive this money. CW5 heard counselors say things like, "You don't have to worry about it financially because aid will take care of the entire cost and you will have some extra money that will be sent to you," and "You can use the money for a new computer or whatever you need to use it on, that's fine, always good to have extra money." Further, CW5 believes that many enrollment counselors misled prospective students about their liability to repay excess money, noting that "a lot" of students would call back and say, "I was told it was a grant not a loan," when informed that they were required to repay this excess money. CW5 believed that approximately 35-40% of students took excess money and then dropped out of school. (CAC ¶ 64).

**CW6** (a Campus Accounting Supervisor working for Apollo subsidiary the Institute for Professional Development ("IPD") between 2005 and 2009) CW6 said, "A lot of times students expressed to me that they felt that the Enrollment Counselors had hustled them into the program. They were brought in so quickly and they didn't have a clear understanding of the financial commitment and investment that was going to be needed on their part." Further, CW6 noted that students repeatedly told CW6 that many of the details concerning their financial aid, from financial aid obligations to how the money

was to be utilized, were not explained to the students clearly or fully. This, CW6 observed, was evidenced by IPD's common practice of allowing students to enroll and start classes before important financial aid paperwork was filled out or completed. (CAC ¶ 66).

**CW7** (a Senior Director of Product Marketing for UOP from November 2008 through February 2010): UOP's six Regional Vice Presidents had their respective bonuses structured based on how many people they enrolled, and how many of those students attended at least three online classes (known internally at UOP as "3Y"). CW7 believes the sole enrollment goal was to get a student to stay for three classes.  CW7 had multiple conversations with people on the "academic side" of the school – including high-ranking educators in the UOP Business School – who expressed their concern that the practice of enrolling unqualified students was hurting the school's reputation. These individuals told CW7 that they were pressured to give students better grades and to pass students who were not academically meeting the criteria so that they would not fail out and so UOP could continue to collect money. Bill Barry, Associate Dean of the Business School, told CW7 about a study he had done which showed that UOP MBA graduates had inferior skills in comparison to state school MBA graduates in all tested areas and had failed miserably compared to their peers. Mr. Barry told CW7 that either Defendant Pepicello or UOP Provost Adam Honea (CW7 could not recall which) told him to "bury" the study.   When  UOP's "Right Student Initiative" – a plan designed to recruit more suitable students – led to a decline in enrollment, Rob Rubell, Chief Marketing Officer and Head of Products, was told in a private meeting with Defendant D'Amico "to turn the dial back up" – in other words, to return to the old marketing models that enrolled more, but less qualified, students.  UOP had "created the perfect storm of achieving high enrollment rate with poor quality students who tended to drop out. They just need to keep feeding the lead machine."  UOP was run on a regional basis with six Regional Vice Presidents. The different campuses would "roll up" to the Regional Vice Presidents on a regional basis. The regions were: Midwest, Southwest, Western, Mountain Plains, Southwest and Northeast.  (CAC ¶¶ 58, 62-63, & 297).

**CW8** (an Accounting Supervisor employed by UOP at its Greenville, South Carolina campus from 2003 to October 2010, UOP's Regional Accounting manager for the South Region): CW8 reported to corporate accounting at Apollo, and specifically to Defendant Swartz. CW8 and CW8's colleagues prepared weekly reports of the campuses' financial results that were sent to Swartz. These weekly reports encompassed all accounting aspects of UOP, including the general ledger, balance sheet and income statement, as well as information concerning student enrollments, dropouts, refunds to students of Title IV funds, return to lender amounts, and accounts receivables from students who had dropped out.  This practice of weekly reporting occurred across all educational segments of Apollo, including WIU and the Institute for Professional Development.  UOP/Apollo's corporate accounting policy was to write off these receivables after 90 days if they were not collected, although oftentimes these receivables would be kept on UOP's books for 180 days.  It was widely known at the corporate accounting level, including by the Chief Financial Officer, that collecting on student accounts receivables was "impossible" whether the receivables were one day old or 180 days old. (CAC ¶ 297)

**CW9** (an Enrollment Counselor in UOP's Center City, Philadelphia office

from August 2007 through July 2009): CW9's supervisor pressured her to "harass and constantly call" prospective students, leading the UOP to enroll "people who couldn't read and/or were homeless." (CAC ¶ 82).

**CW10** (left Apollo in July 2010 after serving as a senior-level executive at WIU since before the beginning of the Class Period, was a member of a compensation committee comprised of senior executives of Apollo, Apollo Global, WIU, UOP and IPD; reported directly to the President of WIU, who in turn reported to the President of Apollo (Mueller until June 2008, and thereafter D'Amico)): WIU's compensation scheme was virtually the same as UOP's and consisted of a performance matrix that rewarded Enrollment Advisors based primarily on the number of students that were enrolled and the retention rate of students. The compensation packages outlined in the matrix were issued and approved at the Apollo corporate level, and CW10 indicated that defendant D'Amico "lent direction to the compensation committee and approved all performance based compensation packages throughout all of [Apollo's] structure from the time he came on as President." The compensation program and performance matrix were not changed following Apollo's 2004 settlement with the DOE, and Apollo continued to compensate its Enrollment Advisors primarily based on the number of students enrolled and the retention rate. It was not until 2010, when the government was considering new rules to govern for-profit schools, that Apollo began to change its compensation system, although no new program was implemented before CW10 left WIU in July 2010. Defendant D'Amico approved the Company's compensation system while financial and compliance issues were handled at the Apollo corporate level by Defendants Edelstein, Cappelli, D'Amico, and a few other individuals. CW10 characterized Apollo as a "very tight organization" where "[t]he people who really tell you what to do and are developing what the company is are confined to a small group and it's a men's club, a close-knit group that works very closely and tightly with each other." (CAC ¶¶ 59 & 298).

The CAC suggests that CW1's statements regarding the compensation of enrollment managers shows that Defendants knew of "clear restrictions on tying compensation to enrollment, and despite having been caught and severely penalized for violating those restrictions [Apollo] continued to evaluate and compensate its 'Enrollment Managers' based chiefly on the number of student they were able to enroll." (CAC ¶ 56). As the Court noted above, Plaintiffs appear to have withdrawn their argument that Apollo was violating restrictions on tying compensation to enrollment during the Class Period. Accordingly, CW1's statements do not support a strong inference of scienter. To the extent that CW2, CW4, and CW10 also discuss compensation practices for enrollment managers, their statements likewise do not support a strong inference of scienter.

CW2 and CW5 also heard enrollment counselors giving inaccurate financial aid advice to prospective students. CW6 reports students complaints that they did not clearly

understand their financial aid obligations. CW9 complains that her supervisor pressured her to constantly call and harass prospective students. The Court finds that these statements do not support a strong inference of scienter. None of these Confidential Witnesses actually indicate any scienter on Defendants' parts. If Plaintiffs seek to establish scienter through an assumption that Defendants knew what their employees knew, this is inadequate. *See Zucco*, 552 F.3d at 998 (even conclusory assertions about defendant's scienter are usually insufficient, standing alone, to adequately allege scienter "since they fail to establish that the witness reporting them has reliable personal knowledge of the defendant's mental state."). Similarly, to the extent CW8 suggests that it was widely known at the corporate accounting level that "collecting on student accounts receivables was 'impossible' whether the receivables were one day old or 180 days old," Plaintiffs assert no basis as to CW8's personal knowledge.

Because CW3's assertion that "Apollo had a practice and policy of enrolling students 'whatever the cost'" is conclusory, it likewise does not support a strong inference of scienter.

Only CW7 and CW8 actually allege scienter on the part of Defendants. However, CW7's information, as alleged, seems to be only based on hearsay. "[A] hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration." *Zucco*, 552 F.3d at 998. Accordingly, CW7's statements do not support a strong inference of scienter. Because CW8 has personal knowledge of Apollo's corporate accounting policy regarding receivables and CW8 actually alleges scienter on the part of Defendants, his statements support an inference of scienter.

### 3. Alleged GAAP Violations

To allege a strong inference of scienter for a violation of GAAP, Plaintiffs must allege that Defendants knowingly and recklessly engaged in improper accounting practices. *Metzler*, 540 F.3d at 1068-69.

Plaintiffs allege that,

Defendants violated ASC No. 450 by Apollo's failure to take immediate and

1

2

3

> adequate allowances for the receivables from students who withdrew from school, including those whose Title IV funds were returned by Apollo, as Defendants knew from the outset that it was probable that those amounts would not be collected, and the amount of loss could be reasonably estimated based on, *inter alia*, Apollo's historic collections experience.

4

5

6

7

8

(CAC ¶ 129).  Plaintiffs only provide conclusory assertions that Defendants "knew" they would not be able to collect certain amounts.  This does not support a strong inference of scienter.  Moreover, knowledge regarding GAAP violations would not raise a strong inference of scienter with regard to the other four categories of misrepresentations that Plaintiffs claim Defendants engaged in throughout the Class Period.

9

10

11

12

13

14

Taking all of Plaintiffs' allegations of scienter as a whole, the Court finds that Plaintiffs have failed to adequately plead the required *strong* inference of scienter.  Although the Court can dismiss the CAC based on Plaintiffs' failure to adequately plead scienter, the Ninth Circuit Court of Appeals has instructed that Courts should provide Plaintiffs guidance when granting leave to amend.  Accordingly, the Court will also analyze whether Plaintiffs have adequately pleaded loss causation.

15

**B.    Loss Causation Pleading**

16

17

18

19

20

21

"To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999). "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses."  *Metzler*, 540 F.3d at 1063.

22

23

24

25

26

27

The Court notes, at the outset, that Plaintiffs have alleged a series of fraudulent practices engaged in by Defendants as described above.  Plaintiffs then alleged a series of corrective disclosures that allegedly revealed these fraudulent practices to the market. However, Plaintiffs have made little to no attempt to link specific fraudulent practices to specific corrective disclosures.  Instead, Plaintiffs have left it to the Court to puzzle together which fraudulent practices were revealed through which corrective disclosures.

28

Plaintiffs claim that a series of seven disclosures slowly revealed Defendants'

fraudulent practices to investors.[9]   First, Plaintiffs fail to adequately plead loss causation with regard to the March 2009 earnings press release because they do not assert the necessary causal link between Defendants' fraudulent practices and those practices becoming generally known to the market.   Instead, the CAC admits that "these manipulative practices were still unknown to investors" at the time of the disclosure.   The CAC alleges that the manipulative practices themselves caused the financial results that Apollo was reporting.

To prove loss causation, Plaintiffs must show that the market learned of and reacted to the fraudulent practices, not just that the alleged fraudulent practices were manifesting themselves in the reports of Defendants' poor financial health.   *See Metzler*, 540 F.3d at 1063 (the complaint should show that "the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.").   Although Plaintiffs are correct that there is no prohibition against alleging loss causation through a series of disclosures, Plaintiffs must still show how each individual disclosure revealed at least some fraudulent conduct to the market and caused the resulting loss.   The Court finds that Plaintiffs have failed to allege loss causation for the March 2009 earnings press release.

Plaintiffs' second alleged corrective disclosure is the October 27, 2009 earnings press release that revealed that the SEC had begun an informal inquiry into the Company's revenue recognition policies.   Defendants argue that "a stock price drop in response to the announcement of an SEC investigation, without subsequent events that reveal fraudulent practices, is not sufficient to plead loss causation." (Doc. 89 at 22-23).   While there is a split

---

[9]   Although the CAC implies that these seven disclosures are only "some of the disclosures and events that have revealed, at least in part, the false and misleading nature of Defendants' public statements during the Class Period, and the true nature of the risks facing Apollo" (CAC ¶ 251), Plaintiffs' burden to plead loss causation necessarily means that they must plead all facts upon which they are basing their allegations.   Accordingly, the Court will assume that these seven statements are the only basis for which Plaintiffs can prove loss causation.

1  of authority among district courts[10] with regard to whether the announcement of an

2  investigation is sufficient to plead loss causation, the Court finds that, at this stage in the

3  litigation, if Plaintiffs were able to adequately allege underlying facts and scienter of

4  misrepresentations or omissions that eventually led to this disclosure, the allegations related

5  to the October 27, 2009 would be sufficient to establish loss causation.

6          More specifically, the October 27, 2009 earnings press release stated that the SEC was

7  conducting an informal inquiry into Apollo's revenue recognition practices.    This

8  information could signal to a reasonable investor that there were improprieties in Apollo's

9  revenue recognition practices, leading to a market reaction causing the stock price to drop

10  17.7%.  *See In re Take–Two,* 551 F.Supp.2d 247, 287 (S.D.N.Y. 2008) (finding allegation

11  of 7.5% drop in share price sufficient, stating that "[o]ther courts have found that similar

12  allegations of significant stock drops in response to announced SEC investigations are

13  sufficient to plead loss causation under the framework established by *Dura* and its progeny").

14  Plaintiffs have pleaded that improprieties in Apollo's revenue recognition practices were the

15  result of Defendants' fraud and the announcement of the SEC inquiry put investors on notice

16  of those improprieties.  Accordingly, if Plaintiffs were able to adequately allege underlying

17  facts and scienter of  misrepresentations or omissions that eventually led to this disclosure,

18  the allegations related to the October 27, 2009 would be sufficient to establish loss causation.

19

20

21          [10]  *Compare In re StockerYale*, 453 F.Supp.2d 345, 359 (D.N.H. 2006) (finding that

22  where Plaintiffs alleged that shares dropped 15% per share on the day SEC announced
    investigation into accuracy of press releases and shares dropped $0.84 per share in after-

23  hours trading when public was informed of the SEC investigation by means of a Form 8k,
    a causal connection was established between the release of corrective information and the

24  decline in the price of shares) *with In re Maxim Integrated Prods., Inc. Secs. Litig.*, 639

25  F.Supp.2d 1038, 1047 (N.D. Cal. 2009) (finding that disclosures regarding compliance with
    an SEC investigation, subpoenas from the United States Attorney's office, and the formation

26  of a Special Committee to investigate options granting practices did not indicate anything
    more than a risk or potential that Defendants engaged in widespread fraudulent conduct and

27  thus could not be considered corrective disclosures for the purpose of pleading loss

28  causation).

Plaintiffs' third alleged corrective disclosure is the January 7, 2010 press release revealing that Apollo had received a preliminary Program Report from the Department of Education ("DOE"). The report contained "six findings and one concern regarding the Company's financial aid policies." The Court finds that if Plaintiffs were able to adequately allege underlying facts and scienter of misrepresentations or omissions that eventually led to this disclosure, the allegations related to the January 7, 2010 disclosure would be sufficient to establish loss causation. Similar to the disclosure revealing the SEC investigation, findings of the Department of Education that Apollo was improperly carrying out its financial aid policies could lead to a market reaction causing the stock price to drop 5.4%. Plaintiffs have pleaded that Apollo failed to timely return Title IV funds as a result of its delayed recognition of student withdrawals and Defendants made representations stating that they had corrected such problems when they had not. Plaintiffs' assertion that investors were put on notice of these practices by the announcement of the DOE report sufficiently establishes a plausible causal link. The Court finds that the same analysis applies to the June 21, 2010 disclosure and the August 6, 2010 disclosure and thus, if Plaintiffs were able to adequately allege underlying facts and scienter of misrepresentations or omissions that eventually led to those disclosures, the allegations related to those disclosures would be sufficient to establish loss causation.

Plaintiffs allege that a series of disclosures from August 3, 2010 through August 4, 2010 that revealed an undercover investigation conducted by the Government Accountability Office ("GAO") revealed Defendants' fraud with regard to deceptive marketing and recruiting practices. The GAO report revealed that fifteen for-profit schools were investigated, and revealed widespread use of fraudulent and deceptive marketing practices to attract students. The GAO report did not reveal that any Apollo schools were part of the investigation. To the extent that Plaintiffs rely on the August 3, 2010 leaking of the GAO report, the Court finds that Plaintiffs have failed to establish a causal connection between Defendants' alleged fraud and any actual loss. Plaintiffs have not sufficiently alleged facts showing how the fact that for-profit schools were being investigated was understood by the

market as realization of fraud being conducted by Defendants at Apollo. *See Metzler*, 540 F.3d 1064 (where Plaintiffs asserted that a disclosure made investors realize that there were fraudulent practices at one of Defendants' schools, the Court held Plaintiffs had failed to assert enough facts showing that the market was alerted to Defendants' widespread fraud).

Plaintiffs allege that, on August 4, 2010, a GAO official testified that two UOP campuses were among the fifteen schools described in the Report.  Plaintiffs fail to allege which specific allegations from the report revealed Defendants' fraud to the market.  Without knowing which allegations Plaintiffs specifically allege caused investors to become aware of Defendants' fraud, the Court finds it impossible to analyze these statements for a causal connection.  If Plaintiffs choose to amend the CAC with these allegations, they should specify both the information revealed to the market and the misrepresentations by Defendants that the information revealed to be fraudulent.

Further, Defendants argue that there were significant errors in the GAO report regarding what campus representatives at Apollo actually said.  Although the Court must take what Plaintiffs allege in the CAC as true, to adequately assert a causal connection between Defendants' alleged fraud and that fraud being revealed to the market, Plaintiffs must identify the true fraudulent activities at Apollo that were revealed to the market.  If the GAO Report incorrectly revealed fraudulent activities to the market that Defendants were not actually engaged in, those false reports cannot possibly have revealed a real fraud to the investors.

Even if Plaintiffs had adequately alleged a causal connection between specific portions of the original GAO Report and Defendants' fraud, Plaintiffs have failed to adequately explain how the revisions to the report affect the loss causation analysis.  Instead of demonstrating to the Court that the revisions to the GAO Report do not change the analysis and citing to the specific statements that would suffice to establish a causal connection between the original release of the GAO Report and Defendants' alleged fraud, Plaintiffs cite to a GAO spokesman's statement regarding the revised report that "[n]othing changed with the overall message of the report, and nothing changed with any of our

findings" and a statement by a spokesman for Senator Harkin "that the revisions 'do not change the substance of the report' or its conclusions that the for-profit schools at issue 'used deceptive or fraudulent recruiting techniques to enroll new students.'" (CAC ¶ 272). Plaintiffs fail to assert their own theory as to how the specific statements actually made by Defendants affected the market and how those statements revealed Defendants' fraud to the market. To adequately allege loss causation, Plaintiffs must link specific acts by Defendants to a specific revelation to the market. The spokesmens' statements do not aid the Court in determining whether such a link exists. Accordingly, the Court finds that Plaintiffs have failed to establish loss causation for the August 3, 2010 and August 4, 2010 disclosures.

Plaintiffs allege that the August 13, 2010 DOE release of data showing that the repayment rates for students at UOP was only at 44%, below the 45% threshold required by *proposed* gainful-employment rules and the DOE's announcement that it was increasing its enforcement staff and would be conducting more investigations generally revealed Defendants' fraud to the market. While it is unclear in the CAC what fraud this revealed to the market, in their Opposition to the Motion to Dismiss, Plaintiffs assert that this revealed to the market that "overly-aggressive and deceptive marketing practices in enrolling students at any cost were rampant throughout the for-profit college industry." (Doc. 76 at 32-22). The Court finds that Plaintiffs have not sufficiently alleged facts showing how Apollo's repayment rates or the DOE's staffing were understood by the market as a realization of fraud being conducted by Defendants. Accordingly, Plaintiffs have failed to establish loss causation for the August 13, 2010 disclosure.

Plaintiffs allege that the October 13, 2010 press release reporting declining enrollment, slowing revenue growth, increased regulatory scrutiny, and implementation of new initiatives revealed to the market "previously undisclosed fraudulent and deceptive practices by Apollo and its peers in the for-profit education industry, and the increased regulatory scrutiny that those revelations engendered." (CAC ¶ 277). The revelation that Plaintiffs point to is a conclusion, not a fact. "[W]hile the court assumes that the facts in a complaint are true, it is not required to indulge unwarranted inferences in order to save a

complaint from dismissal." *Metzler*, 540 F.3d at 1064-65.  It is Plaintiffs' burden to link the market reaction to a disclosure with Defendants' alleged fraudulent behavior revealed in that disclosure.  Plaintiffs have failed to meet that burden with regard to the October 13, 2010 press release.

The practical result of the Court's loss causation analysis is that, even if Plaintiffs had alleged facts proving scienter, Plaintiffs have only adequately pleaded loss causation with regard to two of the categories of  § 10(b) and 10(b)-5 violations asserted in its CAC, i.e. statements regarding Apollo's financial condition and compliance with Title IV.  Plaintiffs have failed to establish loss causation for violations relating to Apollo's business focus, ethics, and compensation and recruitment practices.

Accordingly, because Plaintiffs have failed to adequately plead a strong inference of scienter and have failed to plead loss causation with regard to three categories of 10(b) misrepresentations, the Court finds that Count I of the CAC should be dismissed.

## V.    COUNT II

In Count II, Plaintiffs allege that, during the Class Period,  Defendants John Sperling, Peter Sperling, Joseph D'Amico, Gregory Capelli, Charles Edelstein, Brian Swartz, Brian Mueller, and Gregory Iverson violated § 20(a) of the Exchange Act because each was a controlling person who had direct and supervisory involvement in day-to-day operations of Apollo and, as such, each is jointly and severally liable for the violations of § 10(b) and § 10(b)5 of the Exchange Act described in Count I.

Pursuant to § 20(a) of the Exchange Act:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 21(d)), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Because the Court has found that Plaintiffs have failed to adequately allege violations of 10(b) and § 10(b)5, Plaintiffs have necessarily failed to establish a violation of § 20(a) of the Exchange Act.  Accordingly, Count II should be dismissed.

## VI.   COUNT III

Pursuant to Rule 20a of the Exchange Act,

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

When Plaintiffs have failed to allege an independent violation of the Exchange Act, they cannot maintain a claim under § 20a.  *In re Verifone Securities Litigation*, 11 F.3d 865, 872 (9th Cir. 1993).  Accordingly, Count III should be dismissed.

## VII.   LEAVE TO AMEND

In the event of dismissal, Plaintiffs have requested leave to amend the CAC.  (Doc. 76 at 7).  In response, Defendants argue that "any amendment 'would be an exercise in futility.'" (Doc. 89 at 25).

The Ninth Circuit has instructed district courts to grant leave to amend, *sua sponte*, when dismissing a case for failure to state a claim, "unless the court determines that the pleading could not possibly be cured by the allegations of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  The Court cannot say that the CAC could not possibly be cured by the allegations of other facts.  Therefore, Plaintiffs' request for leave to amend will be granted.

However, in amending the CAC, Plaintiffs should carefully evaluate the allegations therein and be clear and concise in identifying the false statements and articulating the factual allegations supporting an inference that the statement is false or misleading.  In addition to the guidance the Court has provided to Plaintiffs throughout this Order, Plaintiffs should streamline their arguments, delete duplicate allegations, and carefully align each alleged false statement with the facts supporting that statement and the corrective disclosures connected to that statement.  Further, to the extent that Plaintiffs rely on facts that occurred before and after the start of the Class Period, Plaintiffs should be careful to assert why those facts are relevant to Plaintiffs' claims for the Class Period as Defendants may only be held liable for

statements made during the Class Period. *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group*, *Inc.*, No. CIV 06-02674-PHX-RCB, 2011 WL 1253250, at *32 (D. Ariz. March 31, 2011) (noting that it is appropriate to strike statements in the Complaint made before or after the Class Period because they are irrelevant and cannot serve as a basis for liability as a matter of law).

Accordingly,

**IT IS ORDERED** granting Defendants' Motion to Dismiss (Doc. 69);

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Request for Judicial Notice (Doc. 69-1; Doc. 92) consistent with the terms of this Order;

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiffs' Request for Judicial Notice (Doc. 78) consistent with the terms of this Order;

**IT IS FURTHER ORDERED** denying Defendants' Motion to Strike Portions of the Motion to Dismiss (Doc. 71) as moot;

**IT IS FURTHER ORDERED** that Plaintiffs are granted leave to amend and shall file an amended complaint within thirty days of the date of this Order.  If Plaintiffs fail to file an amended complaint within thirty days, the Clerk of Court must, without further notice, enter a judgment of dismissal of this action.

DATED this 27th day of October, 2011.

James A. Teilborg
United States District Judge