1   WO

2

3

4

5

6                     IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8
    IN    RE    APOLLO    GROUP,    INC.   │  Lead Case No. CV-10-1735-PHX-JAT
9   SECURITIES LITIGATION,                  │
                                            │  Consolidated with:
10                                          │  CV-10-2044-PHX-JAT
                                            │  CV-10-2121-PHX – JAT
11                                          │
                                            │  **ORDER**
12                                          │
13  ─────────────────────────────────────┘

14          Pending before the Court are: Defendants' Motion regarding Non-Compliance

15  with ER 4.2 (Doc. 115) and Defendants' Motion to Dismiss Amended Consolidated Class

16  Action Complaint (Doc. 117).  The Court now rules on these motions.

17          **I.      BACKGROUND**[1]

18          This is a consolidated class action proceeding.  Defendant Apollo Group, Inc.

19  ("Apollo") is an Arizona based company that owns and operates proprietary

20  postsecondary education institutions and is one of the largest private education providers

21  in the United States.  *In re Apollo*, 2011 WL 5101787 at *1.  The remaining Defendants

22  are various individuals who served as Apollo officers and directors between May 21,

23  2007 and October 13, 2010 (the "Class Period").  Plaintiffs purchased Apollo stock

24  during the Class Period.

25          The Court previously dismissed Plaintiffs' Consolidated Class Action Complaint,

26  ────────────────────────

27          [1]   For a more detailed description of the background and facts, see the Court's
    Order of October 27, 2011, *In re Apollo Group, Inc. Securities Litigation*, No. CV-10-
28  1735-PHX-JAT, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011).

finding that Plaintiffs failed to state a claim upon which relief could be granted because they failed to meet the standard for pleading securities fraud. Specifically, the Court found that Plaintiffs failed to adequately plead loss causation and scienter. Plaintiffs then amended their Consolidated Class Action Complaint and Defendants now seek to dismiss the Amended Complaint.

Plaintiffs' Amended Complaint (Doc. 114) contains allegations that, during the Class Period, Defendants made false and misleading statements of material fact regarding Apollo's (1) enrollment and revenue growth (Count I), (2) financial condition (Count II), (3) organizational values and management integrity (Count IV), and (4) business focus (Count III) and/or failed to disclose material facts necessary to make the statements not misleading in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10(b)-5 ("Rule 10(b)-5"). Plaintiffs further allege that these false and misleading statements and/or omissions resulted in artificial inflation of Apollo stock that led Plaintiffs to purchase common stock at artificially inflated prices.

In Counts V and VII, Plaintiffs allege that, during the Class Period, Defendants John Sperling, Peter Sperling, Joseph D'Amico, and William Pepicello sold Apollo stock while in possession of material, adverse, non-public information in violation of sections 10(b) and 20A of the Exchange Act and Rule 10(b)-5.

In Count VI, Plaintiffs allege that, during the Class Period, Defendants John Sperling, Peter Sperling, Joseph D'Amico, Gregory Capelli, Charles Edelstein, Brian Swartz, Brian Mueller, and Gregory Iverson violated section 20(a) of the Exchange Act because each was a controlling person who had direct and supervisory involvement in day-to-day operations of Apollo and, as such, each is jointly and severally liable for the violations of section 10(b) of the Exchange Act and Rule 10(b)-5.

Defendants argue that Plaintiffs have failed to correct the deficiencies that led the Court to dismiss the Consolidated Class Action Complaint, and move to dismiss the Amended Complaint based on Plaintiffs' alleged failure to plead a plausible theory of

1  fraud as required by Federal Rules of Civil Procedure 8(a), failure to state a claim upon

2  which relief can be granted as required by Federal Rules of Civil Procedure 12(b)(6),

3  failure to plead fraud with particularity as required by Federal Rules of Civil Procedure

4  9(b), and for failure to meet the heightened pleading requirements of the Private

5  Securities Litigation Reform Act ("PSLRA").

6  **II.   LEGAL STANDARD**

7  A pleading that states a claim for relief must contain "a short and plain statement

8  of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The

9  complaint must allege enough facts so that the claim is plausible on its face. *Bell Atl.*

10  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Securities fraud actions are also subject to

11  the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires

12  Plaintiffs to "state with particularity the circumstances constituting fraud." To satisfy this

13  standard, the party alleging fraud must include an account of the "time, place, and

14  specific content" of any "false representations as well as the identities of the parties to the

15  misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004).

16  Further, when seeking to enforce federal antifraud securities laws, private

17  plaintiffs must meet the higher, more exacting pleading standards contained in the

18  PSLRA. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-314 (2007).

19  "The required elements of a private securities fraud action are: (1) a material

20  misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or

21  sale of a security, (4) transaction and loss causation, and (5) economic loss." *Metzler Inv.*

22  *GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). To meet the

23  pleading requirements for such an action, the PSLRA requires that "the complaint shall,

24  with respect to each act or omission . . . state with particularity facts giving rise to a

25  strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

26  78u-4(b)(2). The "inference of scienter must be more than merely plausible or

27  reasonable—it must be cogent and at least as compelling as any opposing inference of

28  nonfraudulent intent." *Metzler*, 540 F.3d at 1066.

The PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1).  This requirement of specificity "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

In ruling on a 12(b)(6) motion to dismiss in a securities fraud action, the Court must accept all factual allegations in the complaint as true. *See Tellabs*, 551 U.S. at 322. The Court must consider the complaint in its entirety, materials incorporated into the complaint by reference, and matters of which a court may take judicial notice.[2] *Id.* at 322-23.

### III.   ANALYSIS

### A.   FALSE AND MISLEADING STATEMENTS

The underlying theory pled in the Amended Complaint is that Defendants engaged in unethical marketing and recruiting practices and made statements that were designed to either mislead their investors or omit material information from their investors regarding these unethical marketing and recruiting practices, and, as a result of this misleading and/or omitted information, Plaintiffs purchased Apollo Common Stock at artificially inflated prices.   Further, Plaintiffs allege that Defendants knew that the unethical marketing and recruiting practices would increase Apollo's write-offs due to uncollectibility of the receivables, and yet, Defendants continually failed to record adequate bad debt reserve.

### 1.   Enrollment and Revenue Growth (Count I)

---

[2]   The Court has only considered documents incorporated by reference into the Amended Complaint and has not taken judicial notice of any other information.

### a.      Statements

Plaintiffs allege that the following statements regarding enrollment and revenue growth were false and/or misleading:

In 10-K filings for fiscal years 2006, 2007, 2008, and 2009, Apollo reported enrollment and revenue growth as "significant events" and attributed the enrollment and revenue growth to the quality of the educational services being offered by Apollo's schools.  (Doc. 114 at ¶¶ 65-66).  With the exception of the 2009 10-K, each contained the following statement:

> We believe that our track record for enrollment and revenue growth is attributable to our offering comprehensive services combining quality educational content, teaching resources and customer service with formats that are accessible and easy to use for students as well as corporate clients.  We maintain a single-minded focus on providing quality education to serve the needs of working students.

(*Id.* at 67).  The 2009 10-K stated:

> We believe the enrollment growth is primarily attributable to continued investments in enhancing and expanding [UOP] service offerings and academic quality, which has attracted new students and increased student retention, and to enhancements in our marketing capabilities.

(*Id.* at 68).

During an October 28, 2008 conference call with analysts, Defendant D'Amico stated,

> for the fourth quarter we reported consolidated net revenue of 831 million, a 16.5% increase.  The primary contributor to this growth was our 15.4% total enrollment growth, which was driven by very strong new enrollment growth of 19.1% and continued improvement in student retention . . . Academic quality is key to the success of our business and is the foundation on which we are able to achieve the results I just discussed.

(*Id.* at 69).

In 10Q filings in 2009 and 2010, Apollo stated that it believed its enrollment growth was primarily attributable to continued investments in enhancing and expanding

University of Phoenix service offerings and academic quality and marketing capabilities, which has attracted new students and increased student retention, and that this enrollment growth, in turn, was the primary or main cause of its increased revenue. (*Id.* at ¶¶ 69-72).

Plaintiffs allege that by "putting the source of Apollo's enrollment and revenue growth in issue, Defendants became obligated to disclose the truth about the source of that growth" and "Defendants failed to do so." (*Id.* at ¶ 73). Plaintiffs allege that the "truth was that Apollo's enrollment growth during the Class Period was not due to UOP's service offerings or purported 'academic quality,' but rather was the result of a plethora of unsavory, unethical, and deceptive recruitment practices that the Company had employed for the sake of enrolling anyone—regardless of ability—who would be eligible for Title IV aid." (*Id.*). Plaintiffs claim that Apollo's revenue growth was also a result of those deceptive recruitment practices and manipulative accounting practices. (*Id.*).[3]

Plaintiffs further allege that it was Apollo's questionable recruiting practices and not Apollo's purportedly strong academic services and offerings that were the true source of Apollo's seemingly impressive revenue and enrollment results. (*Id.* at ¶ 75). Plaintiffs allege that "Apollo's business model was to get as many students as possible to enroll in its institutions regardless of whether these students were suited for college, had an ability

---

[3] Plaintiffs give these examples of Defendants' allegedly false and misleading statements and assert that "Defendants also made numerous other statements during the Class Period attributing the Company's enrollment and revenue growth to academic quality." (Doc. 114 at ¶ 69). In granting Plaintiffs leave to amend in its October 27, 2011 Order, this Court directed Plaintiffs to specifically identify the materially false and misleading statements that Defendants made that the investors relied upon. *In re Apollo*, 2011 WL 5101787, at *20. Accordingly, the Court will not comb through the *numerous* documents incorporated by reference in the Complaint to try to determine which *numerous* other statements Plaintiffs may believe are materially false and misleading, especially where Plaintiff has the burden of alleging specific false and misleading statements that Defendants knew to be false, and that the market later understood to be false. *Cf. In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 386 (9th Cir. 2010) ("It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles.").

Accordingly, the Court will only address the alleged materially false and misleading statements that Plaintiff has identified.

to pay for an education, or indeed had any probability of obtaining a degree." (*Id.* at 74). Plaintiffs allege that Apollo carried out this business model through well-honed, aggressive marketing tactics that pressured students to sign up for classes and misled those students about the cost of obtaining an education and their financial obligation to repay loans borrowed through Title IV programs. (*Id.* at 75).[4]

Defendants argue that these statements are puffery and/or statements of opinion that were not both objectively and subjective false and cannot be a basis for a securities fraud claim. Statements that are inherently subjective would not induce the reliance of a reasonable investor. *See In re Action Performance Companies Inc. Securities Litigation*, No. C-97-20609 RMW, 2007 WL 496770, at *8 (D. Ariz. Mar. 31, 2007) ("Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere 'puffing.' No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would

---

[4]   The Court notes that Plaintiffs include various allegations concerning Apollo's unethical treatment of its employees and its students. The Court assumes these allegations are true for the purposes of this Motion to Dismiss. Nonetheless, the Court notes that it is the obligation of this Court to determine whether or not Plaintiff has sufficiently stated a claim for *securities fraud*. Plaintiffs include various allegations relating to the type of marketing and recruiting that Apollo should have engaged in and sharply criticize Apollo's marketing and recruiting practices. It is not before the Court in this case to determine how Apollo should have handled its marketing and recruiting practices – rather, the issue before the Court is whether Plaintiffs adequately alleged that Defendants statements to investors about marketing and recruiting were either materially false or raised a duty on Defendants' part to elaborate on those statements because they were materially misleading.

If so, the Court must determine if Defendants knew that their statements about marketing and recruiting were materially false and/or misleading, and whether the market reacted to disclosures that revealed these statements were materially false and misleading. The Court makes this clarification because, in the Complaint and the Response to the Motion to Dismiss, it appears that, at times, Plaintiffs miss the forest for the trees by focusing on allegations concerning Apollo's past bad behavior that is not at all relevant to the facts of this case and allegations of unethical treatment of students and employees, which are only relevant inasmuch as they state a claim for securities fraud, but are not themselves instances of securities fraud. Plaintiffs also make numerous allegations about events occurring after the Class Period, but fail to connect such allegations to their claims. Such pleading style tends to convolute the arguments and leave the Court searching to connect allegations that may or may not be related to each other or to the case at hand. It was this type of pleading that led the Court to advise Plaintiffs to delete duplicate and irrelevant allegations and to streamline their arguments in their Amended Complaint.

significantly alter the total mix of information available to investors.  Vague, amorphous statements are not actionable because reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions.  Such general statements about business models are seen in virtually every public statement companies make.") (internal quotations and citations omitted).

The Court agrees that these statements are inherently subjective and would not induce the reliance of a reasonable investor.  *See Plevy v. Haggerty*, 38 F.Supp.2d 816, 827-828 (C.D. Cal. 1998) (Court held that statements that company's success was due to "crisp execution on the time, performance, reliability and quality of its products," that company expected growth and huge opportunity in the future, that products "have a tradition of technological leadership, with innovative features and significant performance advantages, that results "clearly demonstrate the inherent advantages of its business model and that there "was a strong demand for its products" were "best described as hyperbole or corporate puffery" where Plaintiffs failed to adequately plead that such statements were used to emphasis or induce reliance on a material misrepresentation.).

Plaintiffs argue that these statements are not puffery because by attributing the *reason* for Apollo's revenue growth to marketing and enrollment, but without disclosing that unethical practices were being used in marketing and enrollment, investors were prevented from fairly assessing the company's future.  In Response, Defendants argue that they did disclose relevant facts relating to Apollo's marketing and enrollment practices, including enrollment numbers, retention number, graduation rates, and the fact that many of the students who attended Apollo's schools came from historically underserviced populations that might have been denied access at other institutions, and thus, Plaintiffs cannot show that the market was misled about facts regarding Apollo's marketing and enrollment practices.

Plaintiffs' essential theory is that Defendants were required to disclose that, in marketing to prospective students, Defendants used harassing and aggressive practices

that would convince unqualified students to enroll, thus increasing Apollo's revenue at the time, but would not be allowed to continue because of future regulation of the industry.  The Court need not decide whether omission of these specific marketing and enrollment tactics in their statements could serve as a basis for a securities fraud claim because Plaintiffs have failed to adequately allege Defendants knew of such tactics as discussed more fully below.

**b.     Scienter**

When proceeding under the PSLRA, Plaintiffs "can no longer aver intent in general terms of mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Metzler,* 540 F.3d at 1066 (internal quotations omitted).  Plaintiffs must state with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind.  *Id.*  For such an inference to qualify as "strong," it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as an opposing inference of nonfraudulent intent." *Id.* (quoting *Tellabs,* 551 U.S. at 324).

The Court "must engage in a comparative evaluation; it must consider, not only inferences urged by plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs,* 551 U.S. at 314.  Under this standard, "the Court must consider *all* reasonable inferences to be drawn from the allegations, including references unfavorable to the plaintiffs." *Metzler,* 540 F.3d at 1061 (quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original)).  Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference that misleading statements were made to investors knowingly or with deliberate recklessness, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir. 2001).

Plaintiffs allege that Defendants knew the true nature and source of the Company's enrollment and revenue growth "[g]iven their senior-level positions within Apollo and the fact that enrollment represented the core of Apollo's revenue base." (*Id.*

at ¶ 101).  To adequately plead scienter, Plaintiff must plead more than Defendants must have known of fraud based on their positions within the company.  *See Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 998 (9th Cir. 2009) ("generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter."); *Metzler*, 540 F.3d at 1068 ("corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.") (internal citation omitted).  Plaintiffs have not sufficiently pleaded that the alleged recruiting, marketing, and enrollment practices were such that an individual in a senior level position must have known about them, nor have Plaintiffs sufficiently pleaded that these practices were so pervasive at the time Defendants made their statements that Defendants must have known their statements were false.

Plaintiffs allege that Defendant D'Amico knew his statements about marketing and revenue were false and/or misleading because, on March 28, 2008, he met with executives of Apollo to discuss complaints the Department of Education ("DOE") had received from students that counselors were not adequately informing students of their financial obligations.  (*Id.* at ¶ 103).

Plaintiffs next allege that Confidential Witness ("CW") 12[5] claims that Defendants Mueller, D'Amico, Capelli, Edelstein, Swartz, and Iverson knew their statements about marketing and revenue were false and/or misleading because during several meetings (the time, place, date or other details of such meetings are not alleged), concerns were raised about the fact that the University of Phoenix was marketing to unfit students.  (*Id.* at ¶¶ 105-107).

---

[5] A complaint relying on statements from confidential witnesses to establish scienter must meet two elements: (1) the complaint must describe the confidential witnesses with sufficiency and particularity to establish their reliability and knowledge, and (2) the statements, which are reported by confidential witnesses with sufficient reliability and personal knowledge, must themselves be indicative of scienter. *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 995 (9th Cir. 2009).

Plaintiffs also allege that Defendants must have known of unethical recruiting and marketing practices (rendering their statements about such false) because they were compensated, in part, based on enrollment, making deceptive and unethical recruitment tactics "virtually inevitable." (*Id.* at ¶ 108).  The Court notes that this allegation says nothing about Defendants' scienter, but is rather a conclusory assertion based on unwarranted inferences made by Plaintiffs.  In fact, nearly all of Plaintiffs' allegations regarding scienter are conclusory and based on general assertions that Defendants knew about unethical recruiting and marketing practices and, thus, must have known that their statements about Apollo's growth being linked to marketing and enrollment were false.

Plaintiffs allege that John Sperling must have known that Apollo's compensation practices led recruiters to market to and enroll students who were "unfit" for UOP's programs because of complaints and lawsuits in 2003 and 2004. (*Id.* at 120).  Plaintiffs allege that CW11 claims John Sperling hired Defendants D'Amico, Capelli, and Edelstein to make changes, but the "evidence is overwhelming that changes were never made." (*Id.* at ¶ 120).

Plaintiffs allege that Defendants Mueller and D'Amico must have known that statements attributing Apollo's enrollment and revenue growth to academic quality were false because they approved the Company's compensation structures and knew that compensation was based solely on enrollment and other criteria in the performance matrices "were just window dressing," and, thus, were at least reckless in not attributing Apollo's growth to the "enrollment at all costs" approach. (*Id.* at 121).

Plaintiffs also allege that Defendants violated federal regulations, because although they claimed to use a performance matrix in determining bonuses or incentive compensation for employees, the use of the performance matrix was just a charade because incentive compensation was really the sole factor in determining salary adjustments.

As with Plaintiffs' original complaint, these allegations are generally conclusory in that they rely on the assertion of what Defendants "must have known."  This is not

enough to establish a strong inference of scienter or to link such an inference to Defendants' knowledge at the time the allegedly false or misleading statements were made.  *See In re Apollo*, 2011 WL 5101787, at *10 ("Plaintiffs have listed fraudulent practices engaged in by Defendants and have generally averred Defendants' knowledge. Plaintiffs have made little attempt to link facts indicating actual knowledge on the part of each Defendant to actual fraudulent practices of Defendants . . . It is Plaintiffs' burden to establish a *strong inference* of scienter.").

### c.     Loss Causation and Corrective Disclosures

"To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.,* 189 F.3d 1017, 1027 (9th Cir. 1999). "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler,* 540 F.3d at 1063.

Plaintiffs allege that disclosures in an earnings press release and Form 10-Q on January 7, 2010 revealed that Apollo was providing inadequate information to students about financial aid at the time of enrollment.  (*Id.* at ¶ 123).  Plaintiffs do not allege, and it is not clear to the Court which of the alleged statements made by Defendants were rendered false by this disclosure.  Accordingly, Plaintiffs have failed to adequately plead loss causation related to false statements regarding marketing and enrollment made by Defendants for the January 7, 2010 disclosure.

Plaintiffs next allege that on August 3, 2010, a Bloomberg article speculated that a Government Accountability Office ("GAO") Report would reveal that Apollo had engaged in misleading marketing and the marketplace "correctly anticipated that the GAO findings included conduct by Apollo schools."[6]

---

[6]  As the Court held in its previous Order regarding these allegedly corrective disclosures, Plaintiffs have not sufficiently alleged facts showing how the fact that for-profit schools were being investigated was understood by the market as realization of widespread fraud being conducted by Defendants at Apollo. *See In re Apollo Group, Inc. Securities Litigation*, 2011 WL 5101787 at *18; *Metzler,* 540 F.3d 1064 (where Plaintiffs asserted

Thereafter, on August 4, 2010, the GAO Report was presented during a Senate HELP Committee hearing and described how "admissions representatives at the two UOP campuses had: stated that a degree would take four years to complete, but provided a one-year cost estimate of only 1/5 the required credit hours (thereby understating the total cost); either overstated or failed to disclose the school's graduation rate; encouraged the applicant to pursue a Master's degree after completing the Bachelor's degree, purportedly because some countries pay teachers more money than doctors or lawyers; encouraged the applicants to take out the full amount of student loans for which they qualified, even though the applicants did not need the money; suggested that unneeded loan money could be placed in a high-interest savings account, without explaining to the applicant that unsubsidized loans would be accruing interest during the time it was placed in the savings account; and suggested that the applicant's $250,000 in savings might not need to be reported on the financial aid application." (*Id.* at 114).

While Plaintiffs theorize that "these revelations . . . began to reveal to the public that Apollo's business was built on deceptive recruitment and enrollment practices," (*Id.* at ¶ 127), it is again unclear to the Court which of the alleged statements made by Defendants were rendered false by this disclosure or how Plaintiffs' allegations of Defendants' scienter can be linked to such false statements. Accordingly, Plaintiff has failed to allege how this was a corrective disclosure revealing Defendants' fraud to the market.

Plaintiffs next allege that, in a Form 8-K filed with the SEC on August 6, 2010, Apollo announced that it had received a request from the HELP Committee for information in connection with hearings relating to for-profit universities receiving Title IV student financial aid. Apollo then stated that it would cooperate and comply with the request, commence its own internal investigation and acknowledged that it was going to

that a disclosure made investors realize that there were fraudulent practices at one of Defendants' schools, the Court held Plaintiffs had failed to assert enough facts showing that the market was alerted to Defendants' widespread fraud). This is especially necessary in this case where the allegedly corrective disclosure was "speculation" that some of the campuses discussed in the report "may have" been Apollo campuses.

significantly tighten its enrollment practices.   Again, Plaintiffs fail to connect this allegedly corrective disclosure to statements made by Defendants.   The fact that, in response to an investigation, a company would implement corrective measures to fix future problems does not result in the inference that the company or the company's officers and directors knew that earlier statements made about the company's practices were knowingly false at the time they were made.   Plaintiffs' conclusory allegation that "Apollo's acknowledgement that it would tighten its enrollment practices was a signal to investors that Apollo was guilty of the types of recruitment misconduct discussed in the GAO report" does not add to the *securities fraud* analysis – because it does not show that a corrective disclosure revealed that a past statement made by specific Defendants was knowingly false.

Plaintiffs next allege that, on October 13, 2010, Apollo issued a press release reporting declining enrollment and slowing revenue growth and withdrew its fiscal forecast for 2011, citing increased regulatory scrutiny and implementation of new initiatives that would result in further declining enrollment of new students.   In that Press Release, Apollo stated that its goals were "expanding student protections," and "shifting the mix of enrollment to more experienced students who have a greater likelihood of succeeding in the Company's programs."   (*Id.* at ¶ 130).   Plaintiffs allege that all of these remedial measures were taken as a direct result of the public revelation of previously-undisclosed fraudulent and deceptive practices by Apollo and its peers in the for-profit education industry and the increased regulatory scrutiny engendered by those revelations.

Again, Plaintiffs have not alleged facts showing how this allegedly corrective disclosure relates to a *securities fraud* analysis—because it does not show that a corrective disclosure revealed that a past statement made by specific Defendants was knowingly false.   This is an important distinction in securities fraud cases because if a company could be sued for securities fraud every time it corrected problems discovered within the company, without showing that Defendants were previously aware of those problems and purposefully misrepresented the nature of the problems to investors, then

every time a company tried to improve its business, it would potentially be liable for securities fraud.   Such a broad application of the Securities and Exchange Act is unwarranted.

### 2.     Financial Condition (Count II)

Plaintiffs allege that Apollo misrepresented its financial condition to investors because it failed to record adequate bad debt reserves in connection with accounts receivable from students who withdrew.  (*Id.* at 138).  Plaintiffs also allege that Apollo recorded tuition revenues for students that were earned prior to the students' withdrawal, but were not realized or realizable given the "likely uncollectibility" directly from students after withdrawal, when Title IV funds were returned. (*Id.* at ¶¶ 139-148). Plaintiffs allege that "because the collectability of these pre-withdrawal tuition charges was . . . highly doubtful, . . . they should not have been recorded as revenue under GAAP, and Apollo should have recorded higher reserves and write-offs" in accordance with GAAP.  (*Id.* at 148).

> Understatements of bad debt reserves can support a securities fraud claim because companies are obliged to make reasonable predictions about the collectability of their accounts receivable. Underestimates of bad debt reserves lead to overstatement of income, and ultimately inflation of stock price.   However, allegations that bad debt reserves are inadequate are insufficient; plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood.   Even a delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision.  To meet the PSLRA's pleading standard, Plaintiffs must allege facts demonstrating that the decision not to write off bad receivables . . . was such that no reasonable accountant would have made the same decision if confronted with the same facts.

*Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1213 -1215 (S.D. Cal. 2005) (internal quotations and citations omitted).

Here, Plaintiffs make numerous allegations that collection of tuition from students was highly doubtful and not reasonably assured, but fail to make specific allegations

showing that Defendants (individually or as a group)[7] knew (aside from the assertion that Apollo knew from its historic collections experience that these amounts would not be collected) that such collection was highly doubtful and not reasonably assured.  Without such allegations, there is no inference that Defendants knew their predictions regarding bad debt reserve would turn out to be wrong. *See In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM(RCx), __F.Supp.2d __,  2012 WL 1131684, at *27 -28  (C.D. Cal. Jan. 13, 2012) (where "complaint fail[ed] to allege what statements violated GAAP, why the statements were false, the amount by which they were misstated, what provisions of GAAP were violated, how those provisions were violated, and who was involved in the alleged GAAP violations," court held "[w]ithout allegations detailing the inaccuracies in the financial statements, the types of information that defendants purportedly withheld, and the knowledge or participation of the individual defendants in the withholding, plaintiffs fail to plead scienter.") (internal quotation omitted); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *5  (C.D. Cal. Aug. 21, 2009) (holding "[m]erely alleging that bad debt reserves were inadequate is insufficient because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood.").[8]

Plaintiffs allege that various individual Defendants made statements in 2006 and 2007 that Apollo made significant progress in remediating financial control deficiencies after having to issue restatements in 2004, 2005, and 2006. (*Id.* at ¶¶ 184-189).  Plaintiffs

---

[7]   Although Plaintiffs rely on Defendant D'Amico's statements during conference calls during the class period that "[w]e continue to believe our allowance for doubtful accounts is adequate" (*Id.* at ¶ 177) to show that Defendants knowingly made materially misleading statements to investors, as noted above, Plaintiffs have failed make allegations showing how Defendant D'Amico knew these statements were materially misleading.

[8]   Many of Plaintiffs' allegations relating to improper accounting practices are dependent on their claims that Defendants were misrepresenting its enrollment and marketing practices and knew, based upon these misrepresentations, that it was failing to adequately record bad debt reserves and improperly recognizing revenue.  Because Plaintiffs have failed to plead that Defendants were knowingly making materially false statements regarding marketing and enrollment, Plaintiffs accounting claims based on this theory necessarily fail.

allege that these statements "were materially false and misleading because they indicated that Defendants had actually changed and improved Apollo's internal control over financial reporting and remediated the control deficiencies that gave rise to the  material weaknesses when, in fact the same material weaknesses that plagued its 2004 and 2005 financial reporting continued to exist through the Class Period as the Company continued to improperly record the allowance for doubtful accounts and bad debt reserves in violation of GAAP." (*Id.* at 190).  Plaintiffs allege that, although Defendants disclosed that significant risks could occur regarding internal controls, such risk statements were inadequate and materially misleading because they failed to disclose that Apollo was not maintaining sufficient internal controls at the time of the risk disclosures. (*Id.* at ¶¶ 191-192).

Defendants argue that Plaintiffs only support for their accounting allegations is Plaintiffs' analysis of trends they purport to see in Apollo's publicly reported financial data, which was available to Apollo's investors in the public domain and thus cannot support a securities fraud claim.  Defendants also argue that Plaintiffs have failed to adequately plead scienter because Plaintiffs have not alleged that Defendants had actual access to information that their internal controls were deficient and Plaintiffs completely ignore the fact that internal controls must have improved during the Class Period, because although having to issue restatements in 2004, 2005, and 2006, Apollo did not have to issue any restatements during or after the Class Period.  Plaintiffs argue that it is irrelevant that Defendants did not issue a restatement during or after the Class Period, because Courts have held that the absence of a restatement does not end a plaintiff's case when he has otherwise met the pleading requirements.

While it may be true that the absence of a restatement does not automatically end Plaintiffs' case, where, as here, Plaintiffs rely on prior restatements to prove that Defendants knew that there were inadequacies in their internal financial controls and falsely made statements that they had improved such financial controls, the absence of any restatement after Defendants claimed to have improved the financial controls actually

suggests that Defendants did improve the financial controls and, thus, raises the inference that their statements that the financial controls were improved were not materially false. Accordingly, Plaintiffs' reliance on allegations of past financial control inadequacy do not support a strong inference of scienter and Plaintiffs have otherwise failed to plead a strong inference of scienter with regard to the financial condition statements.

### 3. Organizational Values and Management Integrity (Count IV)

Plaintiffs allege that Defendants made a series of statements during the Class Period regarding Apollo's commitment to integrity and business ethics.  (*Id.* at ¶¶ 226-231). Plaintiffs allege that these statements about Apollo's commitment to integrity and business ethics are plainly materially false because of Apollo's student recruitment practices.  (*Id.* at 233).   To allege scienter, Plaintiffs' rely on the same allegations regarding Defendants' knowledge that they alleged to demonstrate that statements regarding enrollment and marketing practices (Count I) were false.  For the same reasons the Court noted with regard to Count I, Plaintiffs have failed to adequately plead scienter with respect to Defendants' knowledge that the statements they made regarding Apollo's integrity and business ethics were materially false.

### 4. Business Focus (Count III)

Plaintiffs allege that Defendants made materially false and misleading statements regarding Apollo's business focus, such as:

- "Our primary focus is providing the highest-quality educational product and services for our students in order for them to maximize the benefits through our educational experience."  (*Id.* at ¶¶ 238, 240).

- "Retention continues to be the number one focus at Apollo as it impacts so many aspects of our results including enrollment, revenue, profit levels, bad debt, and student default rates."  (*Id.* at ¶ 239).

- "we are intensely focused on student success and better identifying and enrolling students who have a reasonable chance to succeed in our rigorous program."  (*Id.* at ¶ 245).

Plaintiffs alleges that these and similar statements "were materially false and misleading because Apollo's principal focus was on enrolling students in its institutions,

regardless of their suitability for college or their likelihood of success, and not on providing high quality educational products and services to its students in order for them to maximize the benefit of their educational experience or on changing lives through education.    To the contrary, Apollo's recruiting practices led to the enrollment of a student body the majority of which would never earn a degree." (*Id.* at ¶ 248).

To allege scienter, Plaintiffs' rely on the same allegations regarding Defendants' knowledge that statements regarding enrollment and marketing practices (Count I) were false.  For the same reasons the Court noted with regard to Count I, Plaintiffs have failed to adequately plead scienter with respect to Defendants' knowledge that the statements they made regarding Apollo's business focus were materially false.

Based on the foregoing, Plaintiffs have failed to meet the pleading requirements to adequately plead securities fraud based on allegedly false and misleading statements made by Defendants and Counts I (enrollment and revenue growth), II (financial condition), IV (business focus), and III (organizational values and management integrity) of Plaintiffs' Amended Consolidated Class Action Complaint must be dismissed.

**B.    INSIDER TRADING (Counts I and VII)**

In Counts V and VII, Plaintiffs allege that, during the Class Period, Defendants John Sperling, Peter Sperling, Joseph D'Amico, and William Pepicello sold Apollo stock while in possession of material, adverse, non-public information in violation of sections 10(b) and 20A of the Exchange Act and Securities and Exchange Commission Rule 10(b)-5.

20A of the Exchange Act provides,

> (a) Private rights of action based on contemporaneous trading
> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C.A. § 78t-1(a).

Plaintiffs' insider trading allegations are based on Defendants knowledge that the statements alleged in Counts I-IV of the Amended Consolidated Class Action were materially false and misleading.  Because Plaintiffs have failed to adequately allege scienter with regard to those statements, Plaintiffs have not adequately alleged that Defendants were in possession of material, nonpublic information and thus, Counts V and VII must be dismissed.

C.     **CONTROL PERSON LIABILITY (Count VI)**

In Count VI, Plaintiffs allege that, during the Class Period, Defendants John Sperling, Peter Sperling, Joseph D'Amico, Gregory Capelli, Charles Edelstein, Brian Swartz, Brian Mueller, and Gregory Iverson violated section 20(a) of the Exchange Act because each was a controlling person who had direct and supervisory involvement in day-to-day operations of Apollo and, as such, each is jointly and severally liable for the violations of section 10(b) and Rule 10(b)-5 of the Exchange Act described in Count I.

Pursuant to § 20(a) of the Exchange Act:

> (a) Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 21(d)), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Because the Court has found that Plaintiffs have failed to adequately allege violations of 10(b) and § 10(b)-5, Plaintiffs have necessarily failed to establish a violation of § 20(a) of the Exchange Act.  Accordingly, Count IV must be dismissed.

IV.     **CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Defendants' Motion to Dismiss Amended Consolidated Class Action Complaint (Doc. 117) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion regarding Non-Compliance with ER 4.2 (Doc. 115) is denied as moot.

- 20 -

The Clerk of the Court shall enter judgment for Defendants.

Dated this 22nd day of June, 2012.

James A. Teilborg
United States District Judge